PHILLIP A. TALBERT
United States Attorney
DAVID E. THIESS
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA  95814
Telephone:  (916) 554-2700
Facsimile:  (916) 554-2900
David.Thiess@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. |
| Plaintiff, | COMPLAINT |
| v. | |
| MATTHEW H. PETERS, BAYVIEW SPECIALTY SERVICES LLC, COASTLINE SPECIALTY SERVICES LLC, STRAND VIEW CORPORATION, INNOVATIVE SPECIALTY SERVICES LLC, PARAGON PARTNERS LLC (D/B/A PARAGON MEDICAL PARTNERS), CARDEA CONSULTING LLC, PROFESSIONAL RX PHARMACY LLC, INLAND MEDICAL CONSULTANTS LLC (D/B/A ADVANCED THERAPEUTICS), PORTLAND PROFESSIONAL PHARMACY LLC, SUNRISE PHARMACY LLC, PROFESSIONAL 205 PHARMACY LLC (D/B/A PROFESSIONAL CENTER 205 PHARMACY), SYNERGY MEDICAL SYSTEMS LLC (D/B/A SYNERGY RX), PRESTIGE PROFESSIONAL PHARMACY, JMSP LLC (D/B/A PROFESSIONAL CENTER 205 PHARMACY), MPKM, LLC (D/B/A PROFESSIONAL CENTER PHARMACY), ONE WAY DRUG LLC (D/B/A PARTELL PHARMACY), OPTIMUM CARE PHARMACY INC. (D/B/A MARBELLA PHARMACY), GLENDALE PHARMACY LLC, PHARMED PHARMACY LLC, and LAKE FOREST PHARMACY (D/B/A LAKEFOREST PHARMACY) | |
| Defendants. | |

# TABLE OF CONTENTS

Page

I.      COMPLAINT ................................................................................................1

II.     PARTIES ....................................................................................................1

        Pharmacy Defendants ........................................................................2

        Management Service Organization Defendants.................................5

        Marketing Entity Defendants.............................................................5

        Other Corporate Defendants .............................................................6

III.    JURISDICTION AND VENUE ................................................................7

IV.     FEDERAL HEALTH CARE PROGRAMS ...............................................7

        A.      Medicare ..................................................................................7

        B.      Medicaid ..................................................................................9

        C.      TRICARE ................................................................................9

V.      FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE ...............10

        A.      The False Claims Act.............................................................10

        B.      The Anti-Kickback Statute ....................................................10

                i.      The AKS Applies to Physician Investments.................12

                ii.     The AKS Applies to Sales Representative Compensation ...............................14

VI.     THE MANAGEMENT SERVICES ORGANIZATIONS INVESTMENT SCHEME..........15

        A.      Overview and History of the MSO Investment Scheme.................15

                i.      Predecessors to the Defendant MSOs: Peters's Initial Attempt to Pay Kickbacks to Prescribers in the Form of Sham "Investment" Returns Involved Small "Investment" Circles He Called "PPMs"................18

                ii.     The Coastline MSO ................................................18

                iii.    The Bayview MSO ................................................20

        B.      Details of the MSO Investment Scheme ................................21

                i.      Peters Created the MSOs with the Purpose of Rewarding Investors' Prescriptions and Engendering Loyalty to the Pharmacies.  ................................21

                ii.     MSO Investors Were Paid Exorbitant Returns ................................22

iii.  *The Profits Received by each Physician Investor in the MSOs Depended on the Physician's Prescribing Volume.*..................................................................29

iv.  *Continued Prescribing to the Pharmacies Was Effectively a Condition of Investment.* .....................................................................................................33

C.  Peters Attempted to Conceal His Unlawful Intent in False Documentation ..............35

D.  Peters Knew the MSO Investment Scheme Did Not Satisfy an AKS Safe Harbor.....38

VII.  THE SALES REPRESENTATIVE COMMISSION SCHEME ............................................40

A.  Peters Paid Unlawful Commissions to the Sales Representatives ..............................40

B.  Incentivized by Unlawful Commissions, the Sales Representatives Used Illicit Tactics to Push Physicians to Prescribe to the Pharmacies, Regardless of Whether the Prescriptions Were Medically Appropriate ..................................................................................42

VIII.  PETERS CONCEALED OVERUTILIZATION RESULTING FROM UNLAWFULLY-INDUCED PRESCRIPTIONS ...............................................................................................44

IX.  PETERS USED SHELL CORPORATIONS TO CONCEAL HIS CONDUCT....................45

COUNT I:  Against Matthew Peters and the Defendant Pharmacies (False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729(a)(1)(A)) ....................................................47

COUNT II:  Against All Defendants (False Claims Act: Causing to be Presented False Claims) (31 U.S.C. § 3729(a)(1)(A)) ....................................................................................48

COUNT III:  Against All Defendants (False Claims Act: Conspiracy) (31 U.S.C. § 3729(a)(1)(C)) 49

COUNT IV:  Against Peters and the Defendant Pharmacies (False Claims Act: Avoiding or Decreasing an Obligation to Pay or Transmit Money or Property to the Government) (31 U.S.C. § 3729(a)(1)(G))............................................................................................................50

COUNT V:  Against Peters (Unjust Enrichment)...............................................................................51

COUNT VI:  Against Peters and the Defendant Pharmacies (Payment by Mistake)..........................51

PRAYER FOR RELIEF ........................................................................................................................52

DEMAND FOR JURY TRIAL .............................................................................................................52

# I.   COMPLAINT

1.     The United States of America brings this action to recover damages from false claims submitted to various federal health care programs (including Medicare and Medicaid) because of the conduct of defendant Matthew Peters ("Peters") and the defendant entities that Peters owned, operated or controlled.  These entities include a series of mail-order pharmacies to which Peters induced prescriptions for federal health care program beneficiaries, through two parallel financial kickback schemes.  First, Peters used two "management services organizations" ("MSOs") that he created and controlled to pay kickbacks to physician prescribers, disguised as investment income.  Physicians who invested in Peters's MSOs received outsized returns for doing nothing more than writing prescriptions to be filled at his pharmacies.  Second, Peters paid financial rewards to a series of loosely-affiliated independent sales representatives in the form of commissions, rewarding those representatives for bringing in high quantities of expensive prescriptions to his pharmacies.

2.     Peters knew these arrangements were unlawful, yet submitted, or caused to be submitted, thousands of false claims to the United States over the course of several years.  Peters's pharmacies improperly received millions of dollars in reimbursement by federal health care programs that were generated by kickbacks.

3.     By knowingly submitting or causing to be submitted claims for reimbursement for prescriptions generated in these ways, Defendants violated the False Claims Act, 31 U.S.C. §§ 3729 et seq., were unjustly enriched, and were paid by mistake.  The United States brings this action to recover treble damages and civil penalties under the False Claims Act, and relief under the common law and in equity.

# II.   PARTIES

4.     Plaintiff United States of America brings this action on behalf of: (1) the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the federal Medicare and Medicaid health care programs, and (2) the U.S. Department of Defense, Defense Health Agency, which administers the TRICARE medical benefits program.

5.      Defendant Matthew Peters ("Peters") is a resident of the states of California and Nevada. Peters founded, controlled and operated approximately fourteen Defendant pharmacies, along with the other corporate Defendants named in this action, that facilitated and participated in the frauds described in this Complaint.  At all relevant times, Peters derived profits from those fourteen pharmacies for medications (1) prescribed by clinicians receiving exorbitant financial returns from the two management service organizations he founded and operated; and (2) promoted and recommended by independent sales representatives who were rewarded for bringing in as many prescriptions, with the highest prices, as possible.

<u>Pharmacy Defendants</u>

6.      Defendant Professional Rx Pharmacy LLC is a Florida company with the registered address 2560 E. Sunset Road, Suite 120, Las Vegas, NV 89120.  The registered agent is Business Filings Incorporated of 1200 S. Pine Island Road, Plantation, FL 33324.  The registered officer is Peters family member Michael Peters of Las Vegas, NV.  During the time period relevant to this Complaint, Professional Rx Pharmacy LLC was a mail-order pharmacy controlled and operated in fact by Peters.

7.      Defendant Inland Medical Consultants LLC, d/b/a Advanced Therapeutics, is a California company with the registered address 319 E. Palm Drive, Suites A and B, Placentia, CA 92870.  Its registered agent is Cogency Global Inc. of 1780 Barnes Boulevard SW, Tumwater, WA 95812.  Its registered officer is Gary Gilman of Riverside, CA.  During the time period relevant to this Complaint, Inland Medical Consultants LLC was a mail-order pharmacy controlled and operated in fact by Peters.

8.      Defendant Portland Professional Pharmacy LLC is an Oregon company with the registered address 11717 NE Glisan Street, Suite A, Portland, OR 97220.  Its registered agent is Peters family member Susan Hodge of Portland, OR.  During the time period relevant to this Complaint, Portland Professional Pharmacy LLC was a mail-order pharmacy controlled and operated in fact by Peters.

9.      Defendant Sunrise Pharmacy LLC is a Nevada company with the principal place of business 2560 E. Sunset Road, Suite 102, Las Vegas, NV 89120.  Peters family member Michael Peters of Las Vegas, NV, is its registered manager and its registered agent.  During the time period relevant to

this Complaint, Sunrise Pharmacy LLC was a mail-order pharmacy controlled and operated in fact by Peters.

10.     Defendant Professional 205 Pharmacy, LLC, d/b/a Professional Center 205 Pharmacy, formerly known as Synergy Rx 1, is an Oregon company with the principal place of business 10000 SE Main Street, Suite 118, Portland, OR 97216.  Its registered agent is Peters family member Susan Hodge of Portland, OR.  During the time period relevant to this Complaint, Defendant Professional 205 Pharmacy, LLC was a mail-order pharmacy controlled and operated in fact by Peters.

11.     Defendant Synergy Medical Systems LLC, d/b/a Synergy Rx, is a Delaware company with the principal place of business 1710 Willow Creek Circle, Suite 1, Eugene, OR 97402 or 55 Coburg Road, Suite 105, Eugene, OR 97401.  Its registered agent is C. T. Corporation System of 780 Commercial Street SE, Suite 100, Salem, OR 97301.  During the time period relevant to this Complaint, Synergy Medical Systems LLC was a mail-order pharmacy controlled and operated in fact by Peters.

12.     Defendant Prestige Professional Pharmacy is an Oregon company with the principal place of business 11723 NE Glisan Street, Suite A, Portland, OR 97220.  Its registered agent and registered officer are Peters family member Susan Hodge of Portland, OR.  During the time period relevant to this Complaint, Prestige Professional Pharmacy was a mail-order pharmacy controlled and operated in fact by Peters.

13.     Defendant JMSP LLC, d/b/a Professional Center 205 Pharmacy, is an Oregon company with the principal place of business 11557 SE Powell Boulevard, Portland, OR 97266 or 10000 SE Main Street, Suite 118, Portland, OR 97216.  Peters is its registered agent and registered officer, with a listed address in Portland, OR.  During the time period relevant to this Complaint, JMSP LLC was a mail-order pharmacy controlled and operated in fact by Peters.

14.     Defendant One Way Drug LLC, d/b/a Partell Pharmacy, is a Nevada company with the principal place of business 5835 S. Eastern Avenue, Suite 101, Las Vegas, NV 89119.  Its registered agent is Incorp Services, Inc. of 5601 59th Street, Suite C, Lincoln, NE 68516.  During the time period relevant to this Complaint, One Way Drug LLC was a mail-order pharmacy controlled and operated in fact by Peters.

15.     Defendant Optimum Care Pharmacy Inc., d/b/a Marbella Pharmacy, is a California corporation with the principal place of business 31103 Rancho Viejo Road, Suite D1, San Juan Capistrano, CA 92675.  Its registered Chief Executive Officer is Peters's business affiliate James Harmon, whose listed address is in San Juan Capistrano, CA.  During the time period relevant to this Complaint, Optimum Care Pharmacy Inc. was a mail-order pharmacy controlled and operated in fact by Peters.

16.     Defendant Glendale Pharmacy LLC is a Missouri company with the principal place of business 4203 Gardendale Street, Suite 223C, San Antonio, TX 78229 or 221 Bolivar Street, Jefferson City, MO 65101.  The registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, MO 65101.  Its registered member is Peters's business affiliate James Harmon. During the time period relevant to this Complaint, Glendale Pharmacy LLC was a mail-order pharmacy controlled and operated in fact by Peters.

17.     Defendant Pharmed Pharmacy LLC is a Michigan corporation with the principal place of business 5686 Belmont Street, Dearborn Heights, MI 48127.  Its registered agent is Omar Odeh of Ypsilanti, MI.  During the time period relevant to this Complaint, Pharmed Pharmacy LLC was a mail-order pharmacy controlled and operated in fact by Peters.

18.     Defendant Lake Forest Pharmacy, d/b/a Lakeforest Pharmacy, is a Missouri company with the principal place of business 950 Corporate Parkway, Suite 104, Wentzville, MO 63385.  Its registered agent is Thomas Wegrzyn of Wentzville, MO.  Prior to Wegrzyn, its registered agent was Peters's family member Michael Peters.  During the time period relevant to this Complaint, Lake Forest Pharmacy was a mail-order pharmacy controlled and operated in fact by Peters.

19.     Defendant MPKM, LLC, d/b/a Professional Center Pharmacy, is a Nevada company with the principal place of business 608 Sari Drive, Las Vegas, NV 89110.  Its managing member is Peters, with a listed address in Las Vegas, NV.  During the time period relevant to this Complaint, MPKM, LLC was a mail-order pharmacy controlled and operated in fact by Peters.  Peters also used MPKM, LLC as a marketing entity.

20.     The Defendant pharmacies identified in the preceding Paragraphs 6 to 19 are collectively referred to as "the Defendant Pharmacies" or "the Pharmacies" in this Complaint.

21.    At all times relevant to this Complaint, the Defendant Pharmacies were operationally similar and largely interchangeable in terms of the medications they dispensed.

<u>Management Service Organization Defendants</u>

22.    Defendants Coastline Specialty Services LLC and Bayview Specialty Services LLC are collectively referred to as "the Defendant MSOs" or "the MSOs" in this Complaint.

23.    Peters operated the MSOs as investment vehicles for physicians prescribing to the Defendant Pharmacies.

24.    The membership of each Defendant MSO consisted of (1) Defendant Strand View Enterprises LLC (owned and operated by Peters) and (2) physicians who prescribed to Defendant Pharmacies.

25.    Defendant Coastline Specialty Services LLC (the "Coastline MSO") is a Texas company with a principal place of business of 601 South 10th Street, Suite 201A, Las Vegas, NV 89101.  Its registered agent is Pascual Meyer of Dallas, TX.  The Coastline MSO was controlled and operated in fact by Peters.  Peters operated the Coastline MSO between approximately June 2017 and approximately September 2018.

26.    Defendant Bayview Specialty Services LLC (the "Bayview MSO") is a Texas company with a principal place of business of 601 South 10th Street, Suite 201A, Las Vegas, NV 89101.  Its registered agent is Oberheiden, P.C. of 5728 LBJ Freeway, Suite 250, Dallas, TX 75240.  The Bayview MSO was controlled and operated in fact by Peters.  Peters operated The Bayview MSO between approximately September 2018 and early 2020.

27.    Peters's close business affiliate James Harmon was an administrative employee of each MSO.  Other employees included members of Peters's family and Harmon's wife.

<u>Marketing Entity Defendants</u>

28.    Paragon Partners LLC, Cardea Consulting, LLC, and Praxis Marketing Services LLC are collectively referred to as "the Marketing Entity Defendants" or "the Marketing Entities" in this Complaint.

29.    Defendant Paragon Partners LLC, d/b/a Paragon Medical Partners, ("Paragon Partners") is a Nevada company with the principal place of business of 601 South 10th Street, Suite 201A, Las

Vegas, NV 89101.  The registered agent for Paragon is Peters family member Michael Peters of Las Vegas, NV.  Peters was formerly listed as the registered agent of Paragon.  The registered manager is Peters's wife Lea Lametta of Laguna Beach, CA.  James Harmon was a sales director for Paragon Partners, assisting with its administration under the direction of Peters and Lametta.

30.     Defendant Cardea Consulting, LLC ("Cardea Consulting") is a Florida company with the principal place of business 16105 Camelot Court, Tampa, FL 33647.  Its registered agent and registered manager is James Harmon of Tampa, FL.

31.     Defendant Praxis Marketing Services LLC ("Praxis Marketing Services") is a Florida company with the principal place of business 16105 Camelot Court, Tampa, FL 33647.  Its registered agent and registered manager is James Harmon of Tampa, FL.

32.     During the time period relevant to this Complaint, the Marketing Entity Defendants each paid independent contractor sales representatives ("the Sales Representatives") to promote products dispensed by the Defendant Pharmacies.

33.     There were approximately one hundred such Sales Representatives, located throughout the United States, promoting the Pharmacies.

34.     During the time period relevant to this Complaint, the Marketing Entity Defendants did not engage in any marketing business independent of Peters and the Pharmacies.  The Marketing Entity Defendants were corporate intermediaries that existed only to pay the Sales Representatives.  In some cases, there were additional corporate entities interposed between the sales representatives and the Marketing Entities (*e.g.*, personal service companies owned by the sales representatives).

35.     Peters funded the commissions that the Marketing Entity Defendants paid to sales representatives from revenues received by the Pharmacies.  Each time a Marketing Entity Defendant paid a sales representative, Peters calculated and specified the amount to be paid.

<u>Other Corporate Defendants</u>

36.     Defendant Strand View Enterprises LLC ("Strand View") is a Texas company with principal place of business 601 S. 10th Street, Suite 201A, Las Vegas, NV 89101.  The registered agent for Strand View is The Oberheiden Law Group, PLLC, 5710 LBJ Freeway, Suite 120, Dallas, TX

75240.  Peters is the registered Director and the registered President of Strand View.  Peters is its only employee.

37.     Peters used Strand View as an intermediary to move money between and among the Defendant MSOs, the Defendant Pharmacies, and the Defendant Marketing Entities.

38.     Peters also used his Strand View corporate email address to communicate with investors in the Defendant MSOs.

39.     Strand View was also an LLC member of the Defendant MSOs, along with physicians directing prescriptions to the Defendant Pharmacies.

40.     Defendant Innovative Specialty Services LLC, is a California company with the principal place of business 11901 Santa Monica Boulevard, #442, Los Angeles, CA 90025. Its registered agent is National Registered Agents, Inc. of 330 N. Brand Boulevard, Glendale, CA 91203.  During the time period relevant to this Complaint, Innovative Specialty Services LLC was a pass-through entity for investment funds; prescribing physicians wrote investment checks to Innovative Specialty Services LLC when they acquired shares in the Defendant MSOs.

### III.     JURISDICTION AND VENUE

41.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

42.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants have transacted business in the Eastern District of California.

43.     Venue is proper in the Eastern District of California under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) because Defendants have transacted business in this District, and a substantial part of the events giving rise to this Action occurred in this District.

### IV.     THE FEDERAL HEALTH CARE PROGRAMS

#### A.     Medicare

44.     Medicare is a federally funded health insurance program primarily designed to cover medical care for the elderly.  Medicare was created in 1965, by virtue of Title XVIII of the Social Security Act.

45.     The Medicare program is regulated by the Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS").

46.     The Medicare program has four parts, labeled Medicare Parts A through D.  The most relevant Part in this case is Medicare Part D.  Medicare Part D covers prescription drugs dispensed by pharmacies.

47.     Medicare Part D is federally funded and administered by health plans known as Part D plan "sponsors."  See 42 C.F.R. §§ 423.301 et seq.

48.     In order to be covered by Medicare Part D, drugs must be dispensed in connection with a prescription issued by an appropriately licensed clinician and used for a medically accepted indication. 42 C.F.R. § 423.100 (definitions of "Part D drug" and "Covered Part D drug," incorporating the requirements of 42 U.S.C. § 1396r–8(k)(2)(A)).  Prescriber information is tracked by a "National Provider Identifier" number, which must be included for all Part D claims.  42 C.F.R. § 423.120(c)(5).

49.     Every time a pharmacy fills a prescription for a Medicare Part D beneficiary, the Part D plan sponsor must submit a summary record called the prescription drug event ("PDE") data to CMS. The PDE data are summary extracts using CMS-defined standard fields, including identity of the prescriber and the amounts paid for various components of the drug and related services, among other information.  PDE data allows calculations and analysis of Medicare Part D plan sponsor expenditures.

50.     Medicare Parts B and C are also relevant in this case.  Medicare Part C, also known as Medicare Advantage, is a federally funded but privately administered health plan option for Medicare beneficiaries and may also cover prescription drugs dispensed by pharmacies, depending on the coverage selected by the beneficiary.  Medicare Part B covers a select list of prescription drugs (e.g., drugs furnished in a physician office incident to a physician's services) and includes compounded drugs that a physician purchased from a compounding pharmacy and then dispensed to the patient.

51.     Medicare Parts B, C and D cover certain compounded prescription drugs prepared by a compounding pharmacy.  See, e.g., 42 C.F.R. § 423.120(d).  Medicare Part D plans typically pay higher amounts for compounded medications than traditional prescription medications, in part because such compounding pharmacies are typically paid for the cost of the ingredients as well as a dispensing fee.[1]

---

1  Compounded drugs are not approved by the Department of Health and Human Services, Food

8

### B.    Medicaid

52.    Medicaid was also created in 1965, under Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq.  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  Each state administers a state Medicaid program and receives funding from the federal government, known as federal financial participation, based upon a formula set forth in the federal Medicaid statute.

53.    Before the beginning of each quarter, each state submits to CMS an estimate of its Medicaid funding needs for the quarter.  CMS reviews and adjusts the quarterly estimate as necessary, and determines the amount of federal funding the state will be permitted to draw down as the state actually incurs expenditures during the quarter (for example, as provider claims are presented for payment).  After the end of each quarter, the state submits to CMS a final expenditure report, which provides the basis for adjustment to quarterly federal funding.

54.    The California Medicaid program, known as Medi-Cal, is administered by the California Department of Health Care Services, headquartered in Sacramento, CA.

### C.    TRICARE

55.    TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

56.    Together with other health care programs funded by the federal government (such as health plans administered by the United States Veteran's Health Administration), these programs referenced in Section IV of this Complaint shall be collectively referenced as "federal health care programs."  *See* 42 U.S.C. § 1320a–7b(f).

//

//

//

---

and Drug Administration (FDA), which is responsible for assuring the safety and effectiveness of drugs and approving them for marketing in the United States.  In general, compounded drugs meeting certain criteria are exempt from certain requirements under the Federal Food, Drug, and Cosmetic Act (FDCA), including new drug approval, current good manufacturing, and certain labeling requirements. 21 U.S.C. § 353a.

## V.     FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE

### A.     THE FALSE CLAIMS ACT

57.     The False Claims Act provides for the award of treble damages and civil penalties for any person who, *inter alia*:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government; and
>
> (a)(1)(C) conspires to commit a violation of [any of the above].

31 U.S.C. § 3729.

58.     Under the False Claims Act, "knowingly" is defined to include not just actual knowledge, but also reckless disregard and deliberate ignorance.  31 U.S.C. § 3729(b)(1).  No proof of specific intent to defraud is required to establish that a violation has occurred.  *Id.*

### B.     THE ANTI-KICKBACK STATUTE

59.     The Anti-Kickback Statute ("AKS") prohibits any individual or entity from willfully offering or paying any remuneration to induce or reward any person for referring, ordering, recommending, purchasing, or arranging for the purchase of any item or service for which payment may be made under a federal health care program.  42 U.S.C. § 1320a-7b(b).

60.     No specific intent is required to violate the AKS.  The law states that "a person need not have actual knowledge of this section or specific intent to commit a violation of this section."  42 U.S.C. § 1320a-7b(h).

61.     Further, if any "one purpose" of the transaction is to induce referrals, orders, or recommendations of medical items or services reimbursable by a federal health care program, the AKS has been violated.  *See, e.g., United States v. Kats,* 871 F.2d 105 (9th Cir. 1989).

62.     The AKS prohibition applies to "any remuneration (including any kickback, bribe, or rebate) [paid] directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b).  In

addition to obvious types of unlawful transactions (*e.g.* cash payments expressly offered in exchange for referrals), the AKS also prohibits more indirect forms of such remuneration, including those masquerading as legitimate business transactions.

63. The legal prohibition against using any kind of remuneration to induce patient referrals arose out of Congressional concern that such kickbacks to those who can influence health care decisions would result in medications or services being provided based on financial self-interest rather than untainted medical judgment concerning the needs of the patient. This corruption of medical judgment can result in goods or services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. The AKS also promotes genuine competition among health care providers, in that it encourages health care decisions to be driven by the quality and appropriateness of the item or service furnished, rather than by financial incentives between providers referring to each other.

64. In the Affordable Care Act of 2010, Congress amended the AKS to state explicitly that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g); Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, 759 (2010).

65. At all times relevant to Defendants' conduct, compliance with the AKS was a condition of payment under the federal health care programs, material to the payment of claims.

66. Compliance with the AKS goes to the essence of Medicare and other federal health care programs' bargain with providers of medical items and services. It plays a key role in ensuring that medical items and services are reasonable and necessary, and not provided merely to enrich the parties to an unlawful arrangement at the expense of federal health care programs and their beneficiaries.

67. The AKS contains statutory and regulatory "safe harbors" that protect specified arrangements from prosecution or sanction. The safe harbors operate as affirmative defenses, which defendants bear the burden of invoking and proving. Safe harbor protection is afforded only to those arrangements that precisely meet all of the conditions set forth in the applicable safe harbor.

//

//

*i.      The AKS Applies to Physician Investments*

68.      The AKS prohibits investment relationships that involve profit distributions which induce investing physicians to issue prescriptions (or other referrals, orders, etc.) to an entity affiliated with the investment venture or which reward the physicians for doing so.  That can be the case where, for example, an investing physician receives unduly advantageous economic terms or has a financial interest in referring patients to clinical entities affiliated with that investment venture.

69.      The AKS has a safe harbor for certain investment interests.  *See* 42 C.F.R. § 1001.952(a)(2).   The investment interests safe harbor is narrowly tailored to prevent improper economic inducements from being disguised as legitimate investment mechanisms.  For entities that are not publicly traded and/or have less than $50 million in assets, among other conditions, the investment safe harbor requires that:

- the interests held by referral sources cannot exceed 40% of the total interests held;
- the terms on which an investment interest is offered to a passive investor who refers to or otherwise generates business for the entity must be no different from the terms offered to other passive investors; and
- the terms on which an investment interest is offered to a passive investor who refers to or otherwise generates business for the entity cannot be related to the previous or expected volume of referrals, or the amount of business otherwise generated from that investor to the entity.

70.      To qualify for a safe harbor to the AKS, each of the safe harbor's requirements must be satisfied.

71.      The MSOs did not satisfy the requirements of the safe harbor for investment interests.

72.      Peters was aware that the MSOs did not satisfy the requirements of the safe harbor for investment interests.

73.      The United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG") has long expressed concern about investment arrangements and joint ventures with referral sources.

74. HHS-OIG issues Special Fraud Alerts to discuss "trends of health care fraud and certain practices of an industry-wide character." 59 Fed. Reg. 65373 (Dec. 19, 1994). The purpose of these alerts is "to provide general guidance to the health care industry" and to offer "additional insight to the Medicare carrier and fraud units in identifying health care fraud schemes." *Id.*

75. In 1989, HHS-OIG issued a Special Fraud Alert on Joint Venture Arrangements. This Special Fraud Alert discussed arrangements that presented the strong potential for AKS violations where a physician joint venture was "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for those referrals." *See* HHS-OIG Special Fraud Alert, *Joint Venture Arrangements* (1989), republished at 59 Fed. Reg. 65372 (Dec. 19, 1994).

76. This Special Fraud Alert outlines some of the hallmarks of suspect investment arrangements that appear designed to induce referrals and violate the AKS. The factors identified by HHS-OIG include several factors apparent in the foundation of the MSOs and Pharmacies, including:

(a) Investors are chosen because they are in a position to make referrals.

(b) Physicians who are expected to make a large number of referrals may be offered a greater investment opportunity in the venture than those anticipated to make fewer referrals.

(c) Investors may be paid extraordinary returns on the investment in comparison with the risk involved, often well over 50 to 100% per year.

(d) Physician-owners are required, pressured, or actively encouraged to refer, recommend, or arrange for the purchase of the items or services furnished in connection with the venture.

(e) The venture tracks its sources of referrals and distributes this information to the investors.

(f) The investment venture can be characterized as a "shell" that "manages" a provider to which physician investors make referrals.

*See* HHS-OIG Special Fraud Alert, *Joint Venture Arrangements* (1989), republished at 59 Fed. Reg. 65372 (Dec. 19, 1994), also available at https://oig.hhs.gov/documents/physicians-

resources/980/121994.pdf.  Each of these factors are indicative of an investment arrangement intended to induce or reward referrals, and may be present in unlawful arrangements in any combination.

77.     Additional HHS-OIG alerts published in 2003 and 2013 reiterated these same concerns and characteristics of unlawful physician joint ventures and investment arrangements.  *See* HHS-OIG, *Special Advisory Bulletin on Contractual Joint Ventures*, republished at 68 Fed. Reg. 23148 (Apr. 30, 2003), also available at https://oig.hhs.gov/documents/special-advisory-bulletins/885/042303SABJointVentures.pdf; HHS-OIG, *Special Fraud Alert, Physician-Owned Entities* (March 26, 2013), *also available at* https://oig.hhs.gov/documents/special-fraud-alerts/867/POD_Special_Fraud_Alert.pdf.

## ii.   <u>The AKS Applies to Sales Representative Compensation</u>

78.     The AKS prohibits not only remuneration paid to induce clinicians to make medical judgments, but also restricts remuneration paid to promotional representatives who are tasked with recommending a health care item or service.

79.     The AKS has a broad safe harbor for employees with a "bona fide employment relationship" with an employer.  42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952(i).  Relationships with independently contracted sales representatives who market medical products or services do not qualify for this safe harbor.

80.     The AKS also has a regulatory safe harbor for compensation paid by a principal to an agent for the agent's services for the principal.  At all times relevant to this action, that safe harbor required, among other conditions, that:

- the aggregate compensation to the agent must be fixed in advance;
- the compensation to the agent must be consistent with fair market value in arms-length transactions; and
- the compensation to the agent must not be determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made under any federal health care program.

42 C.F.R. § 1001.952(d)(5) (2020).

81.     The difference in requirements between the safe harbor for employees and the safe harbor for independent contractors reflects the United States' substantial concern regarding unfettered contractors whose compensation depends on the amount of business they bring in for a health care provider.  That concern is significant in situations where health care providers receiving referrals exercise little or no oversight over the contractors.

82.     The commission arrangements between Peters, the Defendant Pharmacies, the Marketing Entities, and the Sales Representatives did not satisfy any safe harbor to the AKS.

83.     Peters knew that those arrangements did not satisfy any safe harbor to the AKS.

## VI.     THE MANAGEMENT SERVICES ORGANIZATIONS INVESTMENT SCHEME

### A.     Overview and History of the MSO Investment Scheme

84.     Peters created the Defendant MSOs as a means to financially encourage physicians to direct prescriptions to the Defendant Pharmacies that Peters operated.

85.     Certain physicians who directed prescriptions to the Defendant Pharmacies were offered the opportunity to buy shares in the Defendant MSOs.

86.     Physicians who invested in the Defendant MSOs received frequent financial payouts from the Defendant MSOs in connection with their investment.

87.     These financial payouts were not legitimate financial returns from bona fide business investment.  Rather, the financial payouts from the Defendant MSOs were kickbacks to the physician investors for directing prescriptions to the Defendant Pharmacies, disguised as investment returns.

88.     The financial payouts to physician investors from the Defendant MSOs were designed to induce and reward investors for directing high volumes of prescriptions and/or prescriptions for high-priced medications to the Defendant Pharmacies.

89.     Each Defendant MSO had approximately sixty to ninety-five physician investors at a time, with a total of one hundred physician investors across the two MSOs during the relevant time period.  The majority, but not all, of the physician investors were podiatrists.

90.     Physician investors in the MSOs included, but were not limited to: Jagpreet Mukker, DPM, of Advanced Foot Care & Clinical Research Center; Sanjay Srivasta, MD, of the Heart, Artery, and Vein Center; Amitabh Goswami, DO, of California Pain Consultants; Philip Larkins, DPM, then of

Advanced Foot Care & Clinical Research Center; and Felipe Ruiz, DPM, then of Advanced Foot Care & Clinical Research Center.

91.     The investing membership of each MSO consisted solely of (a) physicians prescribing to the Defendant Pharmacies and (b) Defendant Strand View Enterprises, another Peters business entity.

92.     In contrast to the more usual physician-patient relationship, physician investors in the Defendant MSOs exercised a high degree of control in directing prescriptions to the Defendant Pharmacies.  The physician investors did not provide their patients with the opportunity to choose their own pharmacy.  Instead, the physician investors either (a) faxed prescriptions to a fax number that Peters used for all of the Pharmacies or (b) sent prescriptions through an electronic portal that Peters used for all of the Pharmacies.  Physician investors did not know which of the Defendant Pharmacies would dispense any given medication that was prescribed.  The key for the physician investors was that they were sending prescriptions to one of the Peters-operated Defendant Pharmacies.

93.     Peters administered the MSO investment scheme in numerous ways that violated the AKS.  One aspect of MSO investment that violated the AKS was that Peters *selected* prescribing physicians to be offered investment in the Defendant MSOs based on the volume and value of their prescriptions directed to the Defendant Pharmacies.  This gave physicians the clear incentive to prescribe so that they could "buy in" to the MSOs and begin receiving lucrative payouts.

94.     Peters also determined *how many shares* in the Defendant MSOs each prescriber would be offered based on his or her prescription volume.

95.     After initial investment in a Defendant MSO, numerous physicians were then offered the opportunity to buy more shares.  The primary factor for determining *which physicians* would receive the opportunity, as well as *how many further shares* each physician would be eligible to buy, was again the same: how much each investor had prescribed to the Defendant Pharmacies.

96.     As designed by Peters, the investing physicians paid very little to buy into the Defendant MSOs.

97.     The MSOs did not need the additional capital invested by the physicians and did not use the investment capital for business improvements.  Because the purpose of the investment was to induce

and reward prescriptions from clinicians, the MSOs also did not seek any investment from any non-clinicians (other than the Peters-owned company Defendant Strand View Enterprises).

98.     Physician investors received extraordinary financial returns in a short period of time. Physicians' financial returns regularly exceeded 500% per year, beginning immediately after investment.

99.     Financial returns of that soaring magnitude are not typically available in the general market.  If an investment does involve potential return of that level, it usually involves a tremendous degree of risk of loss, as well.  Here, however, there was little to no investment risk for physicians.  The financial success of the endeavor was in their hands:  To ensure success of the venture and of their investment, they prescribed to the Defendant Pharmacies.

100.    While the payouts to investing physicians were high, the expected profits for the Pharmacies from the physician investors' prescriptions were much higher, making the investor payouts financially worthwhile to Peters and the Pharmacies.

101.    Peters made all decisions regarding profit distributions to investors.

102.    Peters selected approximately ten Sales Representatives who were authorized to use MSO investment as a tool to encourage physicians to direct prescriptions to the Defendant Pharmacies.

103.    While these selected Sales Representatives used MSO investment aggressively to push prescriptions, Peters made all decisions regarding physician investment.

104.    Peters also brought in a few physician investors to the MSO on his own.

105.    Under Peters's direction, each of the Defendant Pharmacies billed Medicare Part D plans for medications prescribed by physician investors.

106.    In fact, Peters communicated (or arranged through James Harmon or Sales Representatives to communicate) to investing physicians that Medicare patients were one type of beneficiary preferred by the Pharmacies.

//

//

//

//

    i.    *Predecessors to the Defendant MSOs: Peters's Initial Attempt to Pay Kickbacks to Prescribers in the Form of Sham "Investment" Returns Involved Small "Investment" Circles He Called "PPMs"*

107.    In 2016, before Peters created either of the Defendant MSOs, he wanted to create an "investment" opportunity for doctors that would reward them for directing their prescriptions to his Pharmacies.

108.    At that time, he did not have any companies or assets for physicians to invest in, however. Peters created what he called "PPMs" in which prescribers "invested" very minor amounts. In the investment world, "PPM" is typically an acronym for a preferred placement memorandum, a document that lays out the terms of private investment in a business or asset. Peters's PPMs did not involve any assets or business, though. The "investing" physicians did not actually invest in anything.

109.    Instead, the Peters PPMs were just private circles of physicians who were paid to direct prescriptions to the Defendant Pharmacies.

110.    Each physician "investing" in one of Peters's PPMs received distributions based on a straight percentage of the revenues received by the Pharmacies for the medications the investor prescribed.

111.    Dr. Jagpreet Mukker was one physician "investing" in a PPM, before later investing in each of the Defendant MSOs.

112.    Peters operated the PPMs until approximately June 2017.

    ii.   *The Coastline MSO*

113.    In approximately June 2017, Peters created and began operating the Coastline MSO.

114.    In comparison to the PPMs, the Coastline MSO involved more physician investors (approximately sixty-five physician investors at any given time) and higher financial payouts.

115.    To obtain money to distribute to physician investors as financial investment returns, the Coastline MSO had various "management services" arrangements with some of the Defendant Pharmacies. Under those arrangements, the Defendant Pharmacies paid the Coastline MSO exorbitant amounts. The exorbitant fees paid under those management services arrangements enabled the exorbitant financial payouts to doctors investing in the Coastline MSO.

116.    Defendant Pharmacies paying the Coastline MSO included at least Portland Professional Pharmacy and Professional Center 205 Pharmacy, at various times.

117.    The management services arrangements with the Pharmacies were the sole source of revenue for the Coastline MSO.  The Coastline MSO had no other customers or business partners besides Peters's Pharmacies.

118.    Because the relationship between the Coastline MSO and the Defendant Pharmacies was not an arms-length arrangement between legitimate businesses, but rather a captive relationship between entities operated by Peters, Peters could unilaterally determine how much the Pharmacies would pay the Coastline MSO and how much money the Coastline MSO would then pay out to physician investors.

119.    From the inception of the Coastline MSO in approximately June 2017 through approximately May 2018, the management services payment to the Coastline MSO was calculated as either thirty percent (30%) or thirty-five percent (35%) of the revenues from the prescription drugs dispensed by the Defendant Pharmacy (or Pharmacies) that had a management services arrangement with the Coastline MSO.

120.    From June 2017 through approximately May 2018, the Coastline MSO distributed its net revenue to investors.  Peters deducted monthly Coastline MSO expenses from the management services fee to reach a net revenue figure.  He divided the net revenue by the number of shares held and distributed to each physician investor accordingly.

121.    For example, in February 2018, Portland Professional Pharmacy had revenues of $1,090,249.64 from prescription medications.  The management fee paid to the Coastline MSO was $327,074.89 (30% of revenues).  Expenses allocated to the MSO were $30,548.20.  That left a net $296,526.69 for distribution to investors.  With 807 total shares held by investors, $220.47 was distributed per share that month.

122.    The revenues of Portland Professional Pharmacy routinely exceeded $1 million per month.  The operating expenses of the Coastline MSO never exceeded $54,000 per month, however, and were typically significantly less than that, in the range of $24,000 per month to $35,000 per month.  That differential allowed the Coastline MSO to distribute significant sums of money to physician investors.

123.     On top of the Coastline MSO net revenue, Peters periodically added extra amounts from Pharmacy revenues, to further increase payouts to physician investors (*e.g.*, an extra $50,000 in April 2018, divided among the investors).

124.     Because the Coastline MSO payouts to physician investors were funded by a percentage of Pharmacy claims, as investing physicians prescribed in greater volumes, the physicians' investment income increased, as well.  By prescribing more frequently and for higher-priced drugs, physician investors could grow the pot of money that Peters split up amongst them.  Thus, physician investors directly increased their MSO payouts through writing more prescriptions and costlier prescriptions.

125.     Beginning in June 2018, payouts were no longer tied to a percentage of prescription medication revenues from the Defendant Pharmacies.  In June 2018 and July 2018, under Peters's direction, the Coastline MSO paid $157.20 per share to investors, each month.  These payouts were financed through revenues of the Defendant Pharmacies for prescription medications dispensed.

126.     In August 2018, shortly before Peters shut it down, the Coastline MSO distributed approximately $750,000 in a "final payout" to physician investors, for a total of $468.37 per share.

      *iii.*    **_The Bayview MSO_**

127.     In the fall of 2018, Peters shut down the Coastline MSO and set up another MSO in its place, the Bayview MSO.

128.     Peters operated the Bayview MSO from approximately September 2018 through early 2020.

129.     The Bayview MSO was operationally very similar to the Coastline MSO, with very similar personnel.

130.     As compared with the Coastline MSO, Peters expanded the number of physician investors in Bayview, with approximately ninety to ninety-five physician investors at any given time.

131.     From September 2018 until October 2019, the Bayview MSO made monthly payouts of $250 per share to investors.  These payouts were financed by a $450,000 monthly management services fee paid to the Bayview MSO by one or more of the Defendant Pharmacies.

132.     In October 2019, the Bayview MSO made payouts to investors in the amount of $125 per share.  These payouts were financed by the $450,000 monthly management services payment to the Bayview MSO from one or more of the Defendant Pharmacies.

133.     Near the end of 2019, the Bayview MSO made two payouts totaling $560 per share to investors (over $700,000 in total).  These payouts were financed by the $450,000 monthly management services payment to the Bayview MSO from one or more of the Defendant Pharmacies.

**B.     Details of the MSO Investment Scheme**

134.     This Section describes some of the specific ways in which Peters designed and operated the system to unlawfully incentivize, reward, and induce prescriptions.

135.     Peters operated each MSO in these ways, across the collection of physician investors.

136.     Many of these features contravene longstanding HHS-OIG guidance regarding investment and joint venture relationships.  Together, they unmistakably demonstrate systemic AKS violations.

   i.    *Peters Created the MSOs with the Purpose of Rewarding Investors' Prescriptions and Engendering Loyalty to the Pharmacies.*

137.     When first rolling out MSO investment as a tool for Sales Representatives to promote the Pharmacies, Peters explained to the Sales Representatives and his close business affiliates that the express purpose of the MSOs was to buy physician loyalty.

138.     By way of example, Peters led or arranged a group phone call in or about early 2017 with Sales Representatives contracted with Defendant Paragon Partners, including Kristopher Ammons.  On that call, Sales Representatives were informed that the MSOs would provide an option for partnerships with medical offices and doctors to have a financial stake in the Pharmacies.  As explained on that call, the MSOs would promote growth because investing doctors would have a financial stake in the success of the Pharmacies and would be loyal in directing prescriptions to the Pharmacies.

139.     Examined under oath in connection with the United States' investigation of this matter, Ammons confirmed that the core business purpose of MSO investment was to reward or induce prescriptions and that he communicated with physicians plainly about that, on behalf of the Pharmacies:

**Q**. In terms of the purpose of offering physicians the opportunity to invest in the MSO, what was the purpose from a business perspective?
**A**. To have them write for the pharmacy.
**Q**. To prescribe?
**A**. To prescribe, yes.
**Q**. So [you] offered this opportunity to invest in direct exchange for getting them to prescribe to the pharmacy?
**A**. Correct.
**Q**. And did you have conversations with each of them to that effect?
**A**. Yes.

140. In turn, based on how Peters had explained it to him, Ammons communicated the purpose of MSO investment to physicians on numerous occasions in plain fashion. For example, when Dr. Jagpreet Mukker first invested in the Coastline MSO, Ammons texted Mukker to discuss logistics on August 1, 2017. In that conversation, Ammons discussed the Pharmacies tracking Mukker's prescriptions (another hallmark of investment schemes that violate the AKS, discussed further in Sections VI.B.iii and VI.B.iv) and the timing of when Mukker's investment contract would be signed. With respect to two potential options for signature date, Ammons informed Mukker "either way you are being rewarded for scripts from day 1."

141. Because the MSOs served no independent business purpose other than to funnel money to physician investors in exchange for prescription volume, frequently neither the physician investors (including Dr. Mukker, Dr. Srivasta, Dr. Larkins, and Dr. Ruiz) nor the Sales Representatives who promoted the Pharmacies using MSO investment opportunities (including Kristopher Ammons) knew anything about the MSOs' operation, type of management services provided, personnel, location, or finances. Some of those individuals, despite their financial interest in the endeavor and the outsized returns they received, never knew what the acronym "MSO" stood for. In fact, several of the physician investors (including Drs. Mukker, Goswami, Srivasta, and Larkins) believed they had invested directly in the Pharmacies themselves, rather than in an MSO.

ii. *MSO Investors Were Paid Exorbitant Returns*

142. The profit returns from the MSOs were extraordinarily high as compared to the amount of capital invested.

143. Each share in an MSO cost only $500 and returned income of multiple times that capital investment in a short period of time.

144.     For example, a physician investor purchasing twenty shares in the Coastline MSO for a total of $10,000 at the beginning of September 2017 would have earned $11,356.40 in distributions by the end of the following month, already more than covering the investment price.  By August 2018, in slightly less than one year, that same investment would have earned $59,183.68 in total payouts.

145.     Similarly, a physician purchasing twenty shares in the Bayview MSO for $10,000 in September 2018 would have recouped his or her investment price in distributions by the following month.  By August 2019, less than one year later, that investor would have earned $60,000 in total distributions, in addition to the value of his or her capital account that remained.

146.     In legitimate ventures, investors are often recruited because the venture needs capital. Physicians were not recruited to invest in a Defendant MSO because of the capital they invested, however—as reflected in the exponential rate of return they received in a matter of months.  Making the matter abundantly clear, in a recorded investor webinar from March 2018, Peters described to investors that the MSOs had excess capital and the business was trying to determine what to do with it.  The MSOs nonetheless continued to take on new physician investment throughout the remainder of 2018 and 2019, because the Pharmacies' revenue derived from those physician investors (via prescription medications paid for by federal health care programs and other insurers) justified the expenditure of paying out distributions to the physician investors.

147.     Similarly, the physician investors did not provide any advisory services to the MSOs or provide any added value other than directing their prescriptions to the Pharmacies.  Their role in MSO investment was simply to write prescriptions and to be paid handsomely for doing so.

148.     For example, Dr. Mukker invested $20,000 in the Coastline MSO in the middle of 2017 and ended the year with distributions of $43,655, plus an ending capital account of $21,177.  In 2018, Dr. Mukker began with that capital account of $21,177 in the Coastline MSO, invested an additional $5,000 in capital, received $74,860 in withdrawals and distributions.[2]  Thus, in approximately 18 months, Dr. Mukker invested $25,000 and received $118,515.

---

2 In addition to these payouts, Dr. Mukker also had $6,639 in his Coastline MSO capital account remaining at the end of 2018.

149.     Dr. Mukker bought into the Bayview MSO when it was formed in September 2018 and invested $20,000.  In just the last four months of 2018, Dr. Mukker received $40,000 in distributions, and ended 2018 with $23,431 in his Bayview MSO capital account.  In 2019, Dr. Mukker began with that same $23,431 capital account, invested no additional capital, and received $117,400 in withdrawals and distributions.

150.     In 2018, Dr. Goswami invested $20,000 in the Bayview MSO and received $40,000 in distributions (in just four months), in addition to a capital account with $23,428 remaining at the end of the year.  In 2019, Dr. Goswami began the year with $23,428 carried over in his capital account, invested no additional capital, and took $117,400 in withdrawals and distributions.

151.     In 2019, Dr. Larkins began the year with a Bayview MSO capital account of $9,808, contributed $20,000 during the year, and received $102,400 in withdrawals and distributions from the Bayview MSO.

152.     With that type of investment structure, several physicians sought more investment in the MSOs at every opportunity.

153.     In June 2018, Dr. Goswami wrote to Peters and made a direct link between his prescription volume and MSO payouts.  He wrote, "Matt: how did I do with prescriptions this month? I counted +240. There were multiple Rx per/fax.  This was over just 8 days. I would like for your company to consider a substantial increase in distribution.  What is the max give out to a group?"  A week later, Peters had not responded and Goswami requested to talk over the phone.  Peters responded, "Hey Doc. Yes let's actually chat tomorrow. Your numbers are looking great and want to give you some updates."

154.     The MSO profit distributions were extremely successful in inducing the physician investors to direct prescriptions to the Defendant Pharmacies.

155.     For example, Dr. Goswami purchased four shares in the Coastline MSO in August 2017.  In the months between August 2017 and March 2018, Medicare Part D plans paid the Pharmacies between $1,286.56 and $9,991.51 each month for Goswami's prescriptions dispensed in those months.  In June 2018, Goswami was permitted to increase his Coastline MSO shares from four to fourteen.  Following that increase in shares, Medicare Part D plans paid the Pharmacies $17,180.55 for

the medications he prescribed in June 2018 and $33,881.19 for the medications he prescribed in July 2018—as Dr. Goswami both received more payout for his prescriptions and demonstrated his prescribing capacity to Peters, so that he could purchase additional shares in the future.  Dr. Goswami then acquired 40 shares in the Bayview MSO in July 2018.  Medicare Part D plans paid $33,856.31 for his prescriptions dispensed by the Pharmacies in August 2018.

156.     Other physician investors' prescription patterns were similar.  Dr. Felipe Ruiz had prescribed to the Pharmacies before investing, with Medicare Part D plans paying the Pharmacies not more than $12,000 in a given month for Dr. Ruiz's prescriptions and usually significantly less than that.  He then invested $3,000 in January 2017.  That same month, Medicare Part D plans paid $20,858.97 to the Pharmacies for medications he prescribed.  His prescription volume continued to rapidly increase in the months after that, reaching more than $70,000 in Medicare Part D plan payments for seven different months in 2017.

157.     Not only did MSO distributions induce physician investors to direct prescriptions to the Pharmacies at the expense of legitimate pharmacies, those payouts induced physician investors to prescribe in greater volumes, overall.  For example, during his MSO investment between mid-2017 and late 2019, Dr. Mukker's overall Medicare Part D utilization was several factors higher than it was before or after his investment.

//

//

//

//

//

//

//

//

//

//

//

25



158.    In the limited instances when the MSOs paid out less than physician investors had come to expect, it was met with outrage from the physician investors.  For example, during two months in early 2019, Dr. Larkins received $5,000 when $10,000 was expected.  Larkins had recently been given the opportunity increase his investment in the Bayview MSO from 20 shares to 40 shares (because Peters determined his prescription volume was high enough to allow the increase).  The Bayview MSO had routinely distributed $250 per share per month to physician investors (based on the one-time investment of only $500 per share), meaning twenty shares typically returned $5,000 per month and 40 shares typically returned $10,000 per month.  Dr. Mukker, who was then a colleague of Dr. Larkins, indignantly wrote to Peters about Dr. Larkins' payouts being too low, citing that "Dr. Larkins had faithfully supported the pharmacy," meaning that Dr. Larkins had written prescriptions to the Defendant Pharmacies and should be paid more.

//

//

## [No Subject]

**From:**     Jay Mukker <drmukker@gmail.com>
**To:**       matthewhpeters@yahoo.com
**Date:**     Sat, 16 Mar 2019 17:14:01 -0400

Hello Matt, Dr Larkin's check was not 10K it was only 5K.  I know he cut the check out in January for the shares and the last two checks he received have only been 5K.  That's not right and it's not fair.  He has faithfully supported the pharmacy and the pharmacy has not held up the contract.  This needs to be rectified Matt!!!  I look foolish because I presented this to Dr Larkin's and he is questioning me now.  I don't like to look foolish in front of my colleagues.

Sent from my iPhone
Dr. Jay Mukker

On the next business day after Dr. Mukker sent this email, Dr. Larkins deposited a check from the

Bayview MSO for an additional $10,000.

159.    In October 2019, Peters reduced the monthly payout to $125 per share.  At the time,

Peters was attempting to set up a publicly traded company (which was ultimately unsuccessful).  He

announced that a one-half distribution ($125 per share) would be made on October 15, 2019, and then

distributions would pause for a few months until the publicly traded company was up and running.

(Nevertheless, Peters later made another one-half distribution to all investors in November 2019, and

then substantial "final payouts" of $435 per share near the end of 2019.)  A short-term reduction in

payout was not acceptable to the physician investors, given the payouts to which they had grown

accustomed.  Dr. Mukker again wrote to Peters, this time even more explicitly citing prescription

volume as the reason that he and Dr. Larkins must be paid $10,000 per month:

//

//

//

//

//

//

//

27

## [No Subject]

**From:** Jay Mukker <drmukker@gmail.com>
**To:** Matthew Peters <matthewhpeters@yahoo.com>, Philip Larkins <larko33139@yahoo.com>
**Date:** Fri, 01 Nov 2019 11:38:41 -0400

Hello Matt, hope all is well.  I wanted to ask you about the remaining 5K for the month. Dr. Larkins and myself have held up our end of the bargain and kept up with supporting the company and prescribing a lot of the compounding to our patients.   We really need you to do the same and in the contract, it does stipulate 10K a month so please, I'm kindly requesting that we be made whole.  We love the services provided by your company and want to keep an honest and open relationship with you but we need to be made whole as per stipulated in the contract.  Look forward to hearing from you.  Thanks Matt.

--
Dr. Jay Mukker
Advanced Foot Care and Clinical Research Center
7210 N. Milburn Ave, Ste 101
Fresno, CA 93722
Office    559.224.5101
Fax       559.224.4396
Website     drmukker.com

160.    Peters forwarded Dr. Mukker's November 1, 2019, email to Kristopher Ammons and James Harmon and commented, "Are these guys fucking serious? They want into the public company or not? I am thinking of just shutting this thing down."  Peters's email suggested that, if the prescribers wanted to be part of the next venture, they should be content with the already-exorbitant kickbacks they had received.

161.    For his part, Dr. Goswami replied directly to Peters's email notice to investors regarding the reduced payout, underscoring the *quid pro quo* of profits-for-prescriptions.  Dr. Goswami felt there was uncertainty in the amount of distributions in the future company, which was not certain enough as a financial gain for him to continue his same level of prescription writing.  Dr. Goswami explained in his email reply, "As I read, we will not receive any distribution from Mid-October. … The shares may have distributions but this is unknown.  Therefore, there is no further incentive for any of the current shareholders to provide any services to your company after Oct 15."

//

//

//

//

//

From: Amitabh G <augoswami@gmail.com> on behalf of Amitabh G
Sent: Wednesday, September 25, 2019 5:49 PM
To: matt@strandviewenterprises.com
Subject: Re: Bayview Specialty Services - ORGANIZATIONAL UPDATE

Hello Matt:

Thank you for the email update. As I read, we will not receive any distributions from Mid-October.  At this time, the shares are converted to preferred stock. The shares may have distributions but this is unknown.  Therefore, there is no further incentive for any of the current shareholders to provide any services to your company after October 15, 2019.   However, I am entitled to the stock (at an unknown amount and price) and will have to just watch and see what happens to the stock after January 2020.

Does this represent what you are stating in your email?

Regards,
Dr. Goswami

162.    The physician investors did not provide any services to the MSOs or Pharmacies, other than writing prescriptions.

        iii.    *The Profits Received by each Physician Investor in the MSOs Depended on the Physician's Prescribing Volume.*

163.    Physician investors received financial distributions from the MSOs after purchasing shares in the MSOs.

164.    Each physician's opportunity to purchase shares depended directly on the physician's prescription volume to the Pharmacies.

165.    Each physician's opportunity to purchase additional shares, after the initial investment, also depended directly on the physician's prescription volume to the Pharmacies.

166.    Peters made all decisions regarding investment eligibility.  He did so by consulting each physician's script volume and determining whether the prescriber was eligible to buy shares (or whether the prescriber was eligible to buy additional shares) and if so, how many.

167.    Sales Representatives and prescribers were not made aware of the specific threshold that Peters used (*e.g.*, X number of prescriptions is enough for Y number of shares).  Nor were Sales Representatives empowered to make those determinations on their own.  Instead, Sales Representatives generally needed to communicate with Peters to find out if there had been enough volume, in his assessment, to permit a physician to invest.

168.     Peters made Sales Representatives well aware, however, that volume and value of prescriptions written to the Pharmacies were Peters's criteria for awarding investment shares.

169.     When asked under oath how a physician would get the opportunity to increase his or her number of shares, Sales Representative Kristopher Ammons summarized straightforwardly, "By volume of scripts written."

170.     Kristopher Ammons added additional detail in his testimony:  "The doctor – [in] the beginning [Peters and his business enterprise] said all doctors were to be offered up I believe no more than five to 10 shares. And then over time, if the doctor wrote prescriptions, then they would be offered a higher level of shares – higher volume of shares."

171.     In July 2017, Kristopher Ammons requested MSO investment for two other prescribers, "Physician A" and "Physician B."  In response, Peters asked Ammons about their prescription volume. On July 13, 2017, Ammons and Peters had the following text exchange:

> **Ammons**: Did James [Harmon] tell you about [Physician A] wanting 10 shares in an MSO, as well as [Physician B] wanting 5 shares?
> **Ammons**: [Physician A] is gonna be a monster
> **Peters**: A little. Yes. Nice man. Any idea on volume. Let's discuss on Monday. We are looking good for that very soon.

172.     Ammons replied to Peters, "[Physician A] will be another Ruiz. … The good news is [Physician A] is greedy, which is good for us[.] [Physician B] just bought a house so he's anxious to move forward[.] [Physician B], Mukker, Ruiz, [Physician A], myself are all going to dinner Wednesday night so it should be a good get together[.]"

173.     Physician A became hesitant about the legality of investment for a period of time, but then wrote Ammons on June 10, 2018, and expressed renewed interest.  In that email, Physician A stated that last time he and Ammons had spoken about investment, there was the opportunity for the investor to earn a "commission" on prescriptions, and asked if that was still an opportunity.  Ammons replied "you betcha."

174.     As another example of prescription volume being the criterion for investment, in early 2018, Dr. Srivasta, Dr. Mukker and Kristopher Ammons were each seeking additional shares for Dr. Srivasta.  (Mukker was seeking investment for Srivasta because the two had an arrangement to share the

investment and distributions in Srivasta's name.)  On May 1, 2018, Ammons texted Peters, "Can Dr Sanjay Srivasta get another 20 shares?"  Peters responded, "I was just looking. That is going to be tough to do. I think we need more production. Sorry man."

175.    On May 20, 2018, Ammons texted Peters, "Question: Sanjay Srivasta, 10 more shares maybe? Need to tell them something sooner than later."  Based on Srivasta's script volume, Peters replied, "I think we can get him 6 more. 10 is too many."

176.    Financial records show that Dr. Srivasta purchased six additional shares in May 2018.

177.    A text exchange between Kristopher Ammons and Dr. Mukker on May 31, 2018 reflects the same considerations:

> **Mukker**: What place would you say Sanjay is at in the US in writing prescriptions? You said I was 4th so what would he be? Approximately?
> **Ammons**: Paragon is 4th in overall performance with professional Center. A big part is due to about 6 big Docs in CA. In Paragon, you are the highest Dr by far. Next would be close between Sanjay and Ruiz
> **Mukker**: think he wants us to buy more shares in it. Please talk to Matt.
> **Ammons**: Already done.  His contract is being drawn up for 6 more shares.  It will be on his desk Monday
> **Mukker**: Ok great
> **Ammons**: He had 158 scripts last month
> You had 280. He shouldn't complain. His patients are happy and he has to fill scripts somehow
> He might as well be invested.  It's not like Walgreens or CVS is doing anything for him.
> **Mukker**: Completely true and that's where a businessman appreciates that and a fool doesn't.

178.    Peters sometimes communicated directly with investors regarding the direct relationship between their prescribing volume and their opportunity to receive additional shares in the MSOs.  In October 2017, Peters emailed Dr. Mukker a breakdown of the Pharmacies' reimbursement for scripts issued by prescribers in Dr. Mukker's practice or with whom Dr. Mukker was closely affiliated:

//

//

//

//

//

| Matthew Peters <matthewhpeters@yahoo.com> | | Tue, Oct 17, 2017 at 11:52 AM |
| --- | --- | --- |
| Reply-To: Matthew Peters <matthewhpeters@yahoo.com> | | |
| To: "drmukker@gmail.com" <drmukker@gmail.com> | | |
| Cc: Rachel Ammons <rachel@paragonmedicalpartners.com> | | |

Please see attached and below for the summary that will arrive every week and every month by the 15th.

Thanks
Matt

| Row Labels ▼ Sum of Adj | | Percentage |
| --- | --- | --- |
| LARKINS | 1,044.55 | 1.4% |
| MUKKER | 11,754.34 | 15.5% |
| RUIZ | 47,910.48 | 63.0% |
| ▮▮▮▮▮▮ | 2,528.30 | 3.3% |
| SRIVATSA | 12,765.74 | 16.8% |
| **Grand Total** | **76,003.41** | |

179.   Dr. Mukker replied to Peters to suggest his MSO payout should have been higher because Dr. Mukker still believed payout to be "10% of the grand total" for the prescriptions attributed to him, reflecting the initial arrangement when he began investing.

180.   Peters responded to Dr. Mukker as follows:

| Matthew Peters <matthewhpeters@yahoo.com> | Wed, Oct 18, 2017 at 12:23 PM |
| --- | --- |
| Reply-To: Matthew Peters <matthewhpeters@yahoo.com> | |
| To: Jay Mukker <drmukker@gmail.com>, Kris Ammons <kris@paragonmedicalpartners.com> | |
| Cc: James Harmon <james@paragonmedicalpartners.com> | |

Hi Dr Mukker,

The check is actually based on the number of shares that you have.

I was just informing Kris and Rachel that now due to your size...you are ready to be offered more shares in the MSO. We cannot pay off of your performance...as that runs into issues. But we can offer more shares as your performance increase. I would look to nearly max you out (if not entirely max you out) at the 40 shares. That would double your monthly payout at this point.

"Your size" was a reference to prescription volume, but the reference to "your performance" cemented that point.

181.   To enable these investment decisions related to the volume and value of a physician investor's prescriptions, Peters closely tracked each physician investor's prescriptions and directed James Harmon to assist him in that effort.

182.   When new physician investors were in the process of finalizing investment details, Sales Representative Kristopher Ammons frequently informed them that their prescription volumes were

32

being "backlogged."  Backlogging meant tracking the prescription volumes of a certain physician

investor.

183.    Backlogging occurred in at least two situations: (1) when there was an agreement that a

prescriber would invest, but before the paperwork was executed and (2) before a custom prescription

pad had been printed with his or her name on it, which was Peters's preferred way to track a physician

investor's prescription volume.  Backlogging allowed Peters to be fully informed regarding a physician

investor's prescription volume trends when it came to decisions about further financially rewarding the

physician investor, including the decision to award further shares.

### iv.  Continued Prescribing to the Pharmacies Was Effectively a Condition of Investment.

184.    Peters and the Sales Representatives made it clear that investors needed to prescribe in

order to receive MSO distributions.  For example, as the investment paperwork was being finalized for

Physician A and Physician B, on July 16, 2017, Kristopher Ammons had the following text exchange

with Peters, in which Peters spoke transparently of the bottom-line connection between MSO

distributions and prescriptions:

> **Ammons**: What are the odds of getting the contract for [Physician A] and [Physician B] by
> tomorrow?
> **Ammons**: They called me Friday wanting to pay up
> **Ammons**: Sorry I know it's Sunday
> **Peters**: No worries on Sunday. Not good. Will arrive by Tuesday. Are they writing yet? If so…I
> would guarantee them as part of the August distributions from July scripts.

185.    Peters and the Sales Representatives also made it clear to physician investors that it was

not acceptable for their prescription volume to decrease after investment.  Peters sought to have

physician investors disregard their medical judgment for when prescription medications were actually

appropriate, in favor of continued financial reward.

186.    By way of example, Kristopher Ammons repeatedly pressured Dr. Srivasta for more

scripts.  Ammons did so primarily through Dr. Mukker, who was close friends and shared several

business arrangements with Dr. Srivasta.

187.    After initial investment in 2017, Dr. Srivasta's volume initially spiked (such that

Ammons remarked to Dr. Mukker, "Based on Sonjays #'s for this month..... I think we should go to the

Bahamas next[.] Holy shit."). As time went on, however, Srivasta grew frustrated with the Pharmacies'

business practices—especially with the fact that the Pharmacies were filling higher quantities of

compounded medications than he had ordered in his prescriptions. With a higher quantity, the patient

needed to pay higher copays because the cost of the medication was higher. (Federal health care

programs and insurance plans were billed more for those unauthorized quantities of medication, as well.)

Dr. Srivasta was hearing a lot of patient complaints. For a period of time, his prescription volume to the

Pharmacies declined. That caused Ammons to pressure Dr. Srivasta for more volume, on behalf of the

Pharmacies, in connection with his MSO shares and distributions.

188.    One example of Ammons pressuring Dr. Srivasta for prescriptions came in the fall of

2018, when Peters ceased the operation of the Coastline MSO and began the operation of the Bayview

MSO. On August 17, 2018, Dr. Mukker and Ammons had this exchange about Dr. Srivasta and Dr.

Larkins:

> **Mukker**: How many shares do u think Larkins can buy?
> **Ammons**: Let me see[.]  Right now until they are able to find his scripts he can't have
> any[.] They are checking this weekend to find any of his signatures [in] the computer
> system. If he hasn't been printing his name on any scripts it could be mission
> impossible[.]  I'm trying to lock him for immediate 6 shares and then production after the
> first month should give the legal group an idea[.]  We should talk next week to lock all
> this down before sept 1st
> **Mukker**: Ok sounds good.
> **Ammons**: You're good for the original 40 of which will be reissued to you
> **Mukker**: Sanjay?
> **Ammons**: He's eligible for 6[.] For the last 3 months his monthly avg has been barely
> $15k[.]  What's his deal? *It's a game of numbers[.] If he doesn't write he can't have
> shares[.]* They accommodated him due to his relationship with you. He killed it in the
> beginning of the year like a badass[.] Then dropped off
> **Mukker**: Jess [Srivasta's assistant] is gonna find out what's going on. I will let u know
> by Tuesday. But I understand what ur saying.

(Emphasis added.)

189.    As another example of pressuring physician investors for more scripts, when Dr.

Goswami's volume dipped in June 2018, Ammons suggested buying back his shares—stating that Dr.

Goswami had "no excuse" for his low script volume.

190.    On June 12, 2018, Peters communicated to Ammons that the MSOs could not technically

push an investor out, but nevertheless made clear that physician investors would be subject to pressure

regarding continued MSO membership if they did not prescribe in sufficient quantities. Peters replied to

Ammons regarding Dr. Goswami's shares, "Unfortunately we can [*sic*] ask him to sell. He is an owner. The best approach is to position it as what can the mso do to utilize more its services for you [*sic*] patients?  If you are not going to use the services do you want to remain an owner or not?"  While not as explicit as Ammons had suggested, the distinction that Peters attempted to create reflected a thinly veiled pressure tactic.  The MSOs "services to patients" amounted to nothing beyond the physician investors directing prescriptions to the Pharmacies.

191.    The pressure on Dr. Goswami worked.  July 2018 through October 2018 were Goswami's highest-prescribing months to the Pharmacies in terms of Medicare Part D reimbursement.

192.    In the summer of 2019, Peters's right-hand man James Harmon contacted Kristopher Ammons out of concern with Dr. Mukker's volume dipping, communicating the need for Dr. Mukker to get his volume back up.  Ammons passed that message along to Dr. Mukker and then reported the conversation back to Peters:

> "If you get a chance today, gimme a shout. I explained to Mukker that with his script production for 40 shares is a problem for me. I explained that monetarily it's difficult to justify future MSO contracts if I can't get the original guys to keep their volume to a moderate level. He understands completely. His numbers will go up."

193.    Ammons reported this conversation to Peters, rather than Harmon, because he understood that Peters was driving the requirement for physician investors to maintain a certain prescription volume.  Peters did not disabuse Ammons of that notion, responding simply "I'll call tonight."

**C.    Peters Attempted to Conceal His Unlawful Intent in False Documentation.**

194.    Under Peters's direction, the MSOs utilized Private Placement Memorandums documenting each prescriber's investment.

195.    Attempting to create the outward appearance that MSO distributions did not violate the AKS, the Private Placement Memorandums falsely stated that MSO services would "not be for patients who are eligible for, or beneficiaries of, federally or state funded health care program [*sic*][.]"  This language was an attempt to conceal the actual way in which the MSO investment scheme worked.

//

//

> (2) **No Healthcare or Government Health Care Program Referrals**.  Company demands that healthcare business **shall not be** referred to Company by the Investor Members — the Company's Services may be provided for healthcare professionals.  The Company expects that services will not be for patients who are eligible for, or beneficiaries of, federally or state funded health care program, including but not limited to Medicare and Medicaid or state Workers' Compensation or any other applicable government program (a "Federally or State Funded Health Care Program") (for this PPM and the Company Operating Agreement, the

*Coastline Specialty Services, LLC Confidential Private Placement Memorandum*, Sect. VIII.B.2.

196.    In reality, as he induced and rewarded investors' prescriptions through MSO distributions, Peters very much intended for Medicare and other federal health care program beneficiaries to be directed to the Pharmacies.  That message was communicated plainly to prescribers.

197.    For example, a *Coastline Specialty Services: MSO Education & Training* presentation that Peters provided to physician investors stated that "No federal Work can be in an MSO."  Directly underneath that statement, however, the presentation instructed investors to "Continue to prescribe as normal"—meaning they should prescribe to the Pharmacies for all patients, including federal health care program beneficiaries.

## Important Notes

‣ No Federal Work can be in an MSO
  ◦ Key Points:
    · Continue to prescribe as normal
    · Pharmacy routing safeguards set in to ensure that federal scripts are kept separate

‣ 35% of gross revenue to MSO

Slide deck, *Coastline Specialty Services: MSO Education & Training*.

198.    Further, what Peters meant by "routing safeguards" to keep federal health care program scripts "separate" from the MSO is that he would redirect those scripts to another one of his Defendant Pharmacies that did not officially receive management services from the MSO.  That would not actually amount to keeping federal health care program prescriptions out of the MSO investment scheme in any

sense at all.  It would simply mean that another one of his Pharmacies would dispense those medications and bill federal health care programs.  The physician investor would receive financial payouts, just the same.  Peters did not distinguish between his Pharmacies in the unlawful financial incentives he created for investing prescribers.

199.    Similarly, on a recorded investor webinar on March 14, 2018, titled *Coastline Specialty Services: MSO Education & Training & Quarterly Training*, Peters identified Portland Professional Pharmacy as the "employed vendor" of the Coastline MSO.[3]  Speaking during the "Legal Structure" slide, Peters then explained:

> "There's no federal work included in the MSO. The prescribing patterns for physicians should be that they continue to prescribe as normal for patient need. However, any federal prescriptions that come in, uh, to the pharmacy, which the MSO is very easily able to identify what's a private and a federal-related prescription, uh, is handled where the Portland Professional Pharmacy will fill the private prescriptions, and any federal prescriptions are re-routed to another pharmacy, a partner pharmacy, that can fill it."

200.    From the perspective of the investing Physician, there was no distinction between any of the Defendant Pharmacies.  Investors did not choose between the Defendant Pharmacies when issuing a prescription.

201.    The custom prescription pads that Peters created for physician investors did not list the name of the Pharmacy being utilized or provide an option for the physician investor to select a Pharmacy.

202.    Under Peters's direction, the Defendant Pharmacies used the same fax number and electronic prescribing platform.

203.    Most of the physician investors were not informed that Peters owned multiple pharmacies (let alone fourteen, or more, essentially identical pharmacies).

204.    Investors knew that they were prescribing to a Peters-operated Pharmacy, that Peters operated the MSOs, that the MSOs made substantial financial distributions, and that prescriptions went hand-in-hand with those payouts.

---

3 Notwithstanding that the services were purportedly provided in the other direction, from the Coastline MSO to Portland Professional Pharmacy.

205.     The MSO investment scheme worked to induce and reward federal health care program prescriptions.  From 2017 through the life of the MSOs, the Pharmacies were paid at least $8,115,998.38 by Medicare Part D plans for medications prescribed by MSO investors.

206.     Moreover, Peters did not actually reroute federal health care program prescriptions away from the Defendant Pharmacy that was funding the MSOs at any given time.  In March 2018—the same month that Peters stated on the *Coastline Specialty Services: MSO Education & Training & Quarterly Training* webinar that he would reroute federal scripts away from Portland Professional Pharmacy (to his other Pharmacies)—Portland Professional Pharmacy submitted claims to Medicare Part D plans for medications prescribed by MSO physician investors and was paid at least $53,071.84 for those medications.  Across 2018, Portland Professional Pharmacy was paid at least $255,685.08 by Medicare Part D plans for medications prescribed by MSO physician investors.

207.     Federal health care program prescriptions were an element of every piece of Peters's MSO investment equation.  His attempt to cover up the role of federal health care program prescriptions on paper is evidence of his willful conduct, as it shows Peters knew what he was doing: paying kickbacks for a stream of prescriptions that included Medicare and other federal health care program business.

**D.     Peters Knew the MSO Investment Scheme Did Not Satisfy an AKS Safe Harbor.**

208.     Multiple MSO investor webinars held by Peters (including the *Coastline Specialty Services: MSO Education & Training & Quarterly Training* presentation) cited the AKS investment safe harbor.  The only condition of the safe harbor that Peters would cite in those webinars was the requirement that referral sources cannot own more than 40% of the investment venture.

209.     In those investor webinars, Peters did not cite the safe harbor's other seven requirements—especially the requirement that the terms of investment cannot relate to the previous or expected volume or referrals or other business generated by the investor.

210.     Peters was aware that all requirements of a safe harbor must be satisfied to comply with it.  The small print of his MSO Private Placement Memoranda for investment in the MSOs identified the eight requirements of the safe harbor, after stating that "each of the following eight (8) standards must

be satisfied." His failure to cite all eight requirements in his webinars indicates his knowledge that those requirements were not satisfied.

211. At the time he attempted to create a publicly-held entity in place of the MSOs, Peters's communications show that he knew the MSO investment structure was unlawful.

212. When Peters emailed MSO investors on September 25, 2019, to notify them that the Bayview MSO would be wound down and a publicly-held investment entity would be created, he stated, "At that point your shares will be subject to the overall profitability of the company and applicable to [*sic*] corporate and healthcare compliance regulations"—highlighting that neither of those things had been true under the MSOs.

213. In July and August 2019, Peters was evaluating with Kristopher Ammons whether "Physician C" and "Physician D," two podiatrists in Conroe, TX, had prescribed in high enough volume to warrant an offer of MSO investment. When it was determined that they had not shown enough prescription volume to do so, Ammons informed Peters: "Bad news: The volume will dip due to a lack of MSO. Not because of the Pharm but because it's hard to justify out of state Pharm without an investment." (Ammons also informed Peters that he had given Physician C a bottle of Johnnie Walker Blue Label scotch, because "They love their liquor in Texas.")

214. Peters replied to Ammons, "Tell them we will get them an option[.] No bull[.] MSo but safer[.]"

215. During the course of this evaluation regarding Physician C and Physician D, Peters also instructed, "I know that we will have a preferred public option for them within 3months [*sic*] that runs just like an MSO. It will be good. And provide all the cover for them legally."

216. Despite knowing that the MSO investment scheme had run afoul of the AKS, Peters and the Pharmacies never reported the issue to federal authorities or refunded the inappropriately paid amounts for federal health care program beneficiaries.

//

///

//

//

### VII.   THE SALES REPRESENTATIVE COMMISSION SCHEME

**A.   Peters Paid Unlawful Commissions to the Sales Representatives.**

217.   During all relevant times, Peters built and expanded a collection of Sales Representatives across the country to promote the Pharmacies to physicians and other prescribers.  At the height of these arrangements, Peters had engaged approximately 100 Sales Representatives.

218.   Peters personally identified the majority of the Sales Representatives, selecting them based on the Sales Representatives' already-established connections with prescribers.  Lea Lametta helped to identify some of the Sales Representatives contracted through Paragon Partners.

219.   The Sales Representatives contracted with the Marketing Entity Defendants created and operated at the direction of Peters (*i.e.*, Paragon Partners, Cardea Consulting, and Praxis Marketing Services).

220.   All Sales Representatives were independent contractors.  They were not employees of the Marketing Entities or the Defendant Pharmacies.

221.   Peters and the Defendant Marketing Entities exercised little if any oversight over the conduct of the Sales Representatives.

222.   Sales Representatives were given little if any training on proper sales techniques or the health care laws that governed their conduct.  Sales Representative Rachel Ammons testified under oath that Paragon Partners management periodically suggested sales initiatives or tactics that sounded problematic.  In these situations, Rachel Ammons would often try to read up on the health care laws on her own, because leadership at Paragon Partners did not take responsibility for such matters.

223.   All of the Sales Representatives were paid on a commission basis.  Each Sales representative's commission depended on the revenue from prescriptions directed to the Defendant Pharmacies by the clinicians on whom the Sales Representative called.

224.   By way of example, under his contract with Paragon Partners, Kristopher Ammons was paid "twenty percent (25.0%) [*sic*] of the net sales price of all products sold including compounded and traditional medications sent to the pharmacy."

225.   Sales Representative commissions included reimbursement received by the Defendant Pharmacies for federal health care program beneficiaries.

226.    By way of example, the commission paid to Kristopher Ammons in 2019 included Medicare Part D plan reimbursement for: (1) "Patient A," for whom Defendant Pharmacy One Way Drug LLC dispensed doxycycline hyclate 100 mg, vancomycin HCL 200 mg, and nystatin topical powder 100000 u/gm, prescribed by Dr. Mukker; (2) "Patient B," for whom Defendant Pharmacy Inland Medical Consultants LLC dispensed tetracycline 500 mg, clindamycin phosphate 1% solution, and voriconazole 200 mg, prescribed by Dr. Larkins; and (3) "Patient C," for whom Defendant Pharmacy Inland Medical Consultants LLC dispensed flurandrenolide 0.05% cream, prescribed by Dr. Srivasta. Under Kristopher Ammons's contract with Paragon Partners, he was to receive 20 or 25 percent of that reimbursement.

227.    James Harmon was responsible for providing commission reports to Sales Representatives.  In that role, he repeatedly observed Sales Representatives' commissions containing revenues from federal health care programs.

228.    The commissions paid to Sales Representatives were directly funded with revenues from the Defendant Pharmacies.  Peters transferred funds from the Defendant Pharmacies to the Defendant Marketing Entities to cover Sales Representative commissions.

229.    Peters knew that it was a violation of the AKS to pay Sales Representatives using the commission structure that he used.

230.    On November 18, 2019, an administrator for Defendant Paragon Partners emailed a "Health Care Compliance Sales and Marketing" slide deck to various Sales Representatives.  A slide called "The Don't(s) of Pharmacy Marketing" stated that if a pharmacy-affiliated independent contractor is generating government program patients for the pharmacy, "the pharmacy cannot pay percentage compensation to the independent contractor. Any compensation paid to such individual must comply with the Personal Services and Management Contracts Safe Harbor to the AKS."

231.    Further, the "The Don't(s) of Pharmacy Marketing" slide stated that "the pharmacy and independent contractor cannot engage in a 'carve out' arrangement in which the pharmacy pays (i) the independent contractor percentage compensation for commercial insurance patients and (ii) nothing for government program patients."

41

232.   The November 18, 2019 email was sent to Kristopher Ammons, Rachel Ammons, and ten other Sales Representatives that had been paid by Paragon Partners in 2019, in addition to James Harmon and Lea Lametta.

233.   All prescriptions to the Defendant Pharmacies came in from clinicians with one or more Sales Representative assigned to call on them.

234.   For prescriptions dispensed between the beginning of 2017 and the end of 2020, the Pharmacies were paid at least $37,920,664.86 by Medicare Part D plans for medications prescribed by a clinician with an assigned Sales Representative.

**B.**   **Incentivized by Unlawful Commissions, the Sales Representatives Used Illicit Tactics to Push Physicians to Prescribe to the Pharmacies, Regardless of Whether the Prescriptions Were Medically Appropriate.**

235.   Peters communicated to Sales Representatives which drugs were most profitable for the Pharmacies, identifying specific average profits for medications (*e.g.*, that the most profitable oral anti-inflammatory is naproxen 375mg oral solution, with average net profit of $280).  That allowed Sales Representatives to promote the highest-paying medications, rather than the most appropriate medications for various medical conditions. This strategy would result in both higher profits for the Pharmacies and higher commissions for the Sales Representatives.

236.   The Sales Representatives used expensive dinners, happy hours, gifts, meals delivered to physician offices, and entertainment to entice clinicians to prescribe to the Pharmacies.  The Sales Representatives expensed these endeavors to the Defendant Marketing Entities, which were funded by the Defendant Pharmacies through Peters.

237.   By way of example, on July 7, 2015, Kristopher Ammons suggested golf with Dr. Mukker.  Dr. Mukker responded, "U must have read my mind!!! I've been pounding the rx's, and was thinking about hitting u up to go have appys and drinks this Friday!!!  How about golf on Thursday ?"

238.   The next month, Mukker openly requested another happy hour as reward for his prescriptions to the Defendant Pharmacies.  He wrote to Kristopher Ammons, "Do u think we can go out for drinks this Friday at yard house?  Killed another pad today!!!"

239. Example golf outings involving Kristopher Ammons and Dr. Mukker include May 19, 2015; August 13, 2015; October 13, 2015 (at which Ammons initially presented an investment opportunity to Dr. Mukker involving the Defendant Pharmacies); January 15, 2016; January 21, 2016; March 28, 2016; July 26, 2016; August 26, 2016; November 21, 2017; January 4, 2018; February 15, 2018; April 24, 2018; May 15, 2018; May 16, 2018; and August 9, 2018, among others.

240. Messages between the two often reference Ammons paying for Dr. Mukker's golf. For example, on August 8, 2019, Ammons texted Dr. Mukker, "Bro your [prescription] # were great[.] Thank you for stepping up huge[.] I'll get your golf and a happy hour next week[.]"

241. On several of these occasions, Dr. Mukker requested that Ammons bring distribution checks from the MSOs.

242. During the time period relevant to this Complaint, "Sales Representative A" of Seattle, WA made cash payments to physicians to direct prescriptions to the Defendant Pharmacies.

243. Sales Representative A would periodically disguise these cash payments as compensation for speaking engagements on behalf of the Pharmacies. Ostensibly, a physician being paid by Sales Representative A would be engaged to speak to audiences of other prescribers at dinner events about the medications offered by the Defendant Pharmacies. However, these speaking engagements involved little or no medical discussion and simply amounted to prescribing physicians being paid (as "speakers") to attend dinners at high-end restaurants. Those meals were paid for with revenues from the Defendant Pharmacies.

244. Peters knew about the cash payments made by Sales Representative A. Peters did not discourage Sales Representative A from making those payments to prescribers or take corrective action.

245. In addition to meals and entertainment, Peters arranged for Sales Representatives to help prescribing physicians financially benefit in their office practices, to engender loyalty to the Pharmacies.

246. By way of example, Peters liberally arranged to send free samples of lidocaine cream for physicians to use in their office procedures. Physicians who conduct minor surgeries in their offices require pain relief medications and numbing agents to use in the procedures. Normally, a physician practice would need to buy those medications and numbing agents. But Peters often provided them for free through the Pharmacies, saving physicians the expense.

247.     Messages between Peters and Kristopher Ammons show Peters providing free lidocaine to "Physician E" on June 29, 2016, when Ammons suggested Physician E would prescribe in high volumes to the Defendant Pharmacies.  Peters also sent free lidocaine to Dr. Ruiz and to Dr. Mukker throughout 2017 for use in their office procedures.  On February 3, 2017, Peters confirmed to Ammons that Drs. Ruiz and Mukker could have "Lidocaine 2% jelly samples. As many as they want. Alll that we can do[.]"  When those lidocaine samples were not received by Drs. Ruiz and Mukker, Ammons replied to Peters, "Send them to me this time[.] I'll take them over[.] It's a damn frat house in this place … A money making frat house."  Peters replied "Ha ha ha. What address? It will go now."

248.     As another example of finding ways to provide extra financial benefits for prescribers on the side, James Harmon worked with Sales Representatives around the country to help referring physicians set up the sale of cannabidiol (known as CBD) in the physicians' offices, as a means for the physicians to add another revenue stream.

249.     As a further example, in October 2019, Paragon Partners began arranging to secure steeply discounted malpractice insurance for prescribing physicians, securing off-market arrangements with an insurance supplier to save prescribing physicians ten percent on their premiums.

## VIII.   PETERS CONCEALED OVERUTILIZATION RESULTING FROM UNLAWFULLY-INDUCED PRESCRIPTIONS

250.     In connection with the MSO investment and Sales Representative commission schemes, it was foreseeable that the Defendant Pharmacies would receive prescriptions that were excessive or medically inappropriate for patient health conditions.

251.     Under Peters's direction, the Defendant Pharmacies took steps to circumvent the exercise of physicians' medical judgment and conceal overutilization concerns raised by patients and insurance payors.

252.     When MSO physician investors' prescriptions to the Defendant Pharmacies began to be audited by Medicare and private insurance plans, Peters would provide responses to the audited physicians and arrange for those physicians to sign back-dated documentation of prescriptions.

//

//

253.    For example, on October 24, 2018, Peters created a prescription order form for Dr. Ruiz's signature, backdated to December 18, 2017, to send to an insurance auditor questioning certain claims submitted by the Pharmacies.

254.    As another example, Dr. Larkins received a series of audits from insurance payors in the fall of 2019, including several from a Medicare Drug Integrity Contractor.  Peters instructed Kristopher Ammons to tell Dr. Larkins to respond that he had prescribed the products <u>and</u> that they were helpful in the treatment of the patient's condition (regardless of the accuracy of either of those statements or the physician's own judgment).  However, Dr. Larkins responded that he did not prescribe a number of the medications, and that the relevant Defendant Pharmacy had made unauthorized substitutions.

255.    As a standard practice, Peters pushed for MSO physician investors to sign "standing change orders" that stated the Pharmacies could substitute a wide array of drugs (e.g., twelve different alternatives) for a prescriber's selected medication, for any patient of the prescriber, indefinitely.  These "standing change orders" allowed the Pharmacies to pursue reimbursement if a payor did not cover a particular medication or did not believe that a medication was effective for a particular condition.  In other words, "standing change orders" ignored any patient-specific medical judgment that the physician had exercised in the patient's circumstances, so that the Pharmacies could get paid.

256.    The Pharmacies and Sales Representatives took other measures to circumvent insurance plan limits on overutilization.  By way of example, Dr. Mukker prescribed 240 grams of a scar cream for "Patient D" in approximately October 2018.  Patient D's insurance plan did not cover more than 60 grams of that cream at a time.  To circumvent this limitation, the Pharmacies dispensed four different jars containing 60 grams of the cream, and submitted four different claims for those medications, in close succession.  That enabled the Pharmacies to receive the higher price for 240 grams (for which Dr. Mukker had been incentivized to prescribe by his MSO investment).

## IX.    PETERS USED SHELL CORPORATIONS TO CONCEAL HIS CONDUCT

257.    In the attempt to evade detection of the MSO investment scheme and the commission payments to Sales Representatives, Peters created fourteen Defendant Pharmacies and multiple duplicative corporations.

//

258. He exercised complete control of each Defendant named in this Complaint, but enlisted nominal owners and officers to be listed on the paperwork.

259. Peters named a family member as registered manager or officer for at least six of the Pharmacies, even though Peters himself retained control at all relevant times.

260. James Harmon was the registered member or Chief Executive Officer for two of the Pharmacies, Optimum Care Pharmacy Inc. and Glendale Pharmacy LLC. Peters directed him to assume those titles. In reality, Peters retained complete control over each entity, and Harmon had very few responsibilities with respect to either.

261. Multiple of the Defendant Pharmacies shared the same registered business address.

262. As predominantly mail-order pharmacies, the Defendant Pharmacies were largely duplicative and there was no legitimate business need for Peters to operate fourteen Pharmacies, beyond obscuring improper conduct.

263. The Coastline MSO and the Bayview MSO were nearly identical, with nearly all employees in common. There was no reason to create the Bayview MSO in place of the Coastline MSO, except to create additional corporate entities.

264. James Harmon is also the registered manager of Cardea Consulting and Praxis Marketing Services because Peters instructed him to be. But Peters retained all operational control over these two companies during the time period relevant to this Complaint. Peters wanted these companies created so that payments to the Sales Representatives would be funneled through multiple companies and to avoid direct contracts between the Sales Representatives and the Pharmacies.

265. The business purpose of each Marketing Entity Defendant was to serve as a corporate intermediary—paying the Sales Representatives who promoted the Defendant Pharmacies, while attempting to distance the Pharmacies from those Sales Representatives.

266. During the time period relevant to this Complaint, the Marketing Entity Defendants exercised little oversight over the operations of the Sales Representatives.

267. During the time period relevant to this Complaint, the Marketing Entity Defendants were largely duplicative of each other.

//

46

## COUNT I

Against Matthew Peters and the Defendant Pharmacies
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1)(A))

268. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

269. Matthew Peters and the Defendant Pharmacies knowingly submitted claims to federal health care programs and related payors (such as Medicare Part D plans) that were false or fraudulent, and not payable, because they were (1) prescribed by a clinician knowingly and willfully paid remuneration in the form of MSO revenue distributions to induce or reward such prescriptions and/or (2) recommended by a Sales Representative knowingly and willfully paid remuneration in the form of commissions from Defendant Pharmacy revenues to induce or reward the recommendation of prescriptions to the Defendant Pharmacies.

270. Further, said Defendants actually knew, deliberately ignored, or recklessly disregarded the fact that this unlawful remuneration was paid and that the associated claims were false.

271. Said Defendants presented the following claims to federal health care programs that were false or fraudulent, and not payable:

a. All of the claims for payment submitted to federal health care programs for medications dispensed by any of the Defendant Pharmacies in connection with a prescription issued by any clinician investing in any of the MSOs, prior to or following the clinician's investment.

b. All of the claims for payment submitted to federal health care programs for medications dispensed by any of the Defendant Pharmacies in connection with a prescription issued by a clinician with a Sales Representative assigned to such clinician, to promote any of the Defendant Pharmacies or any product dispensed by the Defendant Pharmacies.

272. These claims would not have been paid if federal health care programs knew of the AKS violations described in this Complaint.

273. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

1

## COUNT II

2

Against All Defendants
(False Claims Act: Causing to be Presented False Claims)
(31 U.S.C. § 3729(a)(1)(A))

3

4       274.    The United States incorporates by reference all paragraphs of this Complaint set out

5   above as if fully set forth herein.

6       275.    Matthew Peters and the Defendant Pharmacies knowingly submitted claims to federal

7   health care programs and related payors (such as Medicare Part D plans) that were false or fraudulent,

8   and not payable, because they were (1) prescribed by a clinician knowingly and willfully paid

9   remuneration in the form of MSO revenue distributions to induce or reward such prescriptions and/or (2)

10  recommended by a Sales Representative knowingly and willfully paid remuneration in the form of

11  commissions from Defendant Pharmacy revenues to induce or reward the recommendation of

12  prescriptions to the Defendant Pharmacies.

13      276.    Through Peters, the Defendant MSOs knowingly and willfully paid investing prescribers

14  to induce and reward their prescriptions, distributing revenues from medications dispensed by the

15  Defendant Pharmacies to do so.

16      277.    The Marketing Entity Defendants made the knowing and willful payment of unlawful

17  commissions to the Sales Representatives for promoting the Defendant Pharmacies, while funding and

18  failing to control the illicit tactics the Sales Representatives used to encourage physicians to prescribe.

19      278.    Strand View Enterprises held ownership interest in the Defendant MSOs, issued relevant

20  communications to MSO investors, supported the investment in Defendant MSOs by prescribers and,

21  through Peters, facilitated the movement of funds to enable unlawful MSO investor distributions and

22  commission payments to Sales Representatives.

23      279.    Innovative Specialty Services, through Peters, received and transmitted the investment in

24  Defendant MSOs by prescribers.

25      280.    As a result, said Defendants caused to be presented the following claims to federal health

26  care programs that were false or fraudulent, and not payable:

27          a.   All of the claims for payment submitted to federal health care programs for medications

28              dispensed by any of the Defendant Pharmacies in connection with a prescription issued

by any clinician investing in any of the MSOs, prior to or following the clinician's investment.

b. All of the claims for payment submitted to federal health care programs for medications dispensed by any of the Defendant Pharmacies in connection with a prescription issued by a clinician with a Sales Representative assigned to such clinician, to promote any of the Defendant Pharmacies or any product dispensed by the Defendant Pharmacies.

281. These claims would not have been paid if federal health care programs knew of the AKS violations described in this Complaint.

282. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT III

Against All Defendants
(False Claims Act: Conspiracy)
(31 U.S.C. § 3729(a)(1)(C))

283. The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

284. The Defendants entered into an unlawful agreement to cause the presentation of false or fraudulent claims to federal health care programs, and performed acts in furtherance of this conspiracy.

285. Specifically, Defendant Matthew Peters formed and operated the Defendant MSOs as vehicles through which physician investors were paid remuneration in order to induce them to prescribe to the Defendant Pharmacies or reward such prescriptions.

286. Through Peters, the Defendant MSOs performed acts in furtherance of this conspiracy by knowingly and willfully paying investing prescribers to induce and reward their prescriptions, distributing revenues from medications dispensed by the Defendant Pharmacies to do so.

287. Defendant Matthew Peters formed and operated the Defendant Marketing Entities as vehicles through which to pay remuneration to the Sales Representatives to induce or reward the recommendation of prescriptions to the Defendant Pharmacies.

288. The Marketing Entity Defendants performed acts in furtherance of this conspiracy by supporting the knowing and willful payment of unlawful commissions to the Sales Representatives for

promoting the Defendant Pharmacies, while funding and failing to control the illicit tactics the Sales

Representatives used to encourage physicians to prescribe.

289.    Strand View Enterprises performed acts in furtherance of this conspiracy by holding

ownership interest in the Defendant MSOs, by issuing relevant communications to MSO investors, by

supporting the investment in Defendant MSOs by prescribers and, through Peters, by facilitating the

movement of funds to enable unlawful MSO investor distributions and commission payments to Sales

Representatives.

290.    Innovative Specialty Services performed acts in furtherance of this conspiracy by,

through Peters, receiving and transmitting the investment in Defendant MSOs by prescribers.

291.    By virtue of these false or fraudulent claims, the United States suffered damages in an

amount to be determined at trial.

### COUNT IV

Against Peters and the Defendant Pharmacies
(False Claims Act: Avoiding or Decreasing an Obligation to Pay or Transmit
Money or Property to the Government)
(31 U.S.C. § 3729(a)(1)(G))

292.    The United States incorporates by reference all paragraphs of this Complaint set out

above as if fully set forth.

293.    Matthew Peters and the Defendant Pharmacies knowingly submitted claims to federal

health care programs that were false or fraudulent, and not payable, because they were (1) prescribed by

a clinician knowingly and willfully paid unlawful remuneration in the form of MSO revenue

distributions to induce or reward such prescriptions and/or (2) recommended by a Sales Representative

knowingly and willfully paid remuneration from Defendant Pharmacy revenues to induce or reward the

recommendation of prescriptions to the Defendant Pharmacies.

294.    Despite knowledge that such kickbacks violated the AKS, and knowledge that the

Defendant Pharmacies had been received payments from federal health care programs in relation to

those claims that are considered "overpayments" under 42 U.S.C. § 1320a-7k(d)(4), Defendant Peters

did not report and return those overpayments as required under 42 U.S.C. § 1320a-7k(d)(1).

295.    Defendant Peters took steps to conceal these overpayments from detection.

296.    By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT V

Against Peters
Unjust Enrichment

297.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

298.    Defendant Matthew Peters personally profited during all periods in which the Defendant Pharmacies submitted claims to federal health care programs that were false or fraudulent, and not payable, because they were (1) prescribed by a clinician knowingly and willfully paid remuneration in the form of MSO revenue distributions to induce or reward such prescriptions and/or (2) recommended by a Sales Representative knowingly and willfully paid remuneration in the form of commissions from Defendant Pharmacy revenues to induce or reward the recommendation of prescriptions to the Defendant Pharmacies.

299.    By reason of the personal income described above, Matthew Peters received money to which he was not entitled.  Thus, Peters has been unjustly enriched and the United States is entitled to the funds to which Peters was not entitled, in an amount to be determined at trial.

## COUNT VI

Against Peters and the Defendant Pharmacies
Payment by Mistake

300.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

301.    From 2015 through 2020, the United States, through the federal health care programs, paid Defendant Pharmacies as a result of mistaken understandings of fact.

302.    The United States' mistaken understandings of fact were material to the decision to pay the claims submitted by Matthew Peters and the Defendant Pharmacies.

303.    The United States, acting in reasonable reliance on the truthfulness of the claims and representations to the federal health care programs, paid to Defendant Pharmacies monies to which they were not entitled. Specifically, through the federal health care programs, the United States paid to the

Defendant Pharmacies claims for payment for prescription medications tainted by unlawful remuneration.  Thus, the United States is entitled to recoup such monies, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, the United States requests that judgment be entered in its favor and against the Defendants as follows:

(a)  On Counts I, II, III, and IV (False Claims Act), for the amount of the United States' damages, trebled as required by law, and the maximum civil penalties as are authorized by law, together with all such further relief as may be just and proper.

(b)  On Count V (Unjust Enrichment), in the amount by which Defendant Peters was unjustly enriched;

(c)  On Count VI (Payment by Mistake), in the amount of money illegally obtained and retained by Defendant Peters and the Defendant Pharmacies; and

(d)  Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

### DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.


Respectfully submitted,

PHILLIP A. TALBERT
UNITED STATES ATTORNEY

Dated:  January 22, 2024          By:     */s/ David E. Thiess*
                                         DAVID E. THIESS
                                         Assistant United States Attorney