PHILLIP A. TALBERT
United States Attorney
DAVID E. THIESS
STEVEN S. TENNYSON
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900
David.Thiess@usdoj.gov
Steven.Tennyson2@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cv-00287-WBS-CKD |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS (DKT. NO. 21)** |
| v. | |
| MATTHEW H. PETERS, *et al.*, | DATE :     July 8, 2024 |
| Defendants. | TIME  :     1:30 pm<br>CTRM :     5, 14th Floor<br>JUDGE:     Honorable William B. Shubb |

United States' Opposition to Defendants'
Motion to Dismiss

1

# TABLE OF CONTENTS

2
Page

3

I.   INTRODUCTION ................................................................................................ 1

4

II.  FACTUAL BACKGROUND ............................................................................... 2

5

    A.  The MSO Investment Scheme: Kickbacks to Doctors Disguised as Investment Returns  3

6

    B.  The Sales Representative Commission Scheme ................................................ 5

7

III. PLEADING STANDARDS GOVERNING THE MOTION ................................ 6

8

IV. ARGUMENT ....................................................................................................... 7

9

    A.  The FCA Action is Not Time-Barred ............................................................. 7

10

       1.   The FCA Action Is Timely on Its Face ................................................... 7

11

       2.   Defendant Peters's Plea Agreement Involves Separate Crimes and Has No Effect on the Timeliness of the Complaint ................................. 8

12

13

    B.  The United States' Complaint Sets Forth Details Beyond the Required Level of Particularity ..................................................................................... 9

14

       1.   The Complaint Alleges Sufficient Detail Regarding the MSO Investment Scheme ............................................................................... 9

15

16

       2.   The Complaint Alleges Sufficient Detail Regarding the Sales Representative Commission Scheme ....................................................... 10

17

       3.   The Complaint Provides Sufficiently Reliable Indicia that False Claims were Submitted .............................................................. 12

18

19

       4.   The Complaint Sufficiently Describes Each Defendant's Role ............................. 13

20

       5.   Defendants Fail to Identify the Details They Contend the Complaint Lacks ...... 15

21

    C.  The Complaint Adequately Alleges Distinct Individuals and Entities in a Conspiracy ............................................................................................. 16

22

    D.  The Reverse FCA Claims Are Not Redundant ............................................... 18

23

    E.  The United States' Common Law Claims Are Not Time-Barred Under the Appropriate Federal Standard ....................................................................... 19

24

V.  CONCLUSION ................................................................................................. 21

25

26

27

28

United States' Opposition to Defendants'
Motion to Dismiss

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agility Public Warehousing Co. K.S.C.P. v. United States,*
    969 F.3d 1355 (Fed. Cir. 2020) ................................................................ 19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................................ 6

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 6

*Cataldo v. U.S. Steel Corp.,*
    676 F.3d 542 (6th Cir. 2012) ........................................................................ 7

*Cooper v. Pickett,*
    137 F.3d 616 (9th Cir. 1997) ........................................................................ 6

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984) ...................................................................................... 16

*Destfino v. Reiswig,*
    630 F.3d 952 (9th Cir. 2011) ...................................................................... 14

*Ebeid ex rel. United States v. Lungwitz,*
    616 F.3d 993 (9th Cir. 2010) ................................................................ 12, 13

*Gilbrook v. City of Westminster,*
    177 F.3d 839 (9th Cir. 1999) ...................................................................... 16

*Hernandez v. City of El Monte,*
    138 F.3d 393 (9th Cir. 1998) .................................................................... 7, 8

*Novato Fire Prot. Dist. v. United States,*
    181 F.3d 1135 (9th Cir. 1999) .................................................................... 20

*Olympic Coast Inv. v. Seipel,*
    208 F. App'x 569 ............................................................................................ 18

*Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC,*
    733 F.3d 1251 (9th Cir. 2013) ...................................................................... 7

*Skinner v. Switzer,*
    562 U.S. 521 (2011) ...................................................................................... 20

ii

United States' Opposition to Defendants'
Motion to Dismiss

*Supermail Cargo, Inc. v. United States*,
    68 F.3d 1204 (9th Cir. 1995) ......................................................................... 7

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) ........................................................................ 7

*U.S. ex rel. Cericola v. Fed. Nat. Mortg. Assoc.*,
    529 F. Supp. 2d 1139 (C.D. Cal. 2007) ........................................................ 8

*United States ex rel. Condie v. Bd. of Regents of Univ. of California*,
    1993 WL 740185 (N.D. Cal. Sept. 7, 1993) ................................................ 20

*United States ex rel. Everest Principals, LLC v. Abbott Laboratories, Inc.*,
    622 F. Supp. 3d 920 (S.D. Cal. Aug. 18, 2022) ......................................... 13

*United States ex rel. Gagne v. City of Worcester*,
    565 F.3d 40 (1st Cir. 2009) ........................................................................... 7

*United States ex rel. Kane v. Healthfirst, Inc.*,
    120 F. Supp. 3d 370 (S.D.N.Y. 2015) ......................................................... 18

*United States ex rel. Lee v. Corinthian Colls.*,
    655 F.3d 984 (9th Cir. 2011) .................................................................. 6, 13

*United States ex rel. Lutz v. Mallory*,
    988 F.3d 730 (4th Cir. 2021) ...................................................................... 10

*United States ex rel. Osinek v. Permanente Med. Grp., Inc.*,
    640 F. Supp. 3d 885 (N.D. Cal. 2022) ........................................................ 20

*United States ex rel. Radhakrishnan v. Gampel*,
    2024 WL 894671 (D. Ariz. Mar. 1, 2024) ............................................. 20, 21

*U.S. ex rel. Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ................................................... 13, 14, 15, 17

*United States ex rel. Swoben v. United Healthcare Ins. Co.*,
    848 F.3d 1161 (9th Cir. 2016) ............................................................. passim

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) .................................................................... 19

*United States v. Calabrese*,
    825 F.2d 1342 (9th Cir.1987) ..................................................................... 16

*United States v. Carell*,
    681 F. Supp.2d 874 (M.D. Tenn. 2009) ..................................................... 19

iii

United States' Opposition to Defendants'
Motion to Dismiss

*United States v. Mead*,
   426 F.2d 118 (9th Cir. 1970) ............................................................................................ 19, 20

*United States v. Paksn, Inc.*,
   No. 2:15-cv-09064-SB-AGR, 2021 WL 6882171 (C.D.Cal. Nov. 15, 2021) ..................................... 13

*United States v. Polin*,
   194 F.3d 863 (7th Cir. 1999) ............................................................................................ 11

*United States v. St. Junius*,
   739 F.3d 193 (5th Cir. 2013) ............................................................................................ 10

*United States v. Stella Perez*,
   956 F. Supp 1046 (D.P.R. 1997) ........................................................................................ 20

*United States v. Summerlin*,
   310 U.S. 414 (1940) ................................................................................................... 19, 20

*United States v. Thompson*,
   98 U.S. 486 (1878) ...................................................................................................... 20

*United States v. Vernon*,
   723 F.3d 1234 (11th Cir. 2013) ......................................................................................... 10

*United States v. Wurts*,
   303 U.S. 414 (1938) ................................................................................................... 19, 20

*Vieux v. E. Bay Reg'l Park Dist.*,
   906 F.2d 1330 (9th Cir. 1990) .......................................................................................... 16

**Statutes**

28 U.S.C. § 2415(a) .......................................................................................................... 19

31 U.S.C. § 3129(a)(1)(G) .................................................................................................. 18

31 U.S.C. § 3731(b) ........................................................................................................... 7

31 U.S.C. § 3731(b)(1) ........................................................................................................ 7

31 U.S.C. § 3731(b)(2) ........................................................................................................ 7

**Rules**

Fed. R. Civ. P. 8(d)(2) ...................................................................................................... 18

Fed. R. Civ. P. 9(b) .................................................................................................... passim

iv

United States' Opposition to Defendants'
Motion to Dismiss

Fed. R. Civ. P. 15(c)(1)(B) ................................................................................................ 8

**<u>Other Authorities</u>**

Federal Practice and Procedure § 1298 (3d ed. 2016) ...................................................... 6

v

United States' Opposition to Defendants'
Motion to Dismiss

1

# I.    __INTRODUCTION__

2      The Defendants' motion to dismiss should be denied in its entirety.[1] The United States' First

3 Amended Complaint ("Complaint") alleges that Defendant Matthew Peters, through a complex web of

4 entities he controlled, bribed physicians and sales representatives to generate prescriptions to his mail-

5 order compounding pharmacies, so that he could bill federal health care programs in excessive amounts.

6 As Defendants note in their combined Motion to Dismiss, the Complaint contains 303 numbered

7 paragraphs and spans 56 pages. That is a result of the acute specificity with which the Complaint

8 describes the two schemes to induce prescriptions these mail-order pharmacies, perpetrated by Matthew

9 Peters and the companies he controlled.

10      As alleged in the Complaint, Defendants violated the federal Anti-Kickback Statute ("AKS") and

11 False Claims Act ("FCA") in two ways. First, Defendants engaged in a sham investment scheme to pay

12 prescribing physicians kickbacks disguised as investment income in exchange for sending

13 prescriptions—including medications billed to Medicare Part D plans—to the pharmacies controlled by

14 Defendant Peters. Second, Defendant Peters, through a series of shell intermediaries, paid a band of

15 loosely-affiliated sales representatives kickbacks in the form of commissions for bringing in as many

16 prescriptions for the most expensive prescriptions as possible. Both of these schemes violated the AKS

17 and made the resulting claims to federal health care programs false under the FCA.

18      Defendants do not appear to dispute that the United States has plausibly alleged violations of the

19 AKS and FCA. Relying solely on Defendant Peters's guilty plea to separate federal crimes, Defendants

20 baselessly assert the FCA claims are untimely. This argument overlooks both the six-year statute of

21 limitations under the FCA, and the Complaint's numerous allegations of specific acts falling squarely

22 within that six-year period. Defendant Peters's separate federal criminal convictions do not allow him or

23 any other Defendants to escape liability.

24

25

---

26      [1] The motion to dismiss filed at Dkt. No. 21 was brought by Defendants Matthew Peters and
fourteen of the entities that he controls. They are referred to in this Opposition as "Defendants." This
27 includes eight of the fifteen pharmacies named as defendants; both of the management services
organizations named as defendants; all three of the marketing entities named as defendants; and
28 Innovative Specialty Services, LLC. See Def. Br., Dkt. No. 21, at 6 ("Def. Br.").

United States' Opposition to Defendants'
Motion to Dismiss

Then, Defendants vaguely assert that the Complaint fails to meet the particularity requirements of Rule 9(b). But the Complaint is full of the who, what, when, where, and how needed to plead fraud with particularity. The Complaint identifies the entities involved, the people who ran those entities (in name and in practice), how money flowed between particular Defendants, precise details about how Defendants operated the investment scheme, how investment payouts were calculated (including how that changed over time), how the commission-paid sales representatives induced physicians to send their patients' prescriptions to the Peters-controlled pharmacies, and revenue from the resulting claims to Medicare Part D plans for prescriptions—including numerous specific examples of transactions and communications showing these facts. This is more than enough detail to meet the requirements of Rule 9(b). Looking past these extensive allegations, Defendants' general demurrer regarding lack of particularity does not actually cite a single paragraph of the Complaint or illustrate any specific lack of particularity in the context of the Complaint's allegations. Rather, Defendants attempt to deposit a few legal standards (some of them without citation or plainly inaccurate) and ignore the well-plead allegations of the Complaint, without reason or justification.

This Opposition begins with a summary of the factual background. Then, it outlines the legal standards governing pleading. Next, it addresses each of Defendants' arguments in the order appearing in their Motion to Dismiss, highlighting how Defendants have provided no reason to dismiss the Complaint.

## II.    FACTUAL BACKGROUND

Defendant Peters operated and controlled a collection of fifteen mail-order compounding pharmacies. (Dkt. No. 5 ("Compl.") ¶¶ 5, 6 to 20). Those pharmacies, named as defendants in this action (the "Defendant Pharmacies"), were functionally indistinguishable. (*Id*. ¶ 265). Peters made it appear as if he had no relationship to many of the Defendant Pharmacies, by installing family members and associates as straw officers (*id*. ¶ 266) and engaging in circuitous financial transactions to obscure the fact that he capitalized them and benefited from them. (*Id*. ¶¶ 116, 262). But contrary to the false appearance he cultivated, Peters maintained complete control over the operations and finances of the Defendant Pharmacies. (*Id*. ¶ 266).

The Complaint describes two types of kickbacks that Peters used to draw prescriptions to the

United States' Opposition to Defendants'
Motion to Dismiss

Defendant Pharmacies he controlled. Each induced prescription allowed Peters's Pharmacies to submit false claims for reimbursement to federal health programs or other insurers (*id*. ¶¶ 106, 199, 207), and Peters to personally profit (*Id*. ¶ 298).  These kickbacks reflected Peters's and the Defendant Pharmacies' desire to bill for as many medications for as high of prices as possible, regardless of whether the medications were medically appropriate for any given patient or actually prescribed by a doctor for that patient. (*See id*. ¶ 255 (dispensing drugs not prescribed); *id*. ¶ 256 (dispensing drugs not genuinely prescribed for a given patient); *id*. ¶ 188 (dispensing drugs in greater quantities than prescribed)).

## A. The MSO Investment Scheme: Kickbacks to Doctors Disguised as Investment Returns

One of those kickback schemes paid doctors kickbacks for sending prescriptions, under the guise of physicians investing in Peters-controlled entities and receiving financial returns on that investment. The investments were in two hollow "management service organizations" (or "MSOs") created by Peters.  The first MSO was Coastline Specialty Services LLC, which operated approximately June 2017 to August 2018. (*Id*. ¶¶ 114, 127). The second MSO was Bayview Specialty Services, which operated approximately September 2018 to early 2020. (*Id*. ¶ 129). These two MSOs ("the Defendant MSOs") existed to funnel payouts to physician investors for their prescriptions and served no bona fide business purpose. (*Id*. ¶¶ 138, 142).  Only physicians who prescribed to the Defendant Pharmacies were offered a chance to invest. (*Id*. ¶ 92).

The Defendant MSOs were funded with the Defendant Pharmacies' revenue. (*Id*. ¶¶ 116 to 118, 120 to 124, 132 to 134). Indeed, the Defendant Pharmacies were the *sole* source of revenue for the Defendant MSOs, with the Defendant MSOs having no other customers or business partners. (*Id*. ¶¶ 116, 130). The Defendant MSOs' most significant financial expenditure—far and away—was each month's payout to prescribing investors. (*Id*. ¶¶ 122-123). In other words, Peters and the Defendant MSOs were not offering Physicians an investment in the growth a legitimate medical enterprise. Physicians were simply investing in and getting paid out from their own prescriptions, which were billed to federal health care programs and other payors. It was a self-sustaining loop, with the federal health care programs and their beneficiaries being primary victims.

United States' Opposition to Defendants'
Motion to Dismiss

Against this backdrop, Peters administered MSO investment to further induce and reward prescriptions to the Defendant Pharmacies in numerous specific ways. Among them:

- Payouts to physicians were extraordinarily high and immediate, in comparison to the up-front money paid by those physicians to invest in the Defendant MSOs, regularly exceeding 500% returns per year (*id*. ¶¶ 99, 143 to 163);

- Each physician's opportunity to buy into the Defendant MSOs (and to buy more shares, after an initial purchase) was based on the physician's prescribing volume to the Defendant Pharmacies, as judged by Peters (*id*. ¶¶ 164 to 184); and

- Physician investors were pressured to prescribe to the Defendant Pharmacies as a condition of their investment (*id*. ¶¶ 185 to 194).[2]

Accordingly, Peters and the Sales Representatives[3] who were authorized to dangle MSO investment as a tool to promote the Defendant Pharmacies made it known to physicians that payouts from the Defendant MSOs were directly connected to each investor's prescriptions directed to the Defendant Pharmacies. Messages cited throughout the Complaint between Peters, Sales Representatives, and MSO physician investors reflected that clear understanding. Because the coveted payouts from the Defendant MSOs were exorbitant and immediate, physician investors often did not need to know about MSO operations or what exactly they were investing in that purportedly generated those investment returns. (*See id*. ¶ 142). And while a usual physician in above-board circumstances would typically know the name of a pharmacy if he or she sent a prescription to that pharmacy, physician investors in the Defendant MSOs were directed to use prescription pads and a centralized fax number Peters created that did not permit physicians to select a pharmacy.[4] (*Id*. ¶¶ 93, 201 to 203). The physician investors did not know which of the Defendant Pharmacies would fill the prescriptions they issued (*id*. ¶ 93) and did not know the identities of many of the Defendant Pharmacies, anyway (*id*. ¶ 204). The key point was just that one of the Defendant Pharmacies would receive the prescriptions and that Peters and the

---

[2] These features of MSO investment reflect the hallmarks of arrangements that violate the AKS, published in federal guidance on physician investment arrangements.  (*See* Compl. ¶¶ 76 to 78.)

[3] As defined in the Complaint. (*Id*. ¶ 33.)

[4] Once received, Peters routed the prescription to the Defendant Pharmacy that he thought would help him best advance his scheme. (*Id*. ¶ 199.)

United States' Opposition to Defendants'
Motion to Dismiss

Defendant MSOs were paying investors to issue them. (*Id*. ¶¶ 93, 205).

### B.    The Sales Representative Commission Scheme

In the second kickback scheme described in the Complaint, Peters and the Marketing Entity Defendants[5] that he controlled paid commission incentives to a group of loosely-affiliated, non-employed Sales Representatives to call on doctors and bring in prescriptions for the Defendant Pharmacies. (*Id.* ¶¶ 218, 220, 221). The commission payments, which were based on a percentage of revenues paid to the Defendant Pharmacies for the prescriptions that the Sales Representatives secured from doctors (*id.* ¶ 224), motivated the Sales Representatives to encourage doctors to issue as many prescriptions, for the costliest drugs, as possible, regardless of which medication was medically appropriate (if any). (*Id.* ¶ 236). At least one of the Marketing Entity Defendants received compliance advice warning that the commission payments violated the AKS, but the scheme continued anyway. (*Id*. ¶¶ 231 to 233). Peters informed Sales Representatives which medications were the most profitable so that they could promote the products with the best profit margin for the Defendant Pharmacies. (*Id*. ¶ 236).

The Sales Representatives were paid using revenues of the Defendant Pharmacies, which included significant sums from federal health care programs based on prescriptions that the Sales Representatives had generated.  (*Id.* ¶ 229). As described in the Complaint, Peters created a labyrinthine system to conceal his Sales Representative relationships, however, keeping all the relationships indirect between shell companies that he controlled (the Marketing Entity Defendants), with straw members he installed. (*Id*. ¶¶ 30 to 32, 268 to 269).  Peters moved money from the Defendant Pharmacies to the Marketing Entity Defendants to do so. (*Id*. ¶¶ 36, 229).

Given the structure of commission payments and no one reining in their conduct, the Sales Representatives often rewarded doctors for prescribing with other kickbacks, such as gifts of expensive alcohol (*id*. ¶ 214), payments for sham services that were not performed (*id*. ¶¶ 243 to 245) and golf (*id*. ¶¶ 240 to 241). The AKS draws significant distinctions between legitimate commissions a health care provider pays to its own employees and commissions paid for health care business brought in by

---

[5] As identified in the Complaint, the Marketing Entities consist of Paragon Partners LLC, Cardea Consulting, LLC, and Praxis Marketing Services LLC. (*Id*. ¶¶ 29-36).

United States' Opposition to Defendants'
Motion to Dismiss

unchecked and distant promoters (*see id.* ¶¶ 79 to 82), the latter of which pose risks to federal health care programs. Toward that end, the Marketing Entity Defendants did not exercise any oversight over the Sales Representatives, rein in their activities, or undertake the responsibilities of an employer. (*Id.* ¶ 223). Quite the contrary, Peters was aware of extra benefits Sales Representatives were providing to doctors and paid for those benefits from Pharmacy revenues and assisted in those efforts. (*Id.* ¶¶ 244, 247 to 248).

## III.    PLEADING STANDARDS GOVERNING THE MOTION

Dismissal of a complaint for failure to state a claim under Rule 12(b)(6) is unwarranted where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). In considering a motion to dismiss for failure to state a claim, the Court must accept as true a plaintiff's factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Twombly,* 550 U.S. at 555-56; *accord Iqbal*, 556 U.S. at 678.

The pleading standards of Rule 9(b), which apply to claims brought under the False Claims Act, require a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). All "other facts may be plead generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011). "Broad allegations that include no particularized supporting detail do not suffice, but statements of the time, place and nature of the alleged fraudulent activities are sufficient." *United States ex rel. Swoben v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (internal quotation marks omitted). Rule 9(b) "does not require absolute particularity or a recital of the evidence." *Id.* at 1180 (quoting 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (3d ed. 2016)). Thus, "a complaint need not allege 'a precise time frame,' 'describe in detail a single specific transaction,' or identify the 'precise method' used to carry out the fraud." *United Healthcare*, 848 F.3d at 1180 (quoting *Cooper v. Pickett*,137 F.3d 616, 627 (9th Cir. 1997)). The questions of "who, what, when, where, and how" are to be examined "in the context of the complaint as a whole." *United Healthcare*, 848 F.3d at 1181; *see also*

United States' Opposition to Defendants'
Motion to Dismiss

*United States ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009) (finding that Rule 9b is satisfied "when some questions remain unanswered, provided the complaint as a whole is sufficiently particular to pass muster").

At its core, the most basic consideration of Rule 9(b) is to "give adequate notice to an adverse party and enable that party to prepare a responsive pleading" such that the party can "defend against the charge and not just deny that they have done anything wrong.'" *United Healthcare*, 848 F.3d at 1180 (*citations omitted*). Further, "[b]y requiring some factual basis for the claims, the rule protects against false or unsubstantiated charges." *Id.*

## IV.   ARGUMENT

### A.   The FCA Action is Not Time-Barred.

The United States unquestionably alleges conduct occurring within the FCA's statute of limitations and Defendants' arguments on this point should be swiftly rejected. A complaint should not be dismissed due to the statute of limitations unless it is clear from the allegations in the complaint that the claim is time-barred. *See Hernandez v. City of El Monte*, 138 F.3d 393, 402 (9th Cir. 1998) ("A complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995)); *see also Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (finding that dismissal under Rule 12(b)(6) is appropriate only where the allegations on their face "affirmatively show that the claim is time-barred"). In a motion to dismiss, a defendant must show "it is apparent from the face of the complaint the claim is untimely." *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013).

#### 1.   The FCA Action Is Timely on Its Face.

The FCA's statute of limitations provision allows actions to be filed within two alternative limitations periods. The first allows FCA actions within six years of the false claims at issue. 31 U.S.C. § 3731(b)(1). A violation occurs at any time that a false claim is submitted to the Government. *See United States ex rel. Aflatooni v. Kitsap Physicians Serv.,* 314 F.3d 995, 1002 (9th Cir. 2002). The second limitations prong allows actions within "3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged

7

with responsibility to act in the circumstances," and in that case, the action can be brought up to 10 years following the false claims at issue. 31 U.S.C. § 3731(b)(2). FCA plaintiffs can bring actions within whichever of these two periods is later. 31 U.S.C. § 3731(b).

This civil action was brought on January 22, 2024, when the United States filed its original Complaint.[6] (Dkt. No. 1). Based on the six-year prong of the statute of limitations, all claims for FCA violations committed on or after January 22, 2018, are definitively timely. On the face of the Complaint, the United States alleges fraudulent conduct that resulted in false claims submitted to federal health care programs in the years 2018, 2019, and 2020 (which are less than six years preceding the Complaint). (*See* Compl. ¶¶ 121-127, 132-134, 145-147, 149-152, 160, 172, 174-175, 177, 188, 214 (regarding the MSO scheme); *id*. ¶¶ 218, 227, 231, 233, 235 (regarding commission scheme)).  The Complaint alleges that the Defendant Pharmacies received revenue from Medicare Part D plans for claims submitted throughout 2018, 2019 and 2020 that were rendered false by these practices. (*Id.* ¶¶ 122, 156-158, 206-207, 235). Therefore, the Complaint cannot be dismissed because it does not "appear beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim." *Hernandez,* 138 F.3d at 402.  To the contrary, the Complaint's allegations fall squarely within the FCA's 6-year statute of limitations prong.

### 2.    Defendant Peters's Plea Agreement Involves Separate Crimes and Has No Effect on the Timeliness of the Complaint.

Peters's 2020 criminal plea to an earlier health care fraud scheme does not bear on this matter. The plea agreement between Peters and the U.S. Attorney's Office for the District of Oregon, which is attached as Exhibit A to Defendants' Motion to Dismiss ("the Plea Agreement"), lays out another fraud scheme, not appearing in the Complaint. The Plea Agreement states that in 2014 and 2015, Peters knowingly executed a scheme to defraud CVS Caremark by means of false or fraudulent representations. (Def. Br., Ex. A at 2-3). As Peters admitted in the Plea Agreement, a CVS Caremark

---

[6] The First Amended Complaint relates back to the Complaint because the claims brought in it "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B); *see also U.S. ex rel. Cericola v. Fed. Nat. Mortg. Assoc.*, 529 F. Supp. 2d 1139, 1148 (C.D. Cal. 2007) (applying Rule 15 relation back in FCA case).

United States' Opposition to Defendants'
Motion to Dismiss

claims audit uncovered discrepancies potentially requiring two pharmacies owned and operated by Peters to repay claims because the pharmacies did not have documentation that patients actually received medications, and Peters falsified replacement records in an attempt to cover up the discrepancies. (*Id.* at 3). As described in the Plea Agreement, Peters submitted to CVS Caremark 41 written attestations—purportedly from the beneficiaries confirming receipt of their medications—that he forged in order to avoid rescission of the disputed reimbursements and suspension from CVS Caremark's network. (*Id.*).

Defendant Peters's "submi[ssion] that the same allegations underpinning the Government's criminal charges give rise to the Government's civil claims in this case" is obviously wrong. The conduct described in the Plea Agreement is not alleged in the Complaint. Nowhere does the Plea Agreement mention kickbacks, either of the Defendant MSOs (the Coastline MSO or the Bayview MSO), physician investment, Sales Representative commissions, or any of the Marketing Entity Defendants. Only two of the fifteen Defendant Pharmacies named in the Complaint are mentioned in the Plea Agreement. In short, the criminal conduct described in the Plea Agreement is separate, and nothing about that plea can make the FCA claims alleged in the Complaint untimely.[7]

## B.   The United States' Complaint Sets Forth Details Beyond the Required Level of Particularity.

There can be no serious question regarding the sufficiency of the United States' extensive, highly-detailed allegations outlining precisely how Defendants violated the AKS and FCA. These details both provide ample notice of the allegations requiring a response and show that there is sufficient factual basis for a lawsuit, exceeding the requirements and purposes of Rule 9(b).

### 1.   The Complaint Alleges Sufficient Detail Regarding the MSO Investment Scheme.

Defendants assert that the Complaint lacks detail under Rule 9(b), but do not present any cogent argument regarding which details the Complaint might be lacking.  Indeed, none can be offered. While

---

[7] Of course, the mere fact of a prior guilty plea would not in and of itself render any later civil complaint untimely if the same conduct continued into more recent years. However, this case is much simpler than that because the conduct to which Peters pleaded guilty is different from that alleged here.

United States' Opposition to Defendants'
Motion to Dismiss

the 56-page Complaint is replete with allegations regarding "who, what, when, where and how" the

Defendants' fraud was carried out, some examples of particularity regarding the MSO Investment

Scheme include:

- The date ranges that each MSO operated and facilitated unlawful kickbacks to prescribing physicians in the form of investment returns (Compl. at ¶¶ 114, 121, 128-129);

- The specific ways in which Peters administered MSO investment to induce and reward prescriptions to the Defendant Pharmacies (*Id*. ¶¶ 135 to 194);

- Names of specific individual physicians receiving MSO investment payouts in return for their prescriptions to the Defendant Pharmacies (*Id*. ¶¶ 91 and 127 to 129);

- The calculation and history of payouts to physician investors, by month and year, down to the penny (*id*. ¶¶ 122, 126, 127, 132 to 134, 144 to 146, 149 to 152, 159 to 160); and

- Specific examples of the financial calculations and transactions between Defendants facilitating those payouts, again down to the penny (*id*. ¶¶ 120, 122 to 124, and 132 to 134).

These specific allegations are supported by quoted text messages and emails, with specific dates, plainly showing the scheme to induce prescriptions in action.  (*Id.* ¶¶ 141, 154, 159, 160 to 162, 172 to 176, 177 to 181, 185, 189 to 191, 193 to 194, 198, 200, and 213 to 216).  Similarly, the Complaint cites statements made under oath during the investigation of this matter (¶¶ 140, 170, 171) and statements from a recorded presentation made by Peters (¶ 147) to further support these details.

###### 2. The Complaint Alleges Sufficient Detail Regarding the Sales Representative Commission Scheme.

Paying commission to loosely-affiliated sales representatives, based on the payments for prescriptions they generate for a health care provider that bills federal health care programs, is a straightforward violation of the AKS. (Compl. ¶ 79). Courts have thus consistently held the AKS is violated where commissions are paid to independently contracted marketers on behalf of entities submitting claims to federal health care programs. *See United States ex rel. Lutz v. Mallory*, 988 F.3d 730 (4th Cir. 2021) (summarizing findings that "federal appellate courts have frequently, and indeed invariably, upheld [AKS] violations based on commission payments to third parties."); *United States v. St. Junius*, 739 F.3d 193, 209-10 (5th Cir. 2013)*; United States v. Vernon*, 723 F.3d 1234, 1256-58 (11th

10

United States' Opposition to Defendants'
Motion to Dismiss

Cir. 2013); *United States v. Polin*, 194 F.3d 863, 864-66 (7th Cir. 1999)). Defendants do not and cannot contend otherwise.

The Complaint provides substantial detail to underpin the allegations regarding these straightforward violations. These facts include, for example:

- The number of Sales Representatives (Compl. ¶ 218) and names of example Sales Representatives (Kristopher Ammons and Rachel Ammons, cited throughout the Complaint);
- How Sales Representatives were selected (*id*. ¶ 219);
- The entities through which the Sales Representatives were paid (the Marketing Entity Defendants) (*id*. ¶ 220);
- An example contractual provision describing the calculation of commission payments (*id*. ¶ 225);
- Examples of reimbursement from federal health care program claims that were incorporated into Sales Representative commissions (*id*. ¶ 227);
- Who sent commission reports to Sales Representatives (James Harmon) (*id*. ¶ 228);
- Who transferred funds from the Defendant Pharmacies to the Marketing Entity Defendants to fund commission payments to the Sales Representatives (Peters) (*id*. ¶ 229);
- The number of Sales Representatives Peters authorized to push prescriptions to the Defendant Pharmacies by dangling MSO investment (*id*. ¶ 103);
- Numerous examples of other illicit tactics Sales Representatives used to promote the Defendant Pharmacies (*id*. ¶¶ 214, 237 to 250), considering that their commissions depended on the prescriptions they generated; and
- Examples of Peters and the Defendant Pharmacies supporting and financially backing those tactics (*id*. ¶¶ 244, 248).

These facts are also supported by particular details (*e.g*., dates of golf outings), quoted messages between relevant individuals, and statements under oath.

//

//

United States' Opposition to Defendants'
Motion to Dismiss

1

2

       **3.**      **The Complaint Provides Sufficiently Reliable Indicia that False Claims were Submitted.**

3

4

5

6

Defendants assert that the United States has not identified federal health care program claims associated with the two kickback schemes described in the Complaint. (Def. Br., at 10). To the extent Defendants argue that the Complaint must comprehensively list each claim that was associated with the kickback schemes (*e.g.*, by claim identification number), Defendants rely on the wrong standard.

7

8

9

10

11

12

In the Ninth Circuit, "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *United Healthcare*, 848 F.3d at 1180 (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). FCA complaints need not even identify example false claims, let alone identify distinctive information regarding the entire set of false claims. *United Healthcare*, 848 F.3d at 1183 (quoting *Ebeid*, 616 F.3d at 998). The Complaint more than adequately meets that pleading standard.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Complaint identifies specific dollar values paid by Medicare Part D plans for prescriptions resulting from each kickback scheme. The Complaint does so both (1) in the aggregate for a period of multiple years for each kickback scheme (Compl. at ¶¶ 206 and 235) and (2) in the context of several examples specific to each scheme (*e.g.*, *id*. ¶¶ 156, 157, 207, 227). Taking just one example, Paragraph 156 identifies that Dr. Amitabh Goswami was offered the opportunity to increase his investment in the Coastline MSO, from four shares to fourteen, in June 2018. The Complaint specifies that the Defendant Pharmacies shortly thereafter received higher reimbursement from Medicare Part D plans for his prescriptions ($17,180.55 in June 2018) than in previous months. As Dr. Goswami further increased his shares in the Coastline MSO to 40, and thereby substantially increased the payouts he received, Medicare Part D plans paid the Defendant Pharmacies $33,881.19 in July 2018 and $33,856.31 in August 2018 for Dr. Goswami's prescriptions. Considering the details regarding the payouts he received and his clearly communicated understanding of these payments as kickbacks (*see, e.g.*, *id*. ¶¶ 151, 154), the details regarding Medicare Part D reimbursement "lead to a strong inference that claims were actually submitted." *United Healthcare,* 848 F.3d at 1180.

27

28

The particularized evidence cited throughout the Complaint also shows the express ties between the kickbacks and the prescriptions that the Defendant Pharmacies would then claim for payment. For

United States' Opposition to Defendants'
Motion to Dismiss

example, in May 2018, when Peters determined that MSO investor Dr. Sanjay Srivasta would be offered only six additional shares instead of the desired 20 additional shares—because "we need more production" from Dr. Srivasta in order to offer him that many shares (and the monthly payouts that would result)—that is because Peters wanted the Defendant Pharmacies to be able to submit more claims for Dr. Srivasta's prescriptions and be paid more. (Compl. ¶¶ 175-178). Peters pushed for more prescription production from Dr. Srivasta so that the Defendant Pharmacies could submit more claims for those prescriptions.

Combined with allegations that the Defendant Pharmacies each submitted claims to Medicare Part D plans (Compl. ¶ 106) and that Peters communicated to physicians that he preferred Medicare Part D beneficiaries, the extensive emails and texts discussing prescription volume throughout the Complaint further highlight the obvious—that the Complaint provides reliable indicia of actual false claims to federal health care programs, resulting from the kickbacks. *See United States ex rel. Everest Principals, LLC v. Abbott Laboratories, Inc.*, 622 F. Supp. 3d 920, 933 (S.D. Cal. Aug. 18, 2022) (finding that the relator "sufficiently established a link between the kickback and the claim for reimbursement" simply by pleading that the defendant gave remuneration "for the purpose of inducing" usage of a medical device).

As the Complaint emphasizes on numerous occasions and demonstrates in a highly particularized manner, these kickbacks were paid with the design of inducing prescriptions to the Defendant Pharmacies controlled by Peters. (*See*, *e.g.*, Compl. ¶¶ 3, 93, 106, 107, 140, 192, 226). The Defendant Pharmacies thereby obtained payment from claims to federal health care programs for those prescriptions. *See United States v. Paksn, Inc.*, 2:15-cv-09064-SB-AGR, 2021 WL 6882171, at *3-4 (C.D. Cal. Nov. 15, 2021) (*citing Ebeid*, 616 F.3d at 999) ("The detailed allegations regarding [one defendant's] extensive efforts to recruit doctors who would refer Medicare patients and to induce them to do so provide 'reliable indicia that lead to a strong inference that claims were actually submitted' so as to satisfy Rule 9(b)."). Under controlling Ninth Circuit law, the Complaint provides reliable indicia regarding the actual submission of false claims.

4.    **The Complaint Sufficiently Describes Each Defendant's Role.**

Defendants wrongly contend that the Complaint fails under Rule 9(b) because it "collapses the defendants into categories." (Def. Br. at 9.) That assertion is not tied to the correct pleading standard and

United States' Opposition to Defendants'
Motion to Dismiss

overlooks the clear allegation that many of the entities were functionally indistinguishable. In the Ninth Circuit, a complaint naming multiple defendants is tasked with "'identify[ing] the *role* of each defendant in the scheme.'" *United Healthcare,* 848 F.3d at 1184 (citing *United States ex rel. Lee v. Corinthian Colls*., 655 F.3d 984, 997-98) (emphasis added). To that end, it is well-established that "a complaint need not distinguish between defendants that had the exact same role in a fraud." *United States ex rel. Silingo v. WellPoint, Inc*., 904 F.3d 667, 677 (9th Cir. 2018); *accord United Healthcare,* 848 F.3d at 1184 (finding that, for similarly situated defendants, "[t]here is no flaw in a pleading … where collective allegations are used to describe the actions of multiple defendants").

That standard is particularly apt here, where Peters controlled and used multiple duplicative entities as part of the scheme. For example, as described in the Complaint, the fifteen mail-order Pharmacies were owned and operated in fact by Peters (Compl. at ¶¶ 6 to 20), were interchangeable as part of the effort to disguise and diffuse the fraud (*id*. at ¶¶ 22, 258, 265 to 266), were not distinguishable or even known in the minds of the physicians sending prescriptions through the means created by Peters (*id*. at ¶¶ 93, 201 to 205), and all billed federal health care programs for prescriptions that Peters factored into decisions regarding prescribers' investment in the Defendant MSOs (*id*. at ¶ 94, 271-a) and into the commissions paid to Sales Representatives (*id*. at ¶ 224, 271-b). In this situation, as the Ninth Circuit held in *WellPoint*, "there was no reason (and no way) for [the plaintiff] to differentiate among those allegations that are common to the group." 904 F.3d at 678.

Consistent with the relevant pleading standard, the Complaint sufficiently identifies each Defendant's role in the schemes, including how each was involved in the illegal kickbacks or the profits from the claims submitted that resulted from those kickbacks. As explained throughout the Complaint, under Peters's direction, the Defendant MSOs were vehicles to induce to physician investors to prescribe through extraordinary payouts, the Marketing Entity Defendants existed solely to indirectly pay improper commissions to independent Sales Representatives, and the Defendant Pharmacies were paid by federal health care programs and other payors for the prescriptions that were induced through the two kickback schemes.[8]  In contrast, so-called "lumping" is a concern for "different actors playing

---

[8] Similarly, the Complaint specifies the roles of Strand View and Innovative Specialty Services. (Compl. ¶¶ 37-41, 278 to 279, 289 to 290.)

United States' Opposition to Defendants'
Motion to Dismiss

different parts" where the complaint "'lump[s]' together the dissimilar defendants and assert[s] that 'everyone did everything.'" *WellPoint*, 904 F.3d at 677 (citing *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011)). Here, each Defendant has been placed on notice of the allegations against it for its role in orchestrating the collective scheme to defraud federal health care programs.

Even so, the United States has provided many differentiated allegations and examples specific to Defendants. For example, the Complaint provides significant detail regarding the calculation of payouts by each of the Coastline MSO and the Bayview MSO and how that developed over time (Compl. ¶¶ 114 to 134), specifies Defendant Pharmacies whose revenues directly funded the Defendant MSOs (*id*. ¶ 117), names nominal members and shared addresses for various entities (*id*. ¶¶ 6 to 41), provides examples of Peters directing and/or paying those nominees to use their name for specific entities (*id*. ¶¶ 261 to 264), and provides examples of contractual Sales Representative compensation and relevant emails sent by one of the Marketing Entity Defendants (*id*. ¶¶ 225, 231 to 233). The Complaint provides particularized detail as to the individual Defendants.

At bottom, Defendants in this case seek to cast aside detailed allegations simply because the Complaint alleges that other defendants participated in the fraud in the same way. But notwithstanding Defendants' wishes to the contrary, "[a] good claim against one defendant did not become inadequate simply because a co-defendant was alleged to have committed the same wrongful acts." *WellPoint*, 904 F.3d at 677. Put differently, it is not a flaw to reference more than one defendant in the same breath if more than one defendant is alleged to have engaged in the conduct at issue. To the extent there are statements in the Complaint that refer to multiple defendants at once, such collective allegations are a natural result of the intentionally duplicative entities involved in this fraud, and appropriate under Ninth Circuit precedent.

**5.    Defendants Fail to Identify the Details They Contend the Complaint Lacks.**

While Defendants are wrong in their assertions that the Complaint does not provide particularized allegations and that the United States cannot describe the conduct through collective allegations, their own brief is imprecise and lumps together arguments on behalf of fifteen Defendants. Instead of making arguments tailored to specific Defendants, time periods, or theories of liability, Defendants filed a single, joint brief seeking dismissal of the entire lawsuit on the same Rule 9(b)

15

grounds for all Defendants. Similarly, Defendants have presented no argument that would support partial dismissal as to any specific defendant or aspect of the two kickback schemes. Defendants' failure to identify any specific, missing detail not only demonstrates that their argument is misguided, but also deprives the United States of the opportunity to explain where that detail can be found in the Complaint or to otherwise respond. The Court should not entertain any attempts by Defendants to develop a more specific argument for the first time on reply.

**C.    <u>The Complaint Adequately Alleges Distinct Individuals and Entities in a Conspiracy.</u>**

The United States sufficiently pleads sufficient facts to support a conspiracy claim under the FCA. A civil conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856-57 (9th Cir. 1999) (quoting *Vieux v. E. Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990)). The unlawful objective may either reflect the conspirators' "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions. *Id.* (citing *United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir.1987). The Complaint clearly pleads a conspiracy among a number of parties acting in concert as part of the two alleged kickback schemes.

Defendants' lone argument on the Complaint's FCA conspiracy count is that "the Government pleads nothing more than a litany of alleged misconduct by Peters in concert with himself." Def. Br. at 11-12. This argument appears to admit that Peters controlled each of the remaining twenty-three Defendants, despite many of them having straw membership and officers. Nonetheless, this argument fails, first, because it ignores that the companies Peters controlled (*i.e.,* the Defendant Pharmacies, the Defendant MSOs, the Marketing Entity Defendants, Strand View, and Innovative Specialty Services) have separate corporate identities, distinct from Peters. Even though Peters controlled those entities, they are separate actors capable of entering into a conspiracy.

The FCA conspiracy count in the Complaint is not limited to an intra-corporate conspiracy within a single entity. Nor is it limited to a conspiracy among a corporation and a wholly-owned

16

subsidiary of that corporation. *Cf. Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). Rather, the conspiracy to cause the presentation of false claims that is alleged in the Complaint has elements of a "wheel conspiracy." Peters was the "hub" of the conspiracy, but he utilized the other Defendants to accomplish significant tasks in support of the two kickback schemes alleged in the Complaint. (*See* Compl. ¶¶ 284 to 290, describing the acts in furtherance of the conspiracy by the various Defendants); *WellPoint,* 904 F.3d at 678 (describing a "wheel conspiracy" as a single hub member agreeing with two or more other members—the "spokes"—to accomplish the objective.). As alleged in the Complaint, at least some of these entities had other employees (*e.g.*, Compl. ¶¶ 28, 30, 231), in addition to their straw members and officers. Peters's control over the other Defendants does not defeat a conspiracy claim under the FCA.

    In addition, the conspiracy alleged in the Complaint is not limited to the named Defendants in the action. Key players in the conspiracy also included those who received the kickbacks and took action to increase prescriptions to the Defendant Pharmacies—that is, the physicians receiving payouts from the Defendant MSOs and the Sales Representatives who were paid based on the prescriptions they delivered. The emails and texts cited in the Complaint provide more than ample indicia of a meeting of the minds. For example, the Complaint alleges two emails from MSO investor Dr. Jagpreet (Jay) Mukker to Peters complaining about the monthly MSO payouts being lower than expected ($5,000 instead of $10,000 in each case). In one of the emails, Dr. Mukker complained that he and his colleague Dr. Philip Larkins, another MSO investor, had "held up our end of the bargain" by "prescribing a lot of compounding to our patients." (Compl. ¶ 160). The other email complained that the MSO payout to Dr. Larkins was "not fair" because "Dr. Larkins has faithfully supported the pharmacy and the pharmacy has not held up the contract." (Compl. ¶ 159). The Complaint is replete with similar examples showing a meeting of the minds with the recipients of kickbacks, more than meeting the United States' pleading obligation under Rule 9(b).

    In sum, taking the MSO Investment Scheme as an example, it is very difficult for Defendants to argue that the Complaint has not alleged a sufficient number of parties acting in concert, when the Defendant MSOs made extraordinary payouts to prescribing physicians in a way that was tied to prescriptions directed to the Defendant Pharmacies; physicians investing in the Defendant MSOs

17

understood their end of the bargain was to prescribe (*see*, *e.g.*, Compl. ¶¶ 154, 159, 160); some Sales Representatives engaged through the Marketing Entity Defendants pushed physicians to prescribe by dangling MSO investment (*see*, *e.g.*, *id.* ¶¶ 103, 185) and pressured existing MSO investors to prescribe in certain amounts (*see*, *e.g.*, *id.* ¶¶ 189, 193); and the Defendant Pharmacies submitted claims for the prescriptions that resulted.

### D.    The Reverse FCA Claims Are Not Redundant.

By alleging that Peters and the Defendant Pharmacies received warnings that the payments they received from federal health care programs were not proper, and that Peters and the Defendant Pharmacies took no action to report and return those funds, the United States has sufficiently alleged that these Defendants knowingly failed to return money to the Government. 31 U.S.C. § 3129(a)(1)(G) prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. The term "obligation" is defined to include "any funds that a person receives or retains under [Medicare] or [Medicaid] to which the person … is not entitled under such title." 42 U.S.C. § 1320a-7k(d)(4)(B). Further, as applicable here, any "overpayment" (*i.e.*, payment to which a claimant is not entitled) "must be reported and returned" within "60 days after the date on which the overpayment was identified." "More simply stated, … any person who has received an overpayment from Medicare or Medicaid and knowingly fails to report and return it within sixty days after the date on which it was identified has violated the FCA." *United States ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015).

Notice or warning that claims did not comply with federal health care program payment terms (including compliance with AKS) starts the clock for reporting and returning the funds that should not have been paid. *Id. at* 388 (interpreting legislative history of the FCA to mean that the timeline to report and return should "begin[] ticking when a provider is put on notice of a potential overpayment"). The complaint identifies several warnings that the two alleged schemes violated the AKS or that prescriptions derived pursuant to the schemes were not appropriate. (*See, e.g.*, Compl. ¶¶ 231 to 232 (compliance advice that the Sales Representatives could not lawfully be paid based on percentage commissions); *id.* ¶ 255 (identifying a Medicare Integrity Contractor audit questioning the legitimacy of

United States' Opposition to Defendants'
Motion to Dismiss

the prescriptions billed to the program, the impropriety of which Peters then attempted to conceal)). No refunds were submitted to federal health care programs following these warnings. (*Id.* ¶¶ 217, 295).

In addition, plaintiffs are allowed to plead in the alternative. Fed. R. Civ. P. 8(d)(2); *Olympic Coast Inv. v. Seipel*, 208 F. App'x 569. 571 (9th Cir. 2006). Many courts have allowed a party to pursue both affirmative and reverse false claim theories premised on similar facts. *See, e.g., United Staes v. Bourseau*, 531 F.3d 1159, 1164, n.1 (9th Cir. 2008). The Government prevailed at trial in *Bourseau* and only recovered once for the damages it suffered. *Id.* Alternative pleading could become relevant at later stage of the litigation, depending on the positions taken by Defendants. If for example, during the litigation of this matter, Peters or the Defendant Pharmacies assert that they did not know that the federal health care programs claims subject to the Complaint were false at the time they were submitted, the many circumstances signaling those violations and identification of those violations would be relevant.

### E.    The United States' Common Law Claims Are Not Time-Barred Under the Appropriate Federal Standard.

Finally, Defendants challenge the United States' common law claims, erroneously contending that a California statute of limitations binds the United States. (Def. Br. at 16). These claims, however, arise under federal law, and the "United States is not bound by state statutes of limitations." *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *see also United States v. Wurts*, 303 U.S. 414 (1938) ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. … The right to sue is independent of statute.") (internal citation and quotation marks omitted). *See also Agility Public Warehousing Co. K.S.C.P. v. United States*, 969 F.3d 1355, 1365 (Fed. Cir. 2020) ("When a payment is erroneously or illegally made, … the United States may exercise its well-established right to sue for money wrongfully or erroneously paid from the public treasury, a right arising separate and apart from statute, regulation, or contract.") (internal quotation marks omitted).

The Ninth Circuit has recognized that United States' common law claims arise under federal, not state law, including in FCA cases in California. *United States v. Mead*, 426 F.2d 118, 125 (9th Cir. 1970) (*superseded by statute on other grounds*). In *United States v. Mead*, the Ninth Circuit allowed the United States to proceed against the defendant on a payment by mistake action as an alternative to an

United States' Opposition to Defendants'
Motion to Dismiss

1   FCA claim. *Id.* The Ninth Circuit found that the "[payment by mistake] remedy is available to the

2   United States and is independent of statute" and that "if the government made these payments under an

3   erroneous belief which was material to the decision to pay, it is entitled to recover the payments." *Mead*,

4   426 F.2d at 124 (citing *Wurts*).

5         Federal law dictates the statute of limitations. This is because these claims are not barred "unless

6   Congress has 'clearly manifested its intention' to raise a statutory barrier." *Wurts*, 303 U.S. at 416.

7   Consequently, federal courts apply the six-year statute of limitations in 28 U.S.C. § 2415(a) to the

8   United States' claims of unjust enrichment and payment by mistake. *United States v. Stella Perez*, 956 F.

9   Supp 1046 (D.P.R. 1997); *United States v. Carell*, 681 F. Supp.2d 874 (M.D. Tenn. 2009); *United States*

10  *ex rel. Condie v. Bd. of Regents of Univ. of California*, C89-3550-FMS, 1993 WL 740185, at *2 (N.D.

11  Cal. Sept. 7, 1993).

12        Defendants' reliance on California law is therefore misplaced. State law cannot impose a statute

13  of limitations on the United States—as the Supreme Court has repeatedly explained: the "United States

14  is not bound by state statutes of limitations." *Summerlin*, 310 U.S. at 416; *United States v. Thompson*, 98

15  U.S. 486, 489 (1878); *see Novato Fire Prot. Dist. v. United States*, 181 F.3d 1135, 1141 (9th Cir. 1999).

16  Defendants' argument, entirely premised on California law, is unfounded.

17        Defendants' remaining common law arguments are undeveloped and immaterial. First, they

18  argue the United States' common law claims should be dismissed because the Complaint fails to state

19  "what common law upon which [the United States] bases these claims and why that common law

20  applies." (Def. Br. at 15-16). Rule 8(a)(2), however, "requires only a plausible 'short and plain'

21  statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S.

22  521, 530 (2011). The Complaint "need not pin plaintiff's claim for relief to a precise legal theory." *Id.*

23        Second, Defendants contend the United States' common law claims must be premised on an

24  "underlying California common law" cause of action. (Def. Br. at 16). *Mead*, however, established that

25  the United States is not bound by the contours of any state's cause of action, and allowed the United

26  States to proceed on a free-standing common law claim. *See* 426 F.2d at 124. Accordingly, courts

27  regularly permit such claims to proceed as independent and alternative claims. *See,. e.g., United States*

28  *ex rel. Osinek v. Permanente Med. Grp., Inc.*, 640 F. Supp. 885, 914 (N.D. Cal. 2022); *United States*

United States' Opposition to Defendants'
Motion to Dismiss

*ex rel. Radhakrishnan v. Gampel*, CV-20-00176-PHX-GMS, 2024 WL 894671, at \*17 (D. Ariz. Mar. 1, 2024). This Court should too.

## V.   <u>CONCLUSION</u>

Defendants took part in two compound kickback schemes designed to extract exorbitant payments from federal health care programs and other payors. The Complaint plausibly alleges those schemes with exacting factual basis and detail.  Defendants have more than enough notice to prepare their responsive pleading.  Their motion should be denied in its entirety.

Respectfully submitted,

PHILLIP A. TALBERT
UNITED STATES ATTORNEY

Dated: June 3, 2024              By:       */s/ David E. Thiess*
                                            DAVID E. THIESS
                                            STEVEN S. TENNYSON
                                            Assistant United States Attorneys

21

United States' Opposition to Defendants'
Motion to Dismiss