1

2

3

4

5

6

7                  UNITED STATES DISTRICT COURT

8                  EASTERN DISTRICT OF CALIFORNIA

9                         ----oo0oo----

10

11  UNITED STATES OF AMERICA,            No. 2:24-cv-00287 WBS CKD

12              Plaintiff,

13       v.                              MEMORANDUM AND ORDER RE:
                                         DEFENDANTS' MOTIONS TO
14  MATTHEW H. PETERS, BAYVIEW           DISMISS
    SPECIALTY SERVICES LLC,
15  COASTLINE SPECIALTY SERVICES
    LLC, STRAND VIEW CORPORATION,
16  INNOVATIVE SPECIALTY SERVICES
    LLC, PARAGON PARTNERS LLC (D/B/A
17  PARAGON MEDICAL PARTNERS),
    CARDEA CONSULTING LLC, PRAXIS
18  MARKETING SERVICES LLC,
    PROFESSIONAL RX PHARMACY LLC,
19  INLAND MEDICAL CONSULTANTS LLC
    (D/B/A ADVANCED THERAPEUTICS),
20  PORTLAND PROFESSIONAL PHARMACY
    LLC, SUNRISE PHARMACY LLC,
21  PROFESSIONAL 205 PHARMACY LLC
    (D/B/A PROFESSIONAL CENTER 205
22  PHARMACY), SYNERGY MEDICAL
    SYSTEMS LLC (D/B/A SYNERGY RX),
23  SYNERGY RX LLC (D/B/A SYNERGY
    RX), PRESTIGE PROFESSIONAL
24  PHARMACY, JMSP LLC (D/B/A
    PROFESSIONAL CENTER 205
25  PHARMACY), MPKM, LLC (D/B/A
    PROFESSIONAL CENTER PHARMACY),
26  ONE WAY DRUG LLC (D/B/A PARTELL
    PHARMACY), PARTELL PHARMACY LLC,
27  OPTIMUM CARE PHARMACY INC.
    (D/B/A MARBELLA PHARMACY),
28  GLENDALE PHARMACY LLC, and LAKE

                              1

1  FOREST PHARMACY (D/B/A
   LAKEFOREST PHARMACY),
2
                  Defendants.
3

4                          ----oo0oo----

5          The United States brought this action against Matthew

6  Peters and several pharmacies and other corporate entities,

7  alleging that they operated a kickback scheme that submitted

8  claims for prescription medications to federal government

9  insurance programs in violation of the False Claims Act.  (First

10 Am. Compl. ("FAC") (Docket No. 5).)  Before the court are

11 defendants' motions to dismiss.  (Docket Nos. 21, 32, 33.)

12 I.    The Parties[1]

13         Defendant Matthew Peters is an individual who

14 controlled or operated the various pharmacies and other corporate

15 defendants.  (FAC ¶ 5.)

16         The pharmacy defendants are Professional Rx Pharmacy

17 LLC, a Florida company with a registered address in Nevada;

18 Inland Medical Consultants LLC d/b/a Advanced Therapeutics, a

19 California company; Portland Professional Pharmacy LLC, an Oregon

20 company; Sunrise Pharmacy LLC, a Nevada company; Professional 205

21 Pharmacy LLC d/b/a Professional Center 205 Pharmacy, an Oregon

22 company; Synergy Medical Systems LLC d/b/a Synergy Rx, a Delaware

23 company with its principal place of business in Oregon; Synergy

24 RX LLC d/b/a Synergy Rx, a Delaware company with its principal

25 place of business in Oregon; Prestige Professional Pharmacy, an

26 Oregon company; JMSP LLC d/b/a Professional Center 205 Pharmacy,

27

28         [1]   All facts recited in this Order are as alleged in the
   First Amended Complaint unless otherwise noted.

                                  2

1    an Oregon company; One Way Drug LLC d/b/a Partell Pharmacy, a

2    Nevada company; Partell Pharmacy LLC, a Nevada company[2]; Optimum

3    Care Pharmacy Inc. d/b/a Marbella Pharmacy, a California

4    corporation; Glendale Pharmacy LLC, a Missouri company with its

5    principal place of business in Texas or Missouri; Lake Forest

6    Pharmacy d/b/a Lakeforest Pharmacy, a Missouri company; and MPKM

7    LLC d/b/a Professional Center Pharmacy, a Nevada company.  (Id.

8    ¶¶ 6-20.)  All of the pharmacy defendants operated as mail-order

9    pharmacies.  (See id.)

10          The management service organization ("MSO") defendants

11   are Coastline Specialty Services LLC and Bayview Specialty

12   Services LLC, both Texas companies with principal places of

13   business in Nevada.  (Id. ¶¶ 23, 26-27.)  The MSOs provided

14   investment opportunities for physicians who prescribed to the

15   pharmacy defendants.  (Id. ¶ 24.)[3]

16          The marketing entity defendants are Paragon Partners

17   LLC, a Nevada company; Cardea Consulting LLC, a Florida company;

18   and Praxis Marketing Services LLC, a Florida company.  (Id. ¶ 29-

19   _____

20          [2]    Defendant Partell Pharmacy LLC requests that the court
     take judicial notice of documents related to pharmacy licensing,
21   arguing that Partell Pharmacy is not actually a pharmacy.  The
     government disputes this representation and requests judicial
22   notice of other documents that it argues establish Partell is a
     pharmacy.  Because the issue of Partell's status as a pharmacy is
23   subject to "reasonable dispute" by the parties, the court DENIES
     both requests for judicial notice.  See Fed. R. Evid. 201(b).
24   The complaint alleges that Partell is a pharmacy, which the court
     must take as true at this stage of the proceedings.
25

26          [3]    The two MSOs did not operate concurrently.  The
     Coastline MSO operated from approximately June 2017 to September
27   2018, and was replaced by the Bayview MSO, which operated from
     approximately September 2018 to early 2020.  (See FAC ¶¶ 26-27,
28   128.)

1    32.)   The marketing entities paid sales representatives to

2    promote the pharmacy defendants to physicians.  (Id. ¶ 33.)

3           The other corporate defendants are Strand View

4    Enterprises LLC, a Texas company with its principal place of

5    business in Nevada; and Innovative Specialty Services LLC, a

6    California company.  (Id. ¶ 37, 41.)   Strand View was an LLC

7    member of the MSOs.  (Id. ¶ 40.)   Peters used Strand View as an

8    intermediary to move money between the pharmacies, MSOs, and

9    marketing entities.  (Id. ¶ 38.)   Innovative Specialty Services

10   acted as a pass-through entity for "investments" going into the

11   MSOs.  (Id. ¶ 41.)

12   II.   The Alleged Kickback Scheme

13          Peters created the MSOs as vehicles to induce

14   physicians to send prescriptions to the pharmacy defendants.

15   (Id. ¶ 85.)   Physicians who sent prescriptions to the pharmacies

16   at high enough volumes were offered the opportunity to buy

17   "shares" in the MSOs.  (Id. ¶ 88, 94.)   The only other MSO

18   "investor" was Strand View Enterprises, owned by Peters.  (Id. ¶

19   98.)

20          Each MSO had approximately sixty to ninety-five

21   physician investors at a time.  (Id. ¶ 90.)   The number of shares

22   available to physicians and the availability of further share

23   buy-ins were proportional to the volume of prescriptions the

24   physicians sent to the pharmacies.  (Id. ¶¶ 94-96, 164-71.)

25   Physicians who bought MSO shares received frequent financial

26   payouts that were tied to the volume of prescriptions they sent

27   to the pharmacies.  (Id. ¶¶ 86-88.)   Physician investors received

28   high financial returns, regularly exceeding 500% of their initial

1    investment annually immediately upon buy-in.  (Id. ¶ 99.)

2    The MSOs obtained the money paid to physician investors

3    through "management services" arrangements with some of the

4    pharmacies, which were the MSOs' sole revenue source.  (See id. ¶

5    116, 118, 130, 134.)  Under these arrangements, pharmacies paid a

6    large portion of their revenues to the MSOs.  (See id. ¶ 120,

7    132.)  The MSOs "served no independent business purpose other

8    than to funnel money to physician investors in exchange for

9    prescription volume."  (Id. ¶ 142.)

10   Because MSO revenue was directly tied to the revenue of

11   the pharmacies, this arrangement encouraged physicians to direct

12   more prescriptions and costlier prescriptions to the pharmacies.

13   (Id. ¶ 125.)  The MSO distributions induced physician investors

14   not only to direct more prescriptions to the pharmacy defendants

15   (as opposed to other pharmacies), but also to prescribe greater

16   volumes of medications overall.  (Id. ¶ 158.)  When physician

17   investors' volume of prescriptions decreased, sales

18   representatives pressured the physicians to increase their

19   prescription volume.  (Id. ¶¶ 186-94.)

20   From the perspective of the physicians, "there was no

21   distinction between any of" the pharmacy defendants.  (Id. ¶

22   201.)  Investors did not select among the pharmacies when issuing

23   a prescription, as the pharmacies all used the same fax number

24   and electronic prescribing platform.  (Id. ¶ 202.)

25   Sales representatives paid by the marketing entity

26   defendants advertised the MSO investment opportunity to encourage

27   physicians to direct prescriptions to the defendant pharmacies.

28   (Id. ¶ 103.)  The sales representatives used meals, happy hours,

1  gifts, entertainment, cash payments, and free medications for in-

2  clinic use -- all funded by the defendant pharmacies -- to induce

3  physicians to prescribe to the pharmacies.  (Id. ¶ 236, 243,

4  248.)  All prescriptions to the pharmacy defendants came from

5  physicians with one or more sales representatives assigned to

6  work with them.  (Id. ¶ 234.)  In other words, the pharmacies did

7  not do any business unconnected to the scheme.  (See id.)

8         The defendant pharmacies submitted claims for

9  prescription medications to various insurers, including federal

10 health insurance programs like Medicare Part D.  (See id. ¶ 106,

11 269.)  From 2017 through the life of the scheme, the pharmacies

12 received at least $8,115,998.38 from Medicare Part D plans for

13 medications prescribed by physician investors.  (Id. ¶ 206.)

14 During that same period, the pharmacies were paid at least

15 $33,219,567.96 from Medicare Part D plans for medications

16 prescribed by physicians with sales representatives assigned to

17 them (i.e., the entire group of physicians including both

18 investors and those who had been solicited to prescribe to the

19 pharmacies but were not investors).  (See id. ¶ 235.)

20 III. False Claims Act

21        The False Claims Act ("FCA") "prohibits the submission

22 of false or fraudulent claims to the federal government and

23 imposes liability on an individual who 'knowingly presents, or

24 causes to be presented, a false or fraudulent claim for payment

25 or approval' or who knowingly makes a 'false record or statement

26 material to a false or fraudulent claim.'"  United States ex rel.

27 Campie v. Gilead Sci., Inc., 862 F.3d 890, 899 (9th Cir. 2017)

28 (quoting 31 U.S.C. § 3729(a)(1)(A)-(B)).

1           The government premises its FCA claims on violations of

2    the Anti-Kickback Statute, which "states that whoever knowingly

3    and willfully solicits, receives, offers, or pays any

4    remuneration in exchange for referral of an individual for the

5    furnishing of any item or service for which payment may be made

6    under a Federal health care program shall be guilty of a felony."

7    United States v. Kats, 871 F.2d 105 (9th Cir. 1989) (citing 42

8    U.S.C. § 1320a-7b(b)(1)-(2)).  "A claim that includes items or

9    services resulting from a violation of [the Anti-Kickback

10   Statute] constitutes a false or fraudulent claim for the purposes

11   of [the FCA]."  42 U.S.C. § 1320a-7b(g).

12          The government alleges violations of the FCA under

13   several theories.  The first claim alleges that Peters and the

14   pharmacy defendants presented false claims; the second claim

15   alleges that all defendants caused false claims to be presented;

16   the third claim alleges that all defendants engaged in a

17   conspiracy to present false claims; and the fourth claim alleges

18   that Peters and the pharmacy defendants avoided their obligation

19   to pay money owed to the government (i.e., a "reverse" FCA

20   claim).  However, all the FCA claims are based on the alleged

21   submission of false claims by the pharmacies.  See U.S. ex rel.

22   Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th

23   Cir. 2011) (the FCA "attaches liability, not to the underlying

24   fraudulent activity or to the government's wrongful payment, but

25   to the claim for payment") (cleaned up).

26        A.   Rule 12(b)(6)

27          The court first disposes of defendants' argument that

28   the government fails to state a "reverse" FCA claim under Rule

1    12(b)(6).

2           The "reverse" provision of the FCA prohibits knowingly

3    concealing or knowingly and improperly avoiding or decreasing an

4    obligation to pay or transmit money or property to the

5    government.  See 31 U.S.C. § 3729(a)(1)(G).  As relevant here,

6    recipients of Medicare payments have an "obligation" within the

7    meaning of the FCA to "report and return" an overpayment within

8    sixty days "after the date on which the overpayment was

9    identified."  See 42 U.S.C. §§ 1320a-7k(d)(1)-(3).  Defendants

10   argue that the complaint fails to identify any obligation to

11   return funds to the government.

12          The complaint alleges that Peters knew the scheme

13   violated federal law, pointing to investor presentations in which

14   he referenced the requirements of the Anti-Kickback Statute and

15   his efforts to conceal the fact that the MSO scheme involved

16   prescription payments from federal government programs.  (See FAC

17   ¶¶ 196-200, 209-213.)  Further, several physician investors'

18   prescriptions to the defendant pharmacies were audited by

19   Medicare, in response to which Peters allegedly fabricated back-

20   dated prescription documentation and instructed physicians how to

21   respond to auditors.  (See id. ¶¶ 253-55.)

22          Taken as true and construed in the government's favor,

23   these allegations indicate that Peters and the pharmacy

24   defendants (all closely controlled by Peters) had notice the

25   scheme was unlawful, triggering an obligation to repay the

26   Medicare prescription payments.  See United States ex rel.

27   Martinez v. KPC Healthcare Inc., No. 8:15-cv-01521 JLS DFM, 2017

28   WL 10439030, at *6 (C.D. Cal. June 8, 2017) ("fraudulently

1   billing Medicare followed by a knowing subsequent retention of an

2   overpayment may result in liability under the reverse false

3   claims provision") (citing United States v. Mount Sinai Hosp.,

4   No. 13-cv-4735 RMB, 2015 WL 7076092, at *13 (S.D.N.Y. Nov. 9,

5   2015)); United States ex rel. Ormsby v. Sutter Health, 444 F.

6   Supp. 3d 1010, 1078 (N.D. Cal. 2020) ("internal and external

7   reviews of [allegedly false] diagnosis codes put the defendants

8   on notice of the potential overpayments" from Medicare,

9   triggering sixty-day repayment obligation).  The court therefore

10  declines to dismiss the fourth claim alleging reverse FCA

11  violations on this ground.

12         B.    Rule 9(b)

13         "[C]omplaints brought under the FCA must fulfill the

14  requirements of Rule 9(b)."  Bly-Magee v. California, 236 F.3d.

15  1014, 1018 (9th Cir. 2001).  "Under Rule 9(b), a plaintiff 'must

16  state with particularity the circumstances constituting fraud.'"

17  United States ex rel. Swoben v. United Healthcare Ins. Co., 848

18  F.3d 1161, 1180 (9th Cir. 2016).  "This means the plaintiff must

19  allege 'the who, what, when, where, and how of the misconduct

20  charged,' including what is false or misleading about a

21  statement, and why it is false."  Id. (quoting Ebeid ex rel.

22  United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010)).

23         Under Rule 9(b), "it is sufficient to allege

24  'particular details of a scheme to submit false claims paired

25  with reliable indicia that lead to a strong inference that claims

26  were actually submitted.'"  Id. (quoting United States ex rel.

27  Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

28  Nonetheless, the complaint still "must provide enough detail 'to

1 give [defendants] notice of the particular misconduct which is

2 alleged to constitute the fraud charged so that [they] can defend

3 against the charge.'"  Ebeid, 616 F.3d at 999 (quoting U.S. ex

4 rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1051-52 (9th

5 Cir. 2001)).

6          The complaint adequately pleads that false claims were

7 submitted.  It describes the alleged scheme in great detail, as

8 summarized above.  The complaint also provides the total value of

9 the Medicare claims associated with the scheme across all the

10 pharmacies, gives examples of the value of Medicare claims

11 submitted by select pharmacies, and specifically alleges that

12 "each of the [pharmacies] billed Medicare part D plans for

13 medications prescribed by physician investors."  (See id. ¶¶ 107,

14 206-207, 235.)  The government has plainly provided "particular

15 details of a scheme to submit false claims paired with reliable

16 indicia that lead to a strong inference that claims were actually

17 submitted."  See Swoben, 848 F.3d at 1180.

18          Defendants argue that the complaint fails to adequately

19 distinguish among the organizational defendants.  The Ninth

20 Circuit has explained that pursuant to Rule 9(b), "a fraud suit

21 against differently situated defendants must 'identify the role

22 of each defendant in the alleged fraudulent scheme.'"  United

23 States ex rel. Silingo v. WellPoint, Inc., 904 F.3d 667, 677 (9th

24 Cir. 2018) (quoting Swartz v. KPMG LLP, 476 F.3d 756, 765 (9th

25 Cir. 2007)).  "In other words, when defendants engage in

26 different wrongful conduct, plaintiffs must likewise

27 'differentiate their allegations.'"  Id. (quoting Swartz, 476

28 F.3d at 764).  "On the other hand, a complaint need not

10

1    distinguish between defendants that had the exact same role in a

2    fraud."  Id.

3            With respect to the pharmacy defendants, the complaint

4    explains that "[f]rom the perspective of the [physician

5    investors], there was no distinction" between the pharmacies,

6    which all "used the same fax number and electronic prescribing

7    platform."  (See FAC ¶ 201.)  Many physicians were not even aware

8    that Peters owned multiple pharmacies.  (Id. ¶ 204.)  Further,

9    the pharmacies all played the same role in the alleged fraud: to

10   receive prescriptions from physicians involved in the scheme,

11   submit claims to health insurance programs for those

12   prescriptions, and funnel money to the MSOs to provide payouts to

13   physician investors, all under the direction of Peters.  (See id.

14   ¶¶ 6-22, 85-106, 116-19, 185-99.)

15           Because the pharmacies all played the "same role" in

16   the centrally operated scheme, the government may collectively

17   plead the allegations against the pharmacies.  See WellPoint, 904

18   F.3d at 667, 678 ("[I]f a fraudulent scheme resembles a chain

19   conspiracy, then a complaint must separately identify which

20   defendant was responsible for what distinct part of the plan.  By

21   contrast, if a fraudulent scheme resembles a wheel conspiracy,

22   then any parallel actions of the 'spokes' can be addressed by

23   collective allegations.").  The same reasoning applies to the

24   marketing entity defendants, which all served identical roles of

25   using revenue generated by the pharmacies to pay sales

26   representatives who promoted the pharmacies to prescribers, all

27   under the direction of Peters.  (See FAC ¶¶ 29-36.)

28           With respect to the remaining organizational

1 defendants, the complaint adequately distinguishes among them to

2 the extent there are differences in their roles.  While the MSOs

3 served identical functions and operated in largely the same

4 manner under Peters' direction, the complaint does explain their

5 differences, including that they operated during separate periods

6 of time, had different numbers of physician investors, and

7 utilized different methods for distributing funds to physician

8 investors.  (See id. ¶¶ 26-27, 115, 120-36, 142-58.)  The

9 complaint also differentiates between the two remaining corporate

10 defendants -- which both served as intermediaries to move funds

11 -- explaining that Strand View was an LLC member of the MSOs and

12 served as the front for communicating with investors, while

13 Innovative Specialty Services served merely to route investments

14 from physicians to the MSOs.  (Id. ¶¶ 37-41.)

15          While the government has not erred in its use of

16 collective pleading, the complaint does fail to provide adequate

17 notice of the time period at issue.  As the parties appear to

18 agree, the FCA statute of limitations precludes relief for false

19 claims submitted prior to January 22, 2018 (six years prior to

20 the filing of the complaint).  See 31 U.S.C. § 3731(b).  The

21 complaint broadly describes the entire scheme, which operated

22 from sometime in 2015 to October 2019.  (FAC ¶¶ 114, 132.)[4]

23 However, false claims submitted during the majority of that

24 period are time-barred.

25          Although the government conceded in briefing and at

26 _____

   [4]     While the first MSO was created in June 2017, the
27 scheme existed beginning in 2015 in a different configuration
   utilizing organizations referred to as preferred placement
28 memorandums.  (See FAC ¶¶ 108-14, 238.)

1  oral argument that the six-year statute of limitations applies,

2  the complaint must reflect that limitation in order to plead the

3  "when" of the false claims it alleges violated the FCA.  The

4  complaint may, of course, reference events occurring throughout

5  the life of the scheme in order to provide necessary context.

6  But the government must identify when the reimbursement claims

7  for which it seeks to recover damages were submitted, thereby

8  providing defendants with "adequate notice to allow them to

9  defend the charge."  See Scheibe v. Livwell Prod., LLC, No. 23-

10  cv-216 MMA BLM, 2023 WL 4414580, at *4 (S.D. Cal. July 7, 2023).

11  This is because violations of the FCA are premised not on the

12  entire scheme, but on the "claim[s] for payment" themselves.  See

13  Gen. Dynamics, 637 F.3d at 1055; see also United States ex rel.

14  Brooks v. Trillium Cmty. Health Plan, Inc., No. 6:14-cv-1424 MC,

15  2017 WL 2805863, at *2 (D. Or. June 28, 2017) (the fact that the

16  "majority" of examples of fraud given in FCA complaint occurred

17  "outside the statute of limitations . . . represents a pleading

18  deficiency [under Rule 9(b)] rather than a bar to relief as a

19  matter of law").

20        Accordingly, because the court concludes that the

21  government has failed to plead its FCA claims with particularity

22  in this respect, the first through fourth claims will be

23  dismissed with leave to amend.

24  IV.   Unjust Enrichment & Payment By Mistake

25        The complaint also contains claims for unjust

26  enrichment and payment by mistake, which the government may bring

27

28

13

1   alongside FCA claims pursuant to federal common law.[5]  See United

2   States v. Mead, 426 F.2d 118, 124 (9th Cir. 1970) (in action

3   under False Claims Act, "the government's alternative theory of

4   recovery is under the common law doctrine of payment by mistake,"

5   which "is available to the United States and is independent of

6   statute"); United States v. California, 932 F.2d 1346, 1350 (9th

7   Cir. 1991), aff'd, 507 U.S. 746 (1993) (collecting cases for

8   proposition that "classic cases of unjust enrichment" can be

9   brought under federal common law); United States ex rel. Humane

10  Soc'y of the U.S. v. Westland/Hallmark Meat Co., No. 08-cv-00221

11  VAP OPX, 2010 WL 11464786, at *13 (C.D. Cal. Aug. 5, 2010)

12  ("federal common law provides for reimbursement of federal monies

13  improperly paid pursuant to federal programs"); United States v.

14  Bellecci, No. 05-cv-1538 LKK GGH, 2008 WL 802367, at *6 (E.D.

15  Cal. Mar. 26, 2008) (explaining that longstanding federal common

16  law allows government to bring mistake of fact and unjust

17  enrichment claims alongside FCA claims).

18          Because the government has failed to plead the

19  underlying fraud with particularity, the unjust enrichment and

20  payment by mistake claims -- which are premised on that fraud

21  (see FAC ¶¶ 297-303) -- also fail.  See Puri v. Khalsa, 674 F.

22  App'x 679, 690 (9th Cir. 2017) (where an "unjust enrichment claim

23  is based on fraud, it too is subject to Rule 9(b)"); cf. United

24  States ex rel. Berntsen v. Prime Healthcare Servs., Inc., No. 11-

25          [5]    Defendants argue that these claims must be dismissed
26  because (1) unjust enrichment and payment by mistake are not
    available as freestanding claims under California law, and (2)
27  the claims are barred by the California statute of limitations.
    However, as indicated by the cited case law, these claims are
28  available to the government under federal common law.

                                14

1   cv-8214 PJW, 2017 WL 11636166, at *4 (C.D. Cal. Jan. 13, 2017)

2   (declining to dismiss claims for unjust enrichment and payment by

3   mistake as they were "derivative of the government's [adequately

4   pled] False Claims Act claims").  Accordingly, the court will

5   also dismiss the fifth and sixth claims with leave to amend.

6           IT IS THEREFORE ORDERED that defendants' motions to

7   dismiss (Docket Nos. 21, 32, 33) be, and the same hereby are,

8   GRANTED.  The United States has twenty days from the date of this

9   Order to file an amended complaint curing the statute of

10  limitations issue consistent with this Order.

11

12  Dated:  July 10, 2024

WILLIAM B. SHUBB
13                                UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15