1  CLINTON MIKEL, SBN 251319
2  The Health Law Partners, P.C.
   32000 Northwestern HWY., Ste. 240
3  Farmington Hills, MI 48334
   Telephone: (248) 996-8510
4  Facsimile: (248) 996-8525
5  cmikel@thehlp.com

6  IAN W. CRAIG, SBN 160651
   Law Offices of Ian W. Craig, PC
7  700 University Ave., Ste. 100
   Sacramento, CA 95825
8  Telephone: (916) 277-8580
9  Facsimile: (916) 914-1803
   Ian@IWC-Law.com

10
11 Attorneys for Defendant Synergy Medical Systems, LLC

12
13              UNITED STATES DISTRICT COURT
14              EASTERN DISTRICT OF CALIFORNIA

15

16 UNITED STATES OF AMERICA,                  | Case No. 2:24-cv-00287-CKD

17              Plaintiff,

18       v.

19 MATTHEW H. PETERS, BAYVIEW SPECIALTY       | **NOTICE OF MOTION AND**
   SERVICES LLC, COASTLINE SPECIALTY SERVICES | **MOTION TO SET ASIDE**
20 LLC, STRAND VIEW CORPORATION,              | **ENTRY OF DEFAULT**
   INNOVATIVE SPECIALTY SERVICES LLC,
21 PARAGON PARTNERS LLC (D/B/A PARAGON        | **Hearing Date: April 16, 2025**
   MEDICAL PARTNERS), CARDEA CONSULTING       | **Time: 10:00 A.M.**
22 LLC, PRAXIS MARKETING SERVICES LLC,        | **Courtroom: 24, 8th Floor**
   PROFESSIONAL RX PHARMACY LLC, INLAND
23 MEDICAL CONSULTANTS LLC (D/B/A
   ADVANCED THERAPEUTICS), PORTLAND
24 PROFESSIONAL PHARMACY LLC, SUNRISE
   PHARMACY LLC, PROFESSIONAL 205 PHARMACY
25 LLC (D/B/A PROFESSIONAL CENTER 205
   PHARMACY), SYNERGY MEDICAL SYSTEMS LLC
26 (D/B/A SYNERGY RX), SYNERGY RX LLC (D/B/A
   SYNERGY RX), PRESTIGE PROFESSIONAL
27 PHARMACY, JMSP LLC (D/B/A PROFESSIONAL
   CENTER 205 PHARMACY), MPKM, LLC (D/B/A
28 PROFESSIONAL CENTER PHARMACY), ONE WAY

                            1

1  DRUG LLC (D/B/A PARTELL PHARMACY),
   PARTELL PHARMACY LLC, OPTIMUM CARE
2  PHARMACY INC. (D/B/A MARBELLA
   PHARMACY), GLENDALE PHARMACY LLC, and
3  LAKE FOREST PHARMACY (D/B/A LAKEFOREST
   PHARMACY),
4
5              Defendants.

6          TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD

7  HEREIN: PLEASE TAKE NOTICE that on April 16, 2025, or as soon thereafter as the matter

8  may be heard in the above-entitled court located at 501 I Street, Courtroom No. 24, 8th Floor,

9  Sacramento, California, Defendant Synergy Medical Systems, LLC will and hereby does move

10 this Court for an order setting aside the default judgment entered against it on September 26,

11 2024.

12         This motion is made pursuant to Federal Rule of Civil Procedure 55(c) on the grounds that

13 good cause exists to vacate the entry of default due to excusable neglect, meritorious defenses,

14 and the lack of prejudice to Plaintiff.

15         This Motion is based on this Notice of Motion, the accompanying Memorandum of Points

16 and Authorities, the Declaration of Clinton Mikel, Esq., all pleadings and papers on file in this

17 action, and upon such other matters as may be presented to the Court at the time of the hearing.

18
19
20
21
22
23
24
25
26
27
28
                                        2

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2      Under Rule 55(c) of the Federal Rules of Civil Procedure, Defendant, Synergy Medical

3  Systems, LLC ("**SMS**"), through its attorneys, The Health Law Partners, P.C., respectfully

4  requests this Court to set aside its Entry of Default (Dkt. 63) for the good cause enumerated

5  below.

6      Defendant SMS's good cause stems from the confusing-phalanx of "Synergy" defendants

7  named by the Plaintiff, the good-faith course of dealings of an SMS executive (Mr. Brian

8  Baumgartner) with the Plaintiff long before and after this case was filed, and the confusing

9  interplay of these factors. As further expanded upon below, these conversations and Plaintiff's

10  discovery have spanned over numerous years between Plaintiff and Mr. Baumgartner. At no point

11  during these extensive communications was SMS identified as a potential party to the alleged

12  conduct or dispute, and especially as a named party in this action.

13      Rather, Plaintiff emphasized to Mr. Baumgartner, on behalf of SMS, that its inquiry and

14  investigation focused on Matthew Peters, in his role as owner/operator of Synergy RX, LLC, who

15  was portrayed as the "bad actor." Notably, Plaintiff's own statements and binding contractual

16  documents indicated to Mr. Baumgartner, an SMS agent/executive, that SMS was not to be

17  involved in the case at hand. Below we have outlined for the Court how the good cause confusion

18  arose.

19      ***PLAINTIFF'S COMPLAINT ALLEGATIONS***

20      Defendant SMS is an operational entity that has had no pharmacy services for over 8

21  years. There are numerous defendants and d/b/a's in this case bearing the "Synergy" moniker.

22  Defendant SMS's entire purported nexus to the instant action, according to Plaintiff, arises from

23  an executive of SMS, Mr. Brian Baumgartner, selling Synergy RX LLC (a separately named

24  defendant) to Mr. Peters in July 2017.

25      Plaintiff's Second Amended Complaint confusingly names, and says the following, about

26  the "Synergy-named" defendants:

27      • **As to Defendant SMS**:
           ○   "11.    Defendant Synergy Medical Systems LLC, d/b/a Synergy Rx, is a

28

3

1    Delaware company with the principal places of business 55 Coburg Road,
2    Suite 105, Eugene, OR 97401 and 10000 SE Main Street, Suite 118,
     Portland, OR 97216. Its registered agent is C. T. Corporation System of 780
3    Commercial Street SE, Suite 100, Salem, OR 97301. During the time
     period relevant to this Complaint, Synergy Medical Systems LLC was a
4    mail-order pharmacy controlled and operated in fact by Peters." (Dkt. 50);

5

6        • **As to other "Synergy-named" entities**:

7            ○    One "Synergy-named" entity is represented by Mr. Peter's

8        attorney, Connor Nash/James Bell. There, Plaintiff asserts:

9                "10. Defendant Professional 205 Pharmacy, LLC, d/b/a
10               Professional Center 205 Pharmacy, formerly known as Synergy Rx
                 1, is an Oregon company with the principal place of business 10000
11               SE Main Street, Suite 118, Portland, OR 97216... Its registered
                 agent is Peters family member Susan Hodge of Portland, OR.
12               During the time period relevant to this Complaint, Defendant
13               Professional 205 Pharmacy, LLC was a mail-order pharmacy
                 controlled and operated in fact by Peters. After December 29, 2017,
14               claims for medications dispensed by Professional 205 Pharmacy,
                 LLC were submitted to federal health care programs in the name of
15               Defendant Synergy Medical Systems LLC." (Dkt. 50);
16

17           ○    Another "Synergy-named" entity – which was sold by Mr.

18       Baumgartner to Mr. Peters in July of 2017 – is asserted in the Complaint to

19       be a Delaware entity (no such Delaware entity exists), and was dissolved in

20       Oregon in January 2019.  As to this entity, Plaintiff asserts:

21
                 "12. Defendant Synergy RX LLC, d/b/a Synergy Rx, is a Delaware
22               company with the principal place of business 10000 SE Main Street,
                 Suite 118, Portland, OR 97216. Brian Baumgartner, with a registered
23               address in Portland, OR, is its registered member and agent. During
                 the time period relevant to this Complaint, Synergy RX LLC was a
24               mail-order pharmacy controlled and operated in fact by Peters.
25               Claims for medications dispensed by Synergy RX LLC were
                 submitted to federal health care programs in the name of Defendant
26               Synergy Medical Systems LLC." (Dkt. 50).
27

28

                                          4

**MR. BAUMGARTNER IS LEAD TO BELIEVE THAT SMS IS NOT INVOLVED IN THIS CASE**

Mr. Baumgartner first became involved in this matter in July 2021, when Plaintiff issued a Civil Investigative Demand ("**CID**") to Mr. Baumgartner. **EXHIBIT 1**. The CID sought detailed information and documentation concerning alleged violations of the False Claims Act, and specifically stated "[T]he False Claims Act investigation concerns allegations that ***Synergy RX*** submitted, or caused to be submitted, false claims to Medicare by concealing the true ownership of the pharmacy." *Id*. (emphasis added). Since receiving the CID in July 2021, Mr. Baumgartner has continuously cooperated with Plaintiff and acted in good faith, despite the absence of any initiated legal proceedings initially. At all times, Plaintiff was aware that Mr. Baumgartner is an executive at SMS.

At no point in either the CID, or throughout the numerous discussions and correspondence between Plaintiff and Mr. Baumgartner, was it made known to Mr. Baumgartner, either directly or indirectly, that the government was investigating any claims allegedly submitted by Peters through ***SMS***. In fact, Paragraph 3 of the CID Definitions section states: "The term 'SYNERGY RX PHARMACY' shall refer to the pharmacy issued Oregon Board of Pharmacy license number RP-0002412-CS." **EXHIBIT 1**. A review of this Pharmacy license number reveals that it was issued to "SYNERGY RX" on June 22, 2007. **EXHIBIT 2**. The address for SYNERGY RX is listed as 10000 SE Main, #118, Portland, OR 97216. *Id*. ***This address has never been affiliated with Defendant SMS.[1]***

Over the next several months, Mr. Baumgartner continued to operate in good-faith responding to the CID. On or about February 14, 2022, Mr. Baumgartner received a formal notice from Plaintiff and the U.S. Department of Justice, alerting Mr. Baumgartner to the fact that he was being investigated in relation to alleged violations of the False Claims Act. **EXHIBIT 3**. In this formal notice, Plaintiff defines "Synergy" to mean "Synergy RX, LLC", and makes it expressly clear that: "Mr. Baumgartner caused false claims to be submitted to [CMS] by

---

[1] Confusingly, Plaintiff lists the 10000 SE Main St, Suite 118 address as a "principal place of business" for SMS in its Second Amended Complaint. This address has never been listed as a principal place of business for SMS in any of its corporate filings.

1 | concealing the true ownership of **Synergy RX, LLC** ('Synergy'), and representing himself as

2 | Synergy's owner…" **EXHIBIT 3**. This notice further stated that "Mr. Baumgartner sold

3 | Synergy (NPI 1306037825, RP-0002412-CS) to Mr. Peters in July, 2017…" **Id**.

4 | Plaintiff and Mr. Baumgartner, on behalf of SMS, ultimately entered into a settlement

5 | agreement in July 2024. **EXHIBIT 4**. The Settlement Agreement was wholly drafted by Plaintiff,

6 | and refers to Synergy RX as being the involved pharmacy. According to the terms of the

7 | Settlement Agreement, "**Synergy RX** was a corporation organized under the laws of Oregon with

8 | its principal place of business in Eugene, Oregon." **EXHIBIT 4**. SMS is a **Delaware Limited**

9 | **Liability Company**, and is filed as a Foreign Limited Liability Company with the Oregon

10 | Secretary of State.[2] See **EXHIBIT 5,** Oregon Business Entity Filing Records

11 | There is no dispute that Mr. Baumgartner has acted in good faith since first becoming

12 | involved in this matter in 2021. He has consistently assisted Plaintiff and responded promptly to

13 | relevant requests for information and documents. And Plaintiff has consistently told Mr.

14 | Baumgartner, an SMS official, in writing and in a binding Settlement Agreement, that only

15 | Synergy RX was involved in this matter (not SMS).

16 | Plaintiff's confused intermingling of Synergy-named entities in the Complaint, and Mr.

17 | Baumgartner's settlement after the Complaint was filed, have caused substantial confusion for

18 | Defendant SMS.  **EXHIBITS 3 and 4** illustrate to the Court why there was good cause for Mr.

19 | Baumgartner and SMS's confusion. **EXHIBITS 3 and 4**, drafted by Plaintiff, directly contradict

20 | the assertions that the Plaintiff has made to this Court in its Complaint. **EXHIBITS 3 and 4** are

21 | clear that defendant Synergy RX LLC's billing number was used by Peters to bill CMS, not

22 | Defendant SMS's (as alleged in the Complaint).

23 | From **EXHIBIT 3**:

24 | • "Mr. Baumgartner sold Synergy (NPI 1306037825, RP-0002412-CS) **[ed - defined**

25 | **in EXHIBIT 1 as Synergy RX, LLC]** to Mr. Peters in July, 2017… This

26 |

27 | [2] Although SMS was originally incorporated in Oregon as an Oregon Business Corporation, the entity was converted

28 | into a Foreign LLC, incorporated in Delaware, since 2011, approximately 13 years before the Settlement Agreement was executed.

1    arrangement permitted Mr. Peters… to use Synergy's existing NPI number… in

2    order to submit claims to CMS."

3    From **EXHIBIT 4**, an executed Settlement Agreement with Plaintiff, drafted by Plaintiff:

4    • "Synergy RX was a corporation organized under the laws of Oregon…

5    Baumgartner was the owner of Synergy RX until about July 20, 2017, when he sold

6    the pharmacy to Matthew Peters ("Peters"). Peters relocated the pharmacy to

7    Portland, Oregon and operated Synergy RX at that location from about September

8    30, 2017 through about April 6, 2018. Baumgartner retained no ownership interest

9    in Synergy RX after the pharmacy was sold to Peters…. between about September

10    30, 2017 and about April 6, 2018, Baumgartner allowed Peters to use

11    Baumgartner's National Provider Identifier ("NPI") number to submit claims for

12    reimbursement to the Centers for Medicare & Medicaid Services ("CMS").

13    Plaintiff asserted to Mr. Baumgartner (and, hence, SMS), that Synergy RX LLC

14    conducted the billing. Yet, Plaintiff's Complaint asserts the opposite, alleging that SMS's name

15    was used in billing: (i) "[c]laims for medications dispensed by Synergy RX LLC were submitted to

16    federal health care programs *in the name of Defendant Synergy Medical Systems LLC*" (Dkt. 50,

17    Paragraph 12) (emphasis added); and (ii) "[a]fter December 29, 2017, claims for medications

18    dispensed by Professional 205 Pharmacy, LLC were submitted to federal health care programs *in*

19    *the name of Defendant Synergy Medical Systems LLC*" (Dkt. 50, Paragraph 10) (emphasis

20    added).

21    Despite the numerous conversations between Mr. Baumgartner, on behalf of SMS, with

22    Plaintiff before this action was filed, Plaintiff's Second Amended Complaint entirely contradicts

23    what had been previously articulated by Plaintiff. Below is a timeline of events between SMS and

24    Plaintiff, outlining the prior discussions and correspondence between the parties, and

25    emphasizing the reasonable confusion regarding Mr. Baumgartner's and the SMS's involvement

26    in this action.

27    • July 6, 2021 -- Plaintiff sends a Civil Investigative Demand ("CID") to SMS (via

28    Mr. Baumgartner) (**EXHIBIT 1**);

7

1   • August 20, 2021 – Mr. Baumgartner provides initial response to the CID;

2   • October 18, 2021 – Mr. Baumgartner supplements his response to the CID;

3   • December 13, 2021 – Mr. Baumgartner further supplements his response to the
4      CID;

5   • October 18, 2021 – Plaintiff proposes a settlement agreement. In the proposed
6      settlement agreement, Plaintiff makes it clear that Synergy RX LLC (not SMS)
7      billed CMS;

8   • February 14, 2022 – Plaintiff sends a demand letter to Mr. Baumgartner's attorney,
9      Gregory Veralrud (**EXHIBIT 3**). Plaintiff asserts that Synergy RX LLC was used
10     to bill CMS;

11  • March 29, 2022 – Counsel for Mr. Baumgartner meets with AUSA Bunker and
12     discuss potential settlement agreement;

13  • ~July 2022 – Plaintiff proposes a Tolling Agreement to Mr. Baumgartner;

14  • July 10, 2023 – Mr. Baumgartner executes Waiver of Statute of Limitations. This
15     Waiver asserts that Synergy RX, LLC was used to bill CMS;

16  • January 30, 2024 – Mr. Baumgartner executes a second Waiver of Statute of
17     Limitations. This Waiver asserts that Synergy RX, LLC was used to bill CMS.

18  • April 5, 2024 – Plaintiff is still discussing the matter with Mr. Baumgartner;
19     Plaintiff serves Defendant SMS. SMS provides the service to Mr. Baumgartner to
20     address;

21  • May 6, 2024 – Plaintiff serves Mr. Baumgartner regarding defendant Synergy RX,
22     LLC, a sold and dissolved entity. Mr. Baumgartner remains in active discussions
23     with Plaintiff;

24  • July 9, 2024 – AUSA Thiess interviews Mr. Baumgartner on behalf of Plaintiff;

25  • July 9, 2024 – Mr. Baumgartner executes Settlement Agreement (**EXHIBIT 4**);

26  • August 6, 2024 – Plaintiff counter-executes Settlement Agreement (**EXHIBIT 4**);

27  • September 20, 2024 – Plaintiff files Request for Entry of Default;

28  • September 26, 2024 – Court enters Default against SMS;

- • October 16, 2024 through present – Approximately 20 days after the Default being technically entered against SMS despite its non-involvement in this case, SMS learned that this matter might not have been resolved with Mr. Baumgartner's settlement, and that a Default was entered against SMS. This firm promptly emailed Plaintiff to discuss resolving the Default. Since then, counsels for Plaintiff and SMS have continuously discussed resolving the Default without necessity of Court intervention, but have been unable to do so. Counsel for Plaintiff will not be surprised or prejudiced by this Motion, having known that it would be filed since a mere 20 days after the Default was entered. Despite continuing good-faith efforts on behalf of Defendant SMS and Plaintiff to reach resolution, no resolution was able to be reached, ultimately causing this Motion to be filed.

During this entire time period the Plaintiff was well-aware that Mr. Baumgartner was an agent and executive of SMS. Moreover, since Plaintiff first initiated contact with Mr. Baumgartner, all discussions have focused ***solely*** on the involvement and actions of Synergy Rx, LLC – a completely separate corporate entity from SMS.

Plaintiff, with awareness that Mr. Baumgartner was an executive and agent for SMS, has engaged with Mr. Baumgartner for over 3 years regarding its investigations, and for over 8 months after filing suit, culminating in the Settlement Agreement at **EXHIBIT 4**, where Plaintiff contractually asserted and bound itself to a position that Synergy RX LLC's billing number was used with CMS (not Defendant SMS's). At no point during their interactions with Mr. Baumgartner did the Plaintiff  flag the lack-of-SMS-Answer to Mr. Baumgartner's attorney (or Mr. Baumgartner). A simple and standard "We don't have an answer from SMS. You know we are proceeding against them, correct? Is SMS filing an answer?" would have resolved this matter long ago. Instead, Mr. Baumgartner (and SMS) labored under the understanding that he had sold a pharmacy to Mr. Peters in 2017 (well before the statute of limitations ran), that the sold pharmacy entity was the entity that was targeted in the lawsuit, that the sold-entity was the entity billing, that the sold-entity was now dissolved/defunct, and that Mr. Baumgartner was resolving all related liabilities. Plaintiff remained silent, settling with Mr. Baumgartner and subsequently

1    issuing a Default.

2    Promptly upon learning of this confusing and technical issue, counsel for SMS engaged

3    Plaintiff to resolve the matter (only approximately 20 days after this Court issued the Default).

4    Counsel for SMShas delayed seeking Court intervention until this time, instead seeking to

5    amicably resolve the matter with Plaintiff.

6    **ARGUMENT**

7    Federal Rule of Civil Procedure 55(c) permits courts to set aside an entry of default for

8    good cause. See *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091

9    (9th Cir. 2010). The power to set aside defaults and default judgments is "meant to be remedial in

10   nature and therefore must be liberally applied." *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984).

11   Judgment by default is "a drastic step appropriate only in extreme circumstances; a case should,

12   whenever possible, be decided on the merits." *Mesle*, 615 F.3d at 1089 (quoting *Falk*). For that

13   reason, "the burden on a party seeking to vacate a default judgment is not extraordinarily heavy."

14   *United States v. Aguilar*, 782 F.3d 1101, 1107 (9th Cir. 2015).

15   Courts consider three factors to determine whether good cause exists to set aside default:

16   "(1) whether the party seeking to set aside the default engaged in culpable conduct that led to the

17   default; (2) whether it had no meritorious defense; or (3) whether reopening the default judgment

18   would prejudice the other party." *Mesle*, 615 F.3d at 1091 (quoting *Falk*).

19   **A. Defendant was not Culpable in Allowing the Default to Occur**

20   With respect to the first factor, the Ninth Circuit has emphasized that a defendant's

21   conduct is culpable, as opposed to excusable, only where there is an intentional failure to answer.

22   See *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 697 (9th Cir. 2001). In analyzing this first

23   factor, courts determine whether the moving party acted in bad faith, such as with an "intention

24   to take advantage of the opposing party, interfere with judicial decision-making, or otherwise

25   manipulate the legal process." *Mesle*, 615 F.3d at 1092 (citations omitted).

26   Ordinary carelessness or negligence is not culpable conduct for the purposes of Rule 55(c).

27   *Mesle*, 615 F.3d at 1092 ("[I]t is clear that simple carelessness is not sufficient to treat a negligent

28   failure to reply as inexcusable, at least without a demonstration that other equitable factors, such

10

1    as prejudice, weigh heavily in favor of denial of the motion to set aside a default."); see also

2    *Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009) ("Excusable neglect 'encompass[es]

3    situations in which the failure to comply with a filing deadline is attributable to negligence,' and

4    includes 'omissions caused by carelessness.' ") (quoting *Pioneer Inv. Servs. Co. v. Brunswick*

5    *Assocs. Ltd.*, 507 U.S. 380, 394, (1993)).

6          Mr. Baumgartner, as an agent of, and on behalf of SMS, has entered into a settlement

7    agreement with Plaintiff, as well as numerous tolling agreements as Plaintiff compiled and

8    prepared its case. At no point throughout these discussions was it made clear to Mr. Baumgartner

9    that SMS was actually a direct participant in Plaintiff's theory of the case. In fact, this revelation

10   goes completely against the entirety of what had previously been portrayed to Mr. Baumgartner

11   throughout his extensive involvement and cooperation with Plaintiff.

12         SMS's behavior in this matter has been the complete opposite of culpable. Rather, Mr.

13   Baumgartner, on behalf of SMS, has continuously acted in good faith, cooperating with Plaintiff

14   and assisting in their investigations through interviews, and producing hundreds of documents for

15   Plaintiff's review, even before this lawsuit was filed. Furthermore, counsel for SMS reached out

16   to Plaintiff's counsel almost immediately upon learning that a default had been entered against it –

17   a default that was entered without a courtesy notice or similar correspondence from Plaintiff,

18   despite the parties engaging in lengthy discussions throughout the weeks prior relating to this

19   action.

20         Defendant SMS's conduct in allowing the default to be entered against it can be ***at worst***

21   described as careless, as SMS was in good faith trying to resolve the confusion in it being named in

22   the action in the first place. However, as the *Mesle* court held, simple carelessness is not sufficient

23   to treat a negligent failure to reply as inexcusable, at least without a demonstration that other

24   equitable factors, such as prejudice, weigh heavily in favor of denial of the motion to set aside a

25   default. See also *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1225 (9th Cir. 2000) (default should

26   be set aside where "[defendant's] errors resulted from negligence and carelessness, not from

27   deviousness or willfulness"). As such, this factor weighs in favor of setting aside the entry of

28   default.

1

2          **B. Defendant has a Meritorious Defense**

3                In considering whether a defendant has a meritorious defense, "[a]ll that is necessary to

4    satisfy the 'meritorious defense' requirement is to allege sufficient facts that, if true, would

5    constitute a defense: the question whether the factual allegation is true is not to be determined by

6    the court when it decides the motion to set aside the default. Rather, that question would be the

7    subject of the later litigation." *U.S. v. Aguilar*, 782 F.3d 1101, 1107 (9th Cir. 2015). To show that it

8    has a meritorious defense to a Plaintiff's claims, a Defendant must simply show a bona fide chance

9    that it will prevail on the merits. *Id*. This burden is not "extraordinarily heavy." *Id*.

10               Defendant SMS has multiple meritorious defenses that warrant setting aside the default.

11   First, the claims asserted against SMS are likely barred, in whole or in part, by the applicable

12   statute of limitations under the False Claims Act ("**FCA**"). 31 U.S.C. § 3731(b). To SMS's

13   knowledge, all interactions with Mr. Peters occurred before January 1, 2018 (and hence, are

14   barred by the statute of limitations). SMS has a well-founded and good-faith belief that some or

15   all of the conduct alleged in Plaintiff's Second Amended Complaint falls outside of the FCA's

16   relevant limitations periods.

17

18               Second, Plaintiff's claims against SMS are undermined by a prior settlement agreement

19   entered into between Mr. Baumgartner and Plaintiff during the course of Plaintiff's investigation.

20   Although SMS was not a party to the agreement, Mr. Baumgartner, in his individual capacity,

21   acted in good faith to resolve Plaintiff's concerns. The settlement language does not fully reflect

22   the breadth of the discussions between the parties or the reasonable understanding that the matter

23   had been resolved. Given the prior resolution and Plaintiff's failure to portray SMS as a relevant

24   entity during the numerous communications leading up to this action, SMS has a strong basis to

25   challenge the claims now asserted against it.

26

27

28

Finally, SMS was never made out to be a relevant or involved party in Plaintiff's prior communications or investigative discussions. The claims in the Second Amended Complaint arise from a time period *__after__* Mr. Baumgartner sold Synergy RX to Defendant Peters. Furthermore, at no point during Plaintiff's extensive communications with Mr. Baumgartner was SMS identified as a party to the alleged conduct or dispute. Rather, at all relevant times, it was Matthew Peters, owning/operating Synergy RX, LLC, that was portrayed as the "bad actor" and relevant entity to Plaintiff's action. Plaintiff's failure to raise SMS's alleged involvement until it blindsided Mr. Baumgartner and SMS when it filed this action further demonstrates the lack of a clear basis for SMS's inclusion in this action.

SMS did not profit from Defendant Peters' conduct, was not used as a conduit, and was wholly unaware that its billing number was purportedly used in his alleged schemes. SMS adamantly maintains that it neither had the requisite knowledge of these actions nor assisted in submitting any false claims to the government. Despite multiple requests, Plaintiff has failed to produce any evidence to the contrary, and Plaintiff's Complaint is devoid of requisite pleadings with respect to SMS to satisfy Rule 9(b) or 12(b)(6). Accordingly, SMS has a good-faith and meritorious defense, as it lacked the knowledge required under the FCA. Given these meritorious defenses—including the statute of limitations, the implications of the prior settlement discussions, and Plaintiff's failure to identify SMS as a relevant party—SMS has demonstrated sufficient grounds to contest the claims asserted against it. The law favors resolving cases on their merits, and SMS's defenses are more than sufficient to meet the low threshold required to set aside the default.

### C.  Plaintiff will not be Prejudiced if the Default is Set Aside

The final factor is the extent to which vacating Defendant SMS's default will prejudice

Plaintiff. Plaintiff must be able to show that the delay resulted in the loss of evidence, that it increased the difficulty of discovery, or that it thwarted plaintiff's ability to obtain relief. *Cutting v. Town of Allenstown*, 936 F.2d 18, 22 (1st Cir. 1991). Here, the delay caused by the default has not affected Plaintiff's case at all.

The case is only a year old, and is mere months out of initial dispositive motions being resolved. There has been no loss of evidence or witnesses, no increased difficulty of discovery, or otherwise thwarting of Plaintiff's ability to obtain relief. Furthermore, trial for this matter is not set until April 21, 2026, meaning all parties have substantial time to resolve any pre-Answer Motions which Defendant SMS may need to file without impacting or delaying the timing in this matter. Moreover, Plaintiff has known since a mere 20 days after this Court entered a Default that, were it unable to resolve SMS's involvement in this matter and the default amicably, that SMS would file this motion to set aside. Plaintiff has had time and notice to plan, and Plaintiff will not be prejudiced by the relief sought herein; rather, Plaintiff will simply be called upon to do what every litigant must do, which is to prove its case on the merits.

## **CONCLUSION**

Good cause exists to grant Defendant's Motion to Set Aside the Default. Defendant's conduct was not culpable because it was not motivated by bad faith and was, at most, caused by simple carelessness (caused by Plaintiff's assertions). Defendant has several meritorious defenses to Plaintiffs claims, including statute of limitations defenses and that SMS was released from liability in the settlement agreement. Finally, there is no prejudice to Plaintiff in requiring Plaintiff to litigate this action on the merits. For all the foregoing reasons, Defendant respectfully asks that the Court grant its motion to set aside the default entered against it and to let this case proceed on the merits.

1

2                          **Respectfully submitted,**

3    **Dated**: March 19, 2025        **THE HEALTH LAW PARTNERS, P.C.**

4                                     By:/s/Clinton Mikel
                                      _____
                                      Clinton Mikel, Attorney for Defendant
5                                     Synergy Medical Systems, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1



# UNITED STATES OF AMERICA
## United States Department of Justice
### District of Oregon

## CIVIL INVESTIGATIVE DEMAND
### Documentary Material

To:
Brian Baumgartner
American Medical Training, LLC
1710 Willow Creek Circle, Ste. 1
Eugene, Oregon 97402

CID No.: 21-3-002

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Synergy RX submitted, or caused to be submitted, false claims to Medicare by concealing the true ownership of the pharmacy.

This Demand requires you to provide documents to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

You are required by this Demand to produce any and all of the following documents in your custody or control:

### SEE ATTACHMENTS A and B

You must make this material available to Assistant United States Attorneys Gillian Bunker or Alexis A. Lien, who have been designated as False Claims Act custodians in this case. They may be contacted at 503-727-1000 if you have any questions. The requested documents shall be produced no later than (30) days from the receipt of this Demand, at the United States Attorney's Office, 1000 S.W. Third Avenue, Suite 600, Portland, Oregon, 97204. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand. MATERIALS MUST BE PRODUCED IN THE FORMAT REQUIRED IN ATTACHMENT B.

Issued July 6, 2021.

Scott Erik Asphaug
Acting United States Attorney
District of Oregon

**CID No. 21-3-002**

**Declaration of Compliance**
(Documentary Material)

I have responsibility for producing the documentary material required by Civil Investigative Demand No. **21-3-002**. I hereby certify that all the documentary material required by the Civil Investigative Demand which are in the possession, custody, or control of the person to whom the Demand is directed have been submitted to a custodian identified in the Demand.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the forgoing is true and correct.

Executed on _____     _____
                    Date                                              Signature

                                          _____
                                          Printed Name

                                          _____
                                          Title

## VERIFIED RETURN OF SERVICE

I, _Staci Schoff_, an employee of the United States working under the direction and supervision of Assistant United States Attorney Gillian Bunker in connection with a false claims law investigation, hereby certify that at the time of _3:30_, on the _6th_ day of _July_, 2021, I personally served Civil Investigative Demand No. **21-3-002** by the following means:

1. personal delivery to:

   _____ (Name of Person)
   _____ (Title of Person)
   _____ (Name of Legal Entity)
   _____ (Address)
   _____

2. certified mail with return receipt requested or Federal Express mail to:

   _Brian Baumgartner_ (Name of Person)
   _____ (Title of Person)
   _American Medical Training, LLC_ (Name of Legal Entity)
   _1710 Willow Creek Circle, Ste. I_ (Address)
   _Eugene, Oregon 97402_

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _6th_ day of _July_, 2021.

Signature _____

Title _Paralegal Specialist_

**ATTACHMENT A**
**CID 21-3-002**

**Instructions**

A.    These requests apply to all documentary material in your possession, custody, or control regardless of their location and regardless of whether such documents are held by your attorneys, consultants, accountants, investigators, representatives or agents, or any other person acting on your behalf.

B.    You are required to produce the originals of all documents and other items that are responsive, in whole or in part, to this CID including all marginalia, post-its, and any attachments, whether referred to or incorporated by the documents.  As a courtesy, exact copies of documents requested in the CID will be accepted in response to the CID provided that the original documents will be made available upon request to False Claims Act Investigators, Custodians, or Deputy Custodians.

C.    To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label intact.

D.    To the extent that documents are found attached to other documents, by means of paperclips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

E.    Scope of search required:  This request calls for all documents in your possession custody or control, including but not limited to, your officers, directors, employees, agents, consultants and contractors.  You are required to search all files, including electronic sources, reasonably likely to contain responsive documents, including all files left behind by former officers, directors, agents, employees, and contractors.

F.    These requests are continuing in nature.  If you become aware of or acquire possession, custody, or control of additional responsive documents, you shall promptly produce such additional documents in the requested format.

G.    No document called for by this request shall be destroyed, modified, redacted, removed, or otherwise made inaccessible, except insofar as documents are withheld under a claim of privilege in compliance with the instructions herein.

H.    If you withhold any document on the ground of any legal privileges provide a privilege log or index setting forth: (a) the type of document (e.g., letter, memorandum, contract, etc.); (b) the date of the document; (c) the title of the document; (d) the names, address, and position of each author of the document and of any person who assisted its preparation; (e) the names, address, and position of each addressee or recipient of the document or any copies of it; (f) the number of pages; (g) a brief description of the subject matter; (h) the paragraph of the request to which it is responsive; and (i) the factual and legal basis(es) for the claim of privilege or grounds for non-production asserted with respect to the document.

ATTACHMENT A

I.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which privilege is claimed.  When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration. Identify the redactions on the privilege log described herein.  Any redaction must be clearly visible on the redacted document and marked accordingly (use of the word "REDACTION" within or adjacent to the redaction box).

J.      Identify all responsive documents that have been lost, discarded, or destroyed.  In so doing, state the type of document, its date, the approximate date it was lost, discarded, or destroyed, and the identity of each person having knowledge of the contents thereof.

K.      If no documents exist that are responsive to a specific request, provide a written statement to that effect at the time of production.

L.      You shall include the attached declaration of compliance in your production, signed and dated by the appropriate person.

M.      Produce all materials in electronic format in accordance with Attachment B.

N.      Organization of documents produced:  All documents produced pursuant to this CID shall be organized in such a manner that all documents relating to a particular numbered request are grouped together and identified as being responsive to that specific numbered request.

O.      Relevant time period:  Unless otherwise indicated, the relevant time period for each document request in this subpoena shall be **January 1, 2017 through December 31, 2018** and shall include all documents created or prepared during that time period, or referring or relating to that period, regardless of when the document was created or prepared.

## Definitions

1.      The term "You" or "Your" shall mean BRIAN BAUMGARTNER, and any person acting on their behalf, including but not limited to attorneys, consultants, accountants, investigators, representatives, employees, or agents.

2.      The term "Company" shall mean AMERICAN MOBILE TRAINING, LLC or and any person acting on their behalf, including but not limited to attorneys, consultants, accountants, investigators, representatives, employees, contractors, or agents.

3.      The term "SYNERGY RX PHARMACY" shall refer to the pharmacy issued Oregon Board of Pharmacy license number RP-0002412-CS.

4.      "Documentary material," "document," or "documents" shall be defined in a broad and literal sense, including, but not limited to, all items identified in Rule 34(a)(1) of the Federal Rules of Civil Procedure, and necessarily means and includes, without limitation, electronically-stored

ATTACHMENT A

information (ESI), including: computer data (whether or not now existing or reflected on "hard copy" documents), handwritten, printed, typewritten, recorded, electromagnetic, graphic, or photographic matter, or sound reproduction (however produced or reproduced) including, but not limited to, emails, writings, recordings, papers, tangible things, records, papers, communications, tabulations, charts, medical records, pharmacy records, laboratory records, diagnostic reports and films, physician notes and orders, nursing notes, requisitions, consultation notes and records, diaries, appointment books, calendars, schedules, journals, notes, memoranda, reports, questionnaires, applications, minutes, notices, charts, graphs, tables, bulletins, financial statements, financial accounts, bank records, signature cards, cancelled checks, deposit tickets, expenditures, cost models, budgets, balance sheets, asset lists, tax records, forms 1099, forms W-2, ledgers, letters, correspondence of any kind, grants, awards, notice of awards, contracts, agreements, memorandum of understanding, negotiable instruments, proposals, policies, regulations, guidelines, projects, summaries, surveys, floor plans, time records, bills, invoices, pay slips, notepads, notebooks, postcards, telegrams, facsimiles, telexes, films, microfilms, photographs, videotapes, slides, motion pictures, diagrams, models, drawings, tapes, transcriptions, books, publications, phone records, voice mail, computer files (or any other information or data compilations stored in or accessible through computer or other information retrieval systems, together with instructions and all other materials necessary to use or interpret such data compilations), and other things, whether prepared by handwriting, printing, typing, photographing, electronic recording, or any other means of recording, communication or representation, including letters, words, pictures, sounds or symbols, or combinations thereof.

5.    "Relating," "relate," or "concerning" shall mean consisting of, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

6.    "And," "or," and "and/or" shall be construed either disjunctively or conjunctively so as to bring within the scope of these document requests any information which might otherwise be construed as outside their scope.

7.    "Correspondence" means transmittal of information (in the form of facts, ideas, inquiries or otherwise) between two or more persons and/or entities.

8.    "Contact Information" means the business, residence, and, if different, last known address, social security number, e-mail addresses, telephone numbers, fax numbers, or other information as to the location and means of contacting a person and/or entity.

9.    The term "communication" means any transmission or exchange of information between two or more persons and/or entities, orally or in writing, and includes, without limitation, any conversation or discussion, whether face-to face or by means of telephone, facsimile, letter, notes of conversations, memorandum, text message, instant message, tweets, electronic posts, or electronic mail message of whatever type and description in Your possession, custody, or control, however made, and includes all handwritten, typed, printed, recorded, transcribed, and taped writing or record of such communications.

10.    "Employee" and "Employees" means any person, including but not limited to any past or present employees, independent contractors, directors, officers, agents, representatives, attorneys,

ATTACHMENT A

accountants, advisors, and/or consultants who acted or purported to act on behalf of You and/or the Companies, or who have performed any service for, on behalf of, or in Your name and/or in the name of the Companies (whether on a full-time, part-time, piece-work, commission, or other basis, and whether paid or unpaid).

11.     "Person" includes within its meaning natural persons and corporations, companies, partnerships, unincorporated business associations and any other entity composed of natural persons.

12.     The term "remuneration" has the meaning identified in 42 C.F.R. § 411.351.

13.     "Personal services agreement" means any contract and/or agreement relating to individuals or business entities performing actions and/or services, except for the supply of goods, as non-employees.

14.     The singular and plurals forms of any word shall be construed interchangeably so as to bring within the scope of these document requests any information which might otherwise be construed as outside their scope.

## DOCUMENTARY MATERIAL REQUEST

You are required by this Demand to produce any and all of the following documents in Your custody or control:

1.  All documents and/or communications relating to the sale, transfer, and/or relocation of SYNERGY RX PHARMACY.

2.  All communications between You and/or the Company and any of the following persons or entities:

    a.  Matthew Peters
    b.  Susan Hodge
    c.  JMSP, LLC
    d.  PROFESSIONAL CENTER 205 PHARMACY, LLC
    e.  SYNERGY RX PHARMACY.

3.  All written agreements (including but not limited to sales agreements, personal services agreements, and profit sharing agreements) between You and/or the Companies and any of the following persons or entities:

    a.  Matthew Peters
    b.  Susan Hodge
    c.  JMSP, LLP
    d.  PROFESSIONAL CENTER 205 PHARMACY, LLC
    e.  SYNERGY RX PHARMACY

ATTACHMENT A

4. All documents and/or communications relating to any remuneration promised and/or paid to You and/or the Companies from any of the following persons or entities:

    a. Matthew Peters
    b. Susan Hodge
    c. JMSP, LLC
    d. PROFESSIONAL CENTER 205 PHARMACY, LLC
    e. SYNERGY RX PHARMACY

5. All documents pertaining to all open or closed bank accounts held in the name of, for the benefit of, or under the control of You and/or the Companies, including but not limited to:

    a. Signature cards;
    b. Bank statements;
    c. Cancelled checks;
    d. Deposit tickets;
    e. Copies of items deposited;
    f. Check registers
    g. Forms 1099 or back-up withholding documents.

6. All documents that summarize Your and/or the Companies' annual, quarterly, monthly, weekly, or daily financial performance, including without limitation:
    a. auditor's reports;
    b. financial statements, including but not limited to:
        i. balance sheets;
        ii. statements of operations (profit and loss statements);
        iii. filings with Federal or state agencies or regulatory bodies;
    c. trial balances;
    d. federal and state income tax returns and quarterly estimated tax returns.

7. A list or other documents sufficient to show the Contact Information, date of birth, position/title, employment status (whether a current or former employee), and description of job duties of all of Your and/or the Companies' Employees.

8. Management/organizational charts and/or other documents sufficient to identify and describe the Companies' (a) management structure and management personnel, and (b) corporate structure, including relationships to parent(s), subsidiary(ies), and divisions, and/or other related entities associated with You and/or the Companies. The documentary material should include information sufficient to identify the legal status of each such entity.

9. All documents concerning Your and/or the Companies' document retention policies.

10. A list or documents sufficient to identify the names and addresses of all facilities where Your and/or the Companies' documents are stored.

ATTACHMENT A

**ATTACHMENT B**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

Careful consideration should be given to the methodology, implementation, and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 22 below.

**1. Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2. Production Format of ESI and Imaged Hard Copy**

Responsive ESI and imaged hard copy shall be produced in the format outlined below. All ESI, except as outlined below in sections 5 – 19, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a. **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.
       i. All TIFF file names shall include the unique Bates number burned into the image. (See section 20, below, regarding Bates number instructions.)
       ii. All TIFF image files shall be stored with the ".tif" extension.
       iii. Images shall be OCR'd using standard COTS products.

**ATTACHMENT B**

1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.
   a. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
   b. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – the folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

**ATTACHMENT B**

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

    1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ° *or Code 167* |
| *Nested values* | \ *or Code 092* |

    2. This load file should contain the relative file path to the individual multi-page, document level text files.
    3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
    4. There should be one line for every record in a collection.
    5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

        þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
    \\*CaseName*\\**LoadFiles**
    \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Text** <Extracted Text files location (can include

**ATTACHMENT B**

subfolders as needed, should not include more than 2,000 files per folder)

ATTACHMENT B

## ATTACHMENT B

### 3.    Required Metadata/Database Fields

A "√" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 19 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), and imaged hard copy material (section 9). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column.  The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |
| PGCOUNT | Page Count | Number | 10 | √ | √ | √ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | √ | √ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | √ | √ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | √ | √ | √ |

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| PROPERTIES | Privilege notations, Redacted, Document Withheld On Privilege | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. Can contain IP address | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | For PDFs Only | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a.  De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

    b.  All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    c.  All files should be globally de-duplicated with the following conditions:

        i.  The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

        ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

        iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

        iv.  No customization of hashing may occur without prior express approval by the Government.

        v.  De-duplication must be done by document family, not by individual document.

ATTACHMENT B

     vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

  d. The recipient shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government.  All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields.  The recipient will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  For files that cannot be expanded the native files shall be produced with the image file.

## 6.    Embedded Files

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced.  For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

## 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

     a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-19.

ATTACHMENT B

    b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 25) and shall include all available metadata associated with the data, including custodian information.

## 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

    a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

    b.  The first document in the collection represents the parent document and all other documents will represent the children.

    c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

    d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

## 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 20 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

## 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

## 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.),

## ATTACHMENT B

shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of Instant Messenger (IM), Voicemail Data, Audio Data, Video Data, Text Messages, etc.

The responding party shall identify, collect, and produce any and all data which is responsive to the requests which may be stored in audio or video recordings, cell phone/PDA/Blackberry/smart phone data, tablet data, voicemail messaging data, instant messaging, text messaging, conference call data, video/audio conferencing (e.g., GoTo Meeting, WebEx), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similiarly to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, Google+, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any

## ATTACHMENT B

perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, the standard format of all reports provided should be in comma separated values (.csv) format. The information that will be contained in the reports must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 19.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.


ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

## ATTACHMENT B

a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
b.  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.
c.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 20.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 21.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
b.  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives.

**ATTACHMENT B**

    c.  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.

    d.  Media should be labeled with the case name, production date, Bates range, and producing party.

**22.    Virus Protection and Security for Delivery of Production Data**

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

**23.    Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**24.    Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**25.    Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**26.    Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.



# UNITED STATES OF AMERICA
## United States Department of Justice
### District of Oregon

## CIVIL INVESTIGATIVE DEMAND
### Documentary Material

To:

Brian Baumgartner                                    CID No.: 21-3-001
Synergy Medical Systems, Inc.
1710 Willow Creek Circle, Ste. 1
Eugene, Oregon 97402

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Synergy RX submitted, or caused to be submitted, false claims to Medicare by concealing the true ownership of the pharmacy.

This Demand <u>requires you to provide documents</u> to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

You are required by this Demand to produce any and all of the following documents in your custody or control:

### SEE ATTACHMENTS A and B

You must make this material available to Assistant United States Attorneys Gillian Bunker or Alexis A. Lien, who have been designated as False Claims Act custodians in this case. They may be contacted at 503-727-1000 if you have any questions. The requested documents shall be produced no later than (30) days from the receipt of this Demand, at the United States Attorney's Office, 1000 S.W. Third Avenue, Suite 600, Portland, Oregon, 97204. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand. MATERIALS MUST BE PRODUCED IN THE FORMAT REQUIRED IN ATTACHMENT B.

Issued July 6, 2021.

Scott Erik Asphaug
Acting United States Attorney
District of Oregon

**CID No. 21-3-001**

**Declaration of Compliance**
(Documentary Material)

I have responsibility for producing the documentary material required by Civil Investigative Demand No. **21-3-001**. I hereby certify that all the documentary material required by the Civil Investigative Demand which are in the possession, custody, or control of the person to whom the Demand is directed have been submitted to a custodian identified in the Demand.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

I declare under penalty of perjury under the laws of the United States of America (28 U.S.C. § 1746) that the forgoing is true and correct.

Executed on _____          _____
            Date                                Signature

                                                _____
                                                Printed Name

                                                _____
                                                Title

## VERIFIED RETURN OF SERVICE

I, _Staci Schoff_____, an employee of the
United States working under the direction and supervision of Assistant United States Attorney
Gillian Bunker in connection with a false claims law investigation, hereby certify that at the time
of _3:30____, on the _6th_ day of _July_____, 2021, I personally served
Civil Investigative Demand No. **21-3-001** by the following means:

1. personal delivery to:

    _____ (Name of Person)
    _____ (Title of Person)
    _____ (Name of Legal Entity)
    _____ (Address)
    _____

2. certified mail with return receipt requested or Federal Express mail to:

    _Brian Baumgartner_____ (Name of Person)
    _____ (Title of Person)
    _Synergy Medical Systems, Inc._ (Name of Legal Entity)
    _1710 Willow Creek Circle, St.1_ (Address)
    _Eugene, Oregon 97402_

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this _6th_ day of _July_____, 2021.

Signature _____

Title _Paralegal Specialist_

**ATTACHMENT A**
**CID 21-3-001**

<u>**Instructions**</u>

A.    These requests apply to all documentary material in your possession, custody, or control regardless of their location and regardless of whether such documents are held by your attorneys, consultants, accountants, investigators, representatives or agents, or any other person acting on your behalf.

B.    You are required to produce the originals of all documents and other items that are responsive, in whole or in part, to this CID including all marginalia, post-its, and any attachments, whether referred to or incorporated by the documents. As a courtesy, exact copies of documents requested in the CID will be accepted in response to the CID provided that the original documents will be made available upon request to False Claims Act Investigators, Custodians, or Deputy Custodians.

C.    To the extent that documents are found in file folders and other similar containers that have labels or other identifying information, the documents shall be produced with such file folder and label intact.

D.    To the extent that documents are found attached to other documents, by means of paperclips, staples, or other means of attachment, such documents shall be produced together in their condition when found.

E.    Scope of search required: This request calls for all documents in your possession custody or control, including but not limited to, your officers, directors, employees, agents, consultants and contractors. You are required to search all files, including electronic sources, reasonably likely to contain responsive documents, including all files left behind by former officers, directors, agents, employees, and contractors.

F.    These requests are continuing in nature. If you become aware of or acquire possession, custody, or control of additional responsive documents, you shall promptly produce such additional documents in the requested format.

G.    No document called for by this request shall be destroyed, modified, redacted, removed, or otherwise made inaccessible, except insofar as documents are withheld under a claim of privilege in compliance with the instructions herein.

H.    If you withhold any document on the ground of any legal privileges provide a privilege log or index setting forth: (a) the type of document (e.g., letter, memorandum, contract, etc.); (b) the date of the document; (c) the title of the document; (d) the names, address, and position of each author of the document and of any person who assisted its preparation; (e) the names, address, and position of each addressee or recipient of the document or any copies of it; (f) the number of pages; (g) a brief description of the subject matter; (h) the paragraph of the request to which it is responsive; and (i) the factual and legal basis(es) for the claim of privilege or grounds for non-production asserted with respect to the document.

ATTACHMENT A

I.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration. Identify the redactions on the privilege log described herein. Any redaction must be clearly visible on the redacted document and marked accordingly (use of the word "REDACTION" within or adjacent to the redaction box).

J.      Identify all responsive documents that have been lost, discarded, or destroyed. In so doing, state the type of document, its date, the approximate date it was lost, discarded, or destroyed, and the identity of each person having knowledge of the contents thereof.

K.      If no documents exist that are responsive to a specific request, provide a written statement to that effect at the time of production.

L.      You shall include the attached declaration of compliance in your production, signed and dated by the appropriate person.

M.      Produce all materials in electronic format in accordance with Attachment B.

N.      Organization of documents produced: All documents produced pursuant to this CID shall be organized in such a manner that all documents relating to a particular numbered request are grouped together and identified as being responsive to that specific numbered request.

O.      Relevant time period: Unless otherwise indicated, the relevant time period for each document request in this subpoena shall be **January 1, 2017 through December 31, 2018** and shall include all documents created or prepared during that time period, or referring or relating to that period, regardless of when the document was created or prepared.

## Definitions

1.      The term "You" or "Your" shall mean BRIAN BAUMGARTNER, and any person acting on their behalf, including but not limited to attorneys, consultants, accountants, investigators, representatives, employees, or agents.

2.      The term "Companies" shall mean SYNERGY MEDICAL SYSTEMS, LLC; SYNERGY MEDICAL SYSTEMS, INC.; MEDICAL INNOVATIONS, LLC; SYNERGY RX PHARMACY; and any person acting on their behalf, including but not limited to attorneys, consultants, accountants, investigators, representatives, employees, contractors, or agents.

3.      The term "SYNERGY RX PHARMACY" shall refer to the pharmacy issued Oregon Board of Pharmacy license number RP-0002412-CS.

4.      "Documentary material," "document," or "documents" shall be defined in a broad and literal sense, including, but not limited to, all items identified in Rule 34(a)(1) of the Federal Rules

ATTACHMENT A

of Civil Procedure, and necessarily means and includes, without limitation, electronically-stored information (ESI), including: computer data (whether or not now existing or reflected on "hard copy" documents), handwritten, printed, typewritten, recorded, electromagnetic, graphic, or photographic matter, or sound reproduction (however produced or reproduced) including, but not limited to, emails, writings, recordings, papers, tangible things, records, papers, communications, tabulations, charts, medical records, pharmacy records, laboratory records, diagnostic reports and films, physician notes and orders, nursing notes, requisitions, consultation notes and records, diaries, appointment books, calendars, schedules, journals, notes, memoranda, reports, questionnaires, applications, minutes, notices, charts, graphs, tables, bulletins, financial statements, financial accounts, bank records, signature cards, cancelled checks, deposit tickets, expenditures, cost models, budgets, balance sheets, asset lists, tax records, forms 1099, forms W-2, ledgers, letters, correspondence of any kind, grants, awards, notice of awards, contracts, agreements, memorandum of understanding, negotiable instruments, proposals, policies, regulations, guidelines, projects, summaries, surveys, floor plans, time records, bills, invoices, pay slips, notepads, notebooks, postcards, telegrams, facsimiles, telexes, films, microfilms, photographs, videotapes, slides, motion pictures, diagrams, models, drawings, tapes, transcriptions, books, publications, phone records, voice mail, computer files (or any other information or data compilations stored in or accessible through computer or other information retrieval systems, together with instructions and all other materials necessary to use or interpret such data compilations), and other things, whether prepared by handwriting, printing, typing, photographing, electronic recording, or any other means of recording, communication or representation, including letters, words, pictures, sounds or symbols, or combinations thereof.

5.      "Relating," "relate," or "concerning" shall mean consisting of, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

6.      "And," "or," and "and/or" shall be construed either disjunctively or conjunctively so as to bring within the scope of these document requests any information which might otherwise be construed as outside their scope.

7.      "Correspondence" means transmittal of information (in the form of facts, ideas, inquiries or otherwise) between two or more persons and/or entities.

8.      "Contact Information" means the business, residence, and, if different, last known address, social security number, e-mail addresses, telephone numbers, fax numbers, or other information as to the location and means of contacting a person and/or entity.

9.      The term "communication" means any transmission or exchange of information between two or more persons and/or entities, orally or in writing, and includes, without limitation, any conversation or discussion, whether face-to face or by means of telephone, facsimile, letter, notes of conversations, memorandum, text message, instant message, tweets, electronic posts, or electronic mail message of whatever type and description in Your possession, custody, or control, however made, and includes all handwritten, typed, printed, recorded, transcribed, and taped writing or record of such communications.

ATTACHMENT A

10.     "Employee" and "Employees" means any person, including but not limited to any past or present employees, independent contractors, directors, officers, agents, representatives, attorneys, accountants, advisors, and/or consultants who acted or purported to act on behalf of You and/or the Companies, or who have performed any service for, on behalf of, or in Your name and/or in the name of the Companies (whether on a full-time, part-time, piece-work, commission, or other basis, and whether paid or unpaid).

11.     "Person" includes within its meaning natural persons and corporations, companies, partnerships, unincorporated business associations and any other entity composed of natural persons.

12.     The term "remuneration" has the meaning identified in 42 C.F.R. § 411.351.

13.     "Personal services agreement" means any contract and/or agreement relating to individuals or business entities performing actions and/or services, except for the supply of goods, as non-employees.

14.     The singular and plurals forms of any word shall be construed interchangeably so as to bring within the scope of these document requests any information which might otherwise be construed as outside their scope.

## <u>DOCUMENTARY MATERIAL REQUEST</u>

You are required by this Demand to produce any and all of the following documents in Your custody or control:

1.  All documents and/or communications relating to the sale, transfer, and/or relocation of SYNERGY RX PHARMACY.

2.  All communications between You and/or the Companies and any of the following persons or entities:

    a.  Matthew Peters
    b.  Susan Hodge
    c.  JMSP, LLC
    d.  PROFESSIONAL CENTER 205 PHARMACY, LLC
    e.  SYNERGY RX PHARMACY.

3.  All written agreements (including but not limited to sales agreements, personal services agreements, and profit sharing agreements) between You and/or the Companies and any of the following persons or entities:

    a.  Matthew Peters
    b.  Susan Hodge
    c.  JMSP, LLP
    d.  PROFESSIONAL CENTER 205 PHARMACY, LLC
    e.  SYNERGY RX PHARMACY

ATTACHMENT A

4. All documents and/or communications relating to any remuneration promised and/or paid to You and/or the Companies from any of the following persons or entities:

    a. Matthew Peters
    b. Susan Hodge
    c. JMSP, LLC
    d. PROFESSIONAL CENTER 205 PHARMACY, LLC
    e. SYNERGY RX PHARMACY

5. All documents pertaining to all open or closed bank accounts held in the name of, for the benefit of, or under the control of You and/or the Companies, including but not limited to:

    a. Signature cards;
    b. Bank statements;
    c. Cancelled checks;
    d. Deposit tickets;
    e. Copies of items deposited;
    f. Check registers
    g. Forms 1099 or back-up withholding documents.

6. All documents that summarize Your and/or the Companies' annual, quarterly, monthly, weekly, or daily financial performance, including without limitation:
    a. auditor's reports;
    b. financial statements, including but not limited to:
        i. balance sheets;
        ii. statements of operations (profit and loss statements);
        iii. filings with Federal or state agencies or regulatory bodies;
    c. trial balances;
    d. federal and state income tax returns and quarterly estimated tax returns.

7. A list or other documents sufficient to show the Contact Information, date of birth, position/title, employment status (whether a current or former employee), and description of job duties of all of Your and/or the Companies' Employees.

8. Management/organizational charts and/or other documents sufficient to identify and describe the Companies' (a) management structure and management personnel, and (b) corporate structure, including relationships to parent(s), subsidiary(ies), and divisions, and/or other related entities associated with You and/or the Companies. The documentary material should include information sufficient to identify the legal status of each such entity.

9. All documents concerning Your and/or the Companies' document retention policies.

10. A list or documents sufficient to identify the names and addresses of all facilities where Your and/or the Companies' documents are stored.

ATTACHMENT A

# ATTACHMENT B

## Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

Careful consideration should be given to the methodology, implementation, and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 22 below.

## 1. Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

## 2. Production Format of ESI and Imaged Hard Copy

Responsive ESI and imaged hard copy shall be produced in the format outlined below. All ESI, except as outlined below in sections 5 – 19, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a.  **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression). When producing in *color*, paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

        i.  All TIFF file names shall include the unique Bates number burned into the image. (See section 20, below, regarding Bates number instructions.)

        ii.  All TIFF image files shall be stored with the ".tif" extension.

        iii.  Images shall be OCR'd using standard COTS products.

## ATTACHMENT B

1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.
    a. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.
    b. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

        REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
        REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
        REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
        REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
        REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

# ATTACHMENT B

d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

   | | |
   |---|---|
   | *Field Separator* | *¶ or Code 020* |
   | *Text Qualifier* | *þ or Code 254* |
   | *Newline* | *® or Code 174* |
   | *Multi-value* | *° or Code 167* |
   | *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

   þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILEN AMEþ¶þTITLEþ

d.  **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e.  **Directory and folder structure:** The directory structure for productions should be:
    *\CaseName*\**LoadFiles**
    *\CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
    *\CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
    *\CaseName*\**Text** <Extracted Text files location (can include

**ATTACHMENT B**

subfolders as needed, should not include more than 2,000 files per
folder)

ATTACHMENT B

**ATTACHMENT B**

3.     **Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 19 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), and imaged hard copy material (section 9). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |
| PGCOUNT | Page Count | Number | 10 | √ | √ | √ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | √ | √ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | √ | √ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | √ | √ | √ |

## ATTACHMENT B

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| PROPERTIES | Privilege notations, Redacted, Document Withheld Based On Privilege | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM: SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. Can contain IP address | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |

ATTACHMENT B

**ATTACHMENT B**

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | For PDFs Only | Text | Unlimited | | ✓ | ✓ |
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a.  De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

    b.  All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    c.  All files should be globally de-duplicated with the following conditions:

        i.  The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

        ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

        iii.  All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

        iv.  No customization of hashing may occur without prior express approval by the Government.

        v.  De-duplication must be done by document family, not by individual document.

## ATTACHMENT B

     vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be expressly stated in the cover letter accompanying the subsequent production(s).

    d. The recipient shall not use any other procedure to cull, filter, group, separate or
de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The recipient will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.　　Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. For files that cannot be expanded the native files shall be produced with the image file.

## 6.　　Embedded Files

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

## 7.　　Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.　　Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-19.

ATTACHMENT B

      b.  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 25) and shall include all available metadata associated with the data, including custodian information.

## 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

      b.  The first document in the collection represents the parent document and all other documents will represent the children.

      c.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

      d.  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

## 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 20 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

## 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

## 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.),

ATTACHMENT B

shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

**13.    Production of Instant Messenger (IM), Voicemail Data, Audio Data, Video Data, Text Messages, etc.**

The responding party shall identify, collect, and produce any and all data which is responsive to the requests which may be stored in audio or video recordings, cell phone/PDA/Blackberry/smart phone data, tablet data, voicemail messaging data, instant messaging, text messaging, conference call data, video/audio conferencing (e.g., GoTo Meeting, WebEx), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similiarly to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

**14.    Production of Social Media**

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, Google+, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any

## ATTACHMENT B

perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, the standard format of all reports provided should be in comma separated values (.csv) format. The information that will be contained in the reports must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 19.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

ATTACHMENT B

    a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

    b.  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

    c.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 20.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 21.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.

    b.  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives.

ATTACHMENT B

   c.  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
   d.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 22.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

## 23.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

## 24.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

## 25.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

## 26.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

# Exhibit 2

# Licensee Details

## Demographic Information

**Name:**    SYNERGY RX

## Address Information

**Line 1:**                    10000 SE MAIN #118
**Line 2:**
**Line 3:**
**Line 4:**                    PORTLAND OR 97216

## License Information

**Type:**              Retail Drug Outlet
**Secondary:**
**Lic #:**             RP-0002412
**Status:**            Lapsed
**Issued:**            6/22/2007
**Expiration Date:**   3/31/2019
**Last Renewed:**      3/15/2018
**Small Business?**

## Prerequisite Information

| Relationship/Name | | Dates | License Details | |
|---|---|---|---|---|
| **Self Automatic** | SYNERGY RX | **Since:** | Controlled Substance | RP-0002412-CS |
| | | | **Status:** Lapsed | |

## Specialty Information

**Specialty:**              Community Pharmacy Independent
**Issue Date:**             1/27/2010
**Expiration Date:**

## Discipline Information

All Board Orders from 2007 to present are displayed below. Board Orders older than 2007 are being added as available. There may be additional disciplinary documents associated with this license/registration. Please submit a public records request.

For additional information regarding public records, click here.

## Board Orders

No Available Board Orders

# Exhibit 3

1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1000
*www.usdoj.gov/usao/or*

Gillian Bunker
Assistant U.S. Attorney
Gillian.Bunker@usdoj.gov
(503) 727-1000
*Reply to Portland Office*

**U.S. DEPARTMENT OF JUSTICE**
United States Attorney's Office
District of Oregon
Scott Erik Asphaug
Acting United States Attorney

**MEDFORD BRANCH**
310 West Sixth Street
Medford, Oregon 97501
(541) 776-3564

February 14, 2022

Gregory E. Veralrud
Veralrud & Fowler
975 Oak Street
Suite 798
Eugene, Oregon 97401-3136

     Re:     False Claims Act Violations by Brian Baumgartner

Dear Mr. Veralrud:

     It is my understanding that you represent Brian Baumgartner, and therefore I am directing this letter to you on his behalf. If my understanding is incorrect, please advise us immediately.

     The U.S. Department of Health and Human Services, Office of Inspector General (HHS OIG) has referred an investigation to this office for legal action against Brian Baumgartner for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. The investigation has revealed that Mr. Baumgartner caused false claims to be submitted to the Centers for Medicare and Medicaid Services (CMS) by concealing the true ownership of Synergy RX, LLC ("Synergy") and representing himself as Synergy's owner with the Oregon Secretary of State, the Oregon Board of Pharmacy ("Pharmacy Board"), and Pharmacy Benefit Manager ("PBM") CVS Caremark for approximately eight months after he sold the pharmacy to Matthew Peters.

     In order to maintain active enrollment status in the Medicare program, a change of pharmacy ownership or practice location must be reported to the Medicare contractor within 30 days. 42 C.F.R. § 424.516(d)(1). A provider or supplier also must certify that it complies with all "Federal and State licensure, certification, and regulatory requirements." 42 C.F.R. § 424.516(a)(2). Furthermore, a "provider or supplier is prohibited from selling its Medicare billing number or privileges to any individual or entity, or allowing another individual or entity to use its Medicare billing number." 42 C.F.R. § 424.550(a). The Pharmacy Board requires that any "change of ownership shall be reported to the Board within 15 days of the occurrence," and "a change of ownership requires the approval of the Board and new certificate of registration." Or. Admin. R. 855-041-1080.

     Mr. Baumgartner sold Synergy (NPI 1306037825, RP-0002412-CS) to Mr. Peters in July, 2017, but agreed to act as the straw owner of the pharmacy in order to conceal the Synergy's true ownership. More specifically, when Mr. Baumgartner sold Synergy, he agreed to continue to be listed as Synergy's owner with the Oregon Secretary of State, the Pharmacy Board, PBM CVS Caremark, and the Centers for Medicare and Medicaid Services (CMS) in exchange for an initial

Gregory E. Veralrud
Page 2
February 14, 2022

lump sum payment and subsequent periodic payments under a profit sharing arrangement. Mr. Baumgartner filed, or permitted Mr. Peters to file, documents with the Oregon Secretary of State, the Pharmacy Board, and PBM CVS after the sale that listed Mr. Baumgartner as the owner of Synergy, and on several such documents he stated that no change of ownership had occurred. In fact, Mr. Baumgartner retained no ownership interest in Synergy and played no role in Synergy's operation following the sale.

This arrangement permitted Mr. Peters, whose own pharmacies had been shut down by the Pharmacy Board, to use Synergy's existing NPI number, pharmacy license, and contract with CVS Caremark in order to submit claims to CMS. Because Mr. Baumgartner concealed the true ownership of Synergy and allowed Mr. Peters to use his credentials, Synergy did not have a legitimate NPI number or Certificate of Registration from the Pharmacy Board during this time.

Medicare Part D paid approximately **$1,391,308** for claims submitted by Synergy (NPI 1306037825) between October 1, 2017 and April 5, 2018. Every claim submitted during this period was a false claim under the False Claims Act, 31 U.S.C. §§ 3729-3733. The United States is entitled to recover treble damages and additional civil penalties of $11,665 to $23,331[1] for each false claim submitted. HHS-OIG has asked this office to initiate a civil case against Mr. Baumgartner to recover these damages.

It is the policy of this office to offer Mr. Baumgartner an opportunity to meet with us to discuss the violations and attempt to resolve the matter without litigation. If Mr. Baumgartner is interested in discussing a resolution of this matter, please contact me at (503) 727-1000 no later than **February 28, 2022** to arrange a meeting. We look forward to hearing from you.

Sincerely,

SCOTT ERIK ASPHAUG
United States Attorney

GILLIAN BUNKER
Assistant United States Attorney

---

[1] As adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. 2461. See also 28 C.F.R. § 85.5.

# Exhibit 4

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among the United States of America, acting through the United States Department of Justice and on behalf of the Office of Inspector General of the Department of Health and Human Services (OIG-HHS) (collectively, the "United States"), and Brian Baumgartner (collectively referred to as "the Parties"), through their authorized representatives.

### RECITALS

A.    Brian Baumgartner ("Baumgartner") is an individual who resides in the State of Oregon.

B.    Synergy RX was a corporation organized under the laws of Oregon with its principal place of business in Eugene, Oregon. Baumgartner was the owner of Synergy RX until about July 20, 2017, when he sold the pharmacy to Matthew Peters ("Peters"). Peters relocated the pharmacy to Portland, Oregon and operated Synergy RX at that location from about September 30, 2017 through about April 6, 2018. Baumgartner retained no ownership interest in Synergy RX after the pharmacy was sold to Peters.

B.    The United States contends that it has certain civil claims against Baumgartner arising from certain payments he received in exchange for acting as a straw owner of Synergy RX following the sale of the pharmacy to Peters. Specifically, between about September 30, 2017 and about April 6, 2018, Baumgartner allowed Peters to operate Synergy RX under Baumgartner's Oregon Pharmacy License, and he further allowed Peters to use Baumgartner's National Provider Identifier ("NPI") number to submit claims for reimbursement to the Centers for Medicare & Medicaid Services ("CMS"). Baumgartner facilitated Peters' use of his Oregon Pharmacy License and NPI number by representing to the Oregon Secretary of State, the Oregon Board of Pharmacy, and Pharmacy Benefit Manager CVS Caremark that he still owned Synergy

RX following the sale of Synergy RX to Peters and the subsequent relocation of the pharmacy to Portland. In exchange, Peters paid Baumgartner a monthly retainer plus a percentage of the pharmacy's profits in a series of payments totaling approximately $234,000.00. This conduct is referred to below as the "Covered Conduct."

C.     This Settlement Agreement is neither an admission of liability by Baumgartner nor a concession by the United States that its claims are not well founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree, and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     Baumgartner shall pay to the United States $450,000.00 plus accrued interest ("Settlement Amount"), of which $234,000.00 is restitution.

2.     The Settlement Amount shall be paid in four installments as follows:

| | |
|---|---|
| Within fourteen (14) days of the Effective Date of this Agreement | $125,000.00 |
| Within twelve (12) months of the Effective Date of this Agreement | $100,000.00 plus interest accrued at the rate of 6.0% per annum from the Effective Date through the date of payment |
| Within twenty four (24) months of the Effective Date of this Agreement | $100,000.00 plus interest accrued at the rate of 6.0% per annum from the Effective Date through the date of payment |
| Within thirty six (36) months of the Effective Date of this Agreement | $125,000 plus interest accrued at the rate of 6.0% per annum from the Effective Date through the date of payment |

3.     Payment of the Settlement Amount to the United States shall be made by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the District of Oregon.

4.     Subject to the exceptions in Paragraph 5 (concerning reserved claims) below, and conditioned upon Baumgartner's full payment of the Settlement Amount, the United States

releases Baumgartner from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of payment by mistake, unjust enrichment, and fraud.

5.      Notwithstanding the release given in Paragraph 4 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

        a.      Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

        b.      Any criminal liability;

        c.      Except as explicitly stated in this Agreement, any administrative liability or enforcement right, including mandatory or permissive exclusion from Federal health care programs;

        d.      Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

        e.      Any liability based upon obligations created by this Agreement;

        f.      Any liability of individuals;

        g.      Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

        h.      Any liability for failure to deliver goods or services due;

        i.      Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

6.      Baumgartner waives and shall not assert any defenses Baumgartner may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be

based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

7.    Baumgartner fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Baumgartner has asserted, could have asserted, or may assert in the future against the United States, and its agencies, officers, agents, employees, and servants related to the Covered Conduct and the United States' investigation and prosecution thereof.

8.    The Settlement Amount shall not be decreased as a result of the denial of claims for payment now being withheld from payment by any Medicare contractor (e.g., Medicare Administrative Contractor, fiscal intermediary, carrier) or any state payer, related to the Covered Conduct; and Baumgartner agrees not to resubmit to any Medicare contractor or any state payer any previously denied claims related to the Covered Conduct, agrees not to appeal any such denials of claims, and agrees to withdraw any such pending appeals.

9.    Baumgartner agrees to the following:

a.    Unallowable Costs Defined:  All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47; and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395lll and 1396-1396w-5; and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Baumgartner in connection with:

(1)    the matters covered by this Agreement;

     (2)    the United States' audit(s) and civil and any criminal investigation(s) of

           the matters covered by this Agreement;

     (3)    Baumgartner's investigation, defense, and corrective actions

           undertaken in response to the United States' audit(s) and civil and any

           criminal investigation(s) in connection with the matters covered by this

           Agreement (including attorneys' fees);

     (4)    the negotiation and performance of this Agreement; and

     (5)    the payment Baumgartner makes to the United States pursuant to this

           Agreement,

are unallowable costs for government contracting purposes and under the Medicare Program,

Medicaid Program, TRICARE Program, and Federal Employees Health Benefits Program

(FEHBP) (hereinafter referred to as "Unallowable Costs").

     b.    Future Treatment of Unallowable Costs:  Unallowable Costs shall be

separately determined and accounted for by Baumgartner, and Baumgartner shall not charge

such Unallowable Costs directly or indirectly to any contracts with the United States or any State

Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost

statement, information statement, or payment request submitted by Baumgartner or any of his

subsidiaries or affiliates to the Medicare, Medicaid, TRICARE, or FEHBP Programs.

     c.    Treatment of Unallowable Costs Previously Submitted for Payment:

Baumgartner further agrees that within 90 days of the Effective Date of this Agreement he shall

identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors,

and Medicaid and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph)

included in payments previously sought from the United States, or any State Medicaid program,

including, but not limited to, payments sought in any cost reports, cost statements, information

reports, or payment requests already submitted by Baumgartner and shall request, and agree, that

such cost reports, cost statements, information reports, or payment requests, even if already

settled, be adjusted to account for the effect of the inclusion of the unallowable costs.

Baumgartner agrees that the United States, at a minimum, shall be entitled to recoup from

Baumgartner any overpayment plus applicable interest and penalties as a result of the inclusion

of such Unallowable Costs on previously submitted cost reports, information reports, cost

statements, or requests for payment.

Any payments due after the adjustments have been made shall be paid to the United

States pursuant to the direction of the Department of Justice and/or the affected agencies. The

United States reserves its rights to disagree with any calculations submitted by Baumgartner on

the effect of inclusion of Unallowable Costs (as defined in this paragraph) on Baumgartner.

d.    Nothing in this Agreement shall constitute a waiver of the rights of the

United States to audit, examine, or re-examine Baumgartner's books and records to determine

that no Unallowable Costs have been claimed in accordance with the provisions of this

paragraph.

10.    In the event that Baumgartner fails to pay the Settlement Amount as provided in

the payment schedule set forth in Paragraphs 1 and 2 above, Baumgartner shall be in Default of

Baumgartner's payment obligations ("Default"). The United States will provide a written Notice

of Default, and Baumgartner shall have an opportunity to cure such Default within seven (7)

calendar days from the date of receipt of the Notice of Default by making the payment due under

the payment schedule and paying any additional interest accruing under the Settlement Agreement

up to the date of payment. Notice of Default will be delivered to Baumgartner, or to such other

representative as Baumgartner shall designate in advance in writing. If Baumgartner fails to cure

the Default within seven (7) calendar days of receiving the Notice of Default and in the absence

of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance).

11.    In the event of Uncured Default, Baumgartner agrees that the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement and pursue the Civil Action or bring any civil and/or administrative claim, action, or proceeding against Baumgartner for the claims that would otherwise be covered by the releases provided in Paragraph 4 above, with any recovery reduced by the amount of any payments previously made by Baumgartner to the United States under this Agreement; (ii) take any action to enforce this Agreement in a new action or by reinstating the Civil Action; (iii) offset the remaining unpaid balance from any amounts due and owing to Baumgartner and/or affiliated companies by any department, agency, or agent of the United States at the time of Default or subsequently; and/or (iv) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity. The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection. In the event the United States pursues a collection action, Baumgartner agrees to immediately pay the United States the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in such an action. In the event that the United States opts to rescind this Agreement pursuant to this paragraph, Baumgartner waives and agrees not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that are (i) filed by the United States against Baumgartner within 120 days of written notification

that this Agreement has been rescinded, and (ii) relate to the Covered Conduct. Baumgartner agrees not to contest any offset, recoupment, and /or collection action undertaken by the United States pursuant to this paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

12.    In the event of Uncured Default, OIG-HHS may exclude Baumgartner from participating in all Federal health care programs until Baumgartner pays the Settlement Amount, with interest, as set forth above (Exclusion for Default). OIG-HHS will provide written notice of any such exclusion to Baumgartner. Baumgartner waives any further notice of the exclusion under 42 U.S.C. § 1320a-7(b)(7), and agrees not to contest such exclusion either administratively or in any state or federal court. Reinstatement to program participation is not automatic. If at the end of the period of exclusion, Baumgartner wishes to apply for reinstatement, it must submit a written request for reinstatement to OIG-HHS in accordance with the provisions of 42 C.F.R. §§ 1001.3001-.3005. Baumgartner will not be reinstated unless and until OIG-HHS approves such request for reinstatement. The option for Exclusion for Default is in addition to, and not in lieu of, the options identified in this Agreement or otherwise available.

13.    This Agreement is intended to be for the benefit of the Parties only. The Parties do not release any claims against any other person or entity, except to the extent provided for in Paragraph 14.

14.    Baumgartner agrees that he waives and shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third-party payors based upon the claims defined as Covered Conduct.

15.    Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

16.     Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

17.     This Agreement is governed by the laws of the United States. The exclusive venue for any dispute relating to this Agreement is the United States District Court for the District of Oregon. For purposes of construing this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

18.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

19.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

21.     This Agreement is binding on Baumgartner's successors, transferees, heirs, and assigns.

22.     All Parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

23.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles and electronic transmissions of signatures shall constitute acceptable, binding signatures for purposes of this Agreement.

THE UNITED STATES OF AMERICA

DATED: _8/6/2024_   BY: _____

Gillian L. Bunker
Assistant United States Attorney
United States Attorney's Office – District of Oregon

DATED: _08/05/24_   BY: SUSAN GILLIN
Digitally signed by SUSAN GILLIN
Date: 2024.08.05 18:34:04 -04'00'

SUSAN E. GILLIN
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
Office of Inspector General
United States Department of Health and Human Services

DEFENDANT BRIAN BAUMGARTNER

DATED: _7/9/2024_   BY: _____
Brian Baumgartner

DATED: _7/10/2024_  BY: _____
Gregory E. Veralrud
Counsel for Brian Baumgartner

10

# Exhibit 5



OREGON SECRETARY OF STATE

**Corporation Division**

HOME

Business Xpress | business name search | oregon business guide

license directory | business registry/renewal | forms/fees | notary public

uniform commercial code | uniform commercial code search | documents & data services

**Business Name Search**

## Business Entity Data

02-27-2025 06:59

| Registry Nbr | Entity Type | Entity Status | Jurisdiction | Registry Date | Next Renewal Date | Renewal Due? |
|---|---|---|---|---|---|---|
| 258017-96 | FLLC | ACT | DELAWARE | 12-17-2004 | 12-17-2025 | |
| Entity Name | SYNERGY MEDICAL SYSTEMS, LLC | | | | | |
| Foreign Name | | | | | | |

**New Search**       **Printer Friendly**

## Associated Names

| Type | PPB | PRINCIPAL PLACE OF BUSINESS | | | |
|---|---|---|---|---|---|
| Addr 1 | 1710 WILLOW CREEK CIRCLE STE 1 | | | | |
| Addr 2 | | | | | |
| CSZ | EUGENE | OR | 97402 | Country | UNITED STATES OF AMERICA |

*Please click here for general information about registered agents and service of process.*

| Type | AGT | REGISTERED AGENT | | Start Date | 10-15-2021 | Resign Date | |
|---|---|---|---|---|---|---|---|
| Of Record | 003292-27 | C T CORPORATION SYSTEM | | | | | |
| Addr 1 | 780 COMMERCIAL STREET SE | | | | | | |
| Addr 2 | STE 100 | | | | | | |
| CSZ | SALEM | OR | 97301 | | Country | UNITED STATES OF AMERICA | |

| Type | MAL | MAILING ADDRESS | | | |
|---|---|---|---|---|---|
| Addr 1 | 1710 WILLOW CREEK CIRCLE STE 1 | | | | |
| Addr 2 | | | | | |
| CSZ | EUGENE | OR | 97402 | Country | UNITED STATES OF AMERICA |

| Type | MEM | MEMBER | | Resign Date | |
|---|---|---|---|---|---|

| Not of Record | CTC MANAGEMENT, INC | | | | | |
|---|---|---|---|---|---|---|
| Addr 1 | 27051 TOWNE CENTER DR | | | | | |
| Addr 2 | | | | | | |
| CSZ | FOOTHILL RANCH | CA | 92610 | | Country | UNITED STATES OF AMERICA |

| Type | MEM | MEMBER | | | Resign Date | |
|---|---|---|---|---|---|---|
| Of Record | 807163-93 | SYNERGY MEDICAL SYSTEMS HOLDINGS, INC. | | | | |
| Addr 1 | 28050 SW BOBERG ROAD | | | | | |
| Addr 2 | | | | | | |
| CSZ | WILSONVILLE | OR | 97070 | | Country | UNITED STATES OF AMERICA |

| Type | MGR | MANAGER | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | OTTO | | FERNANDEZ | | | |
| Addr 1 | 27051 TOWNE CENTER DR | | | | | |
| Addr 2 | | | | | | |
| CSZ | FOOTHILL RANCH | CA | 92610 | | Country | UNITED STATES OF AMERICA |

| Type | MGR | MANAGER | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | WILLIAM | M | HOUSTON | III | | |
| Addr 1 | 28050 SW BOBERG ROAD | | | | | |
| Addr 2 | | | | | | |
| CSZ | WILSONVILLE | OR | 97070 | | Country | UNITED STATES OF AMERICA |

| Type | MGR | MANAGER | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | CHRISTIAN | | ROBINSON | | | |
| Addr 1 | 27051 TOWNE CENTER DR | | | | | |
| Addr 2 | | | | | | |
| CSZ | FOOTHILL RANCH | CA | 92610 | | Country | UNITED STATES OF AMERICA |

| Type | MGR | MANAGER | | | Resign Date | |
|---|---|---|---|---|---|---|
| Name | BRIAN | | BAUMGARTNER | | | |
| Addr 1 | 28050 SW BOBERG ROAD | | | | | |
| Addr 2 | | | | | | |
| CSZ | WILSONVILLE | OR | 97070 | | Country | UNITED STATES OF AMERICA |

| Type | MGR  MANAGER | | | | | Resign Date | |
|---|---|---|---|---|---|---|---|
| Name | CLARK | F | GOODMAN | JR | | | |
| Addr 1 | 28050 SW BOBERG ROAD | | | | | | |
| Addr 2 | | | | | | | |
| CSZ | WILSONVILLE | OR | 97070 | | Country | UNITED STATES OF AMERICA | |

New Search            Printer Friendly

# Name History

| Business Entity Name | Name Type | Name Status | Start Date | End Date |
|---|---|---|---|---|
| SYNERGY MEDICAL SYSTEMS, LLC | EN | CUR | 12-01-2011 | |
| SYNERGY MEDICAL SYSTEMS, INC. | EN | PRE | 04-30-2007 | 12-01-2011 |
| PACIFIC COAST PROSTHETICS AND ORTHOTICS INC. | EN | PRE | 12-17-2004 | 04-30-2007 |

Please read before ordering Copies.

New Search            Printer Friendly

# Summary History

| Image Available | Action | Transaction Date | Effective Date | Status | Name/Agent Change | Dissolved By |
|---|---|---|---|---|---|---|
| 📄 | AMENDED ANNUAL REPORT | 11-04-2024 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 10-27-2023 | | FI | | |
| 📄 | REINSTATEMENT AMENDED | 04-28-2023 | | FI | | |
| | ADMINISTRATIVE REVOKE AUTHORITY | 02-23-2023 | | SYS | | |
| 📄 | AMENDED ANNUAL REPORT | 12-20-2021 | | FI | | |
| 📄 | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 10-15-2021 | | FI | Agent | |
| 📄 | AMENDED ANNUAL REPORT | 11-11-2020 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 12-18-2019 | | FI | Agent | |
| 📄 | AMENDED ANNUAL REPORT | 11-08-2018 | | FI | Agent | |
| 📄 | AMENDED ANNUAL REPORT | 11-15-2017 | | FI | | |
| 📄 | AMENDED ANNUAL REPORT | 11-16-2016 | | FI | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | AMENDED ANNUAL REPORT | 12-30-2015 | | FI | | |
| | AMENDED ANNUAL REPORT | 01-05-2015 | | FI | | |
| | AMENDED ANNUAL REPORT | 12-17-2013 | | FI | | |
| | AMENDED ANNUAL REPORT | 11-26-2012 | | FI | | |
| | AMENDED ANNUAL REPORT | 12-19-2011 | | FI | | |
| | ARTICLES OF CONVERSION | 12-01-2011 | | FI | Name | |
| | ANNUAL REPORT PAYMENT | 12-13-2010 | 12-10-2010 | SYS | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 04-22-2010 | | FI | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 01-20-2010 | | FI | | |
| | ANNUAL REPORT PAYMENT | 12-18-2009 | 12-17-2009 | SYS | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 12-02-2009 | | FI | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 09-16-2009 | | FI | | |
| | CHANGE OF REGISTERED AGENT/ADDRESS | 09-16-2009 | | FI | Agent | |
| | ANNUAL REPORT PAYMENT | 11-26-2008 | 11-25-2008 | SYS | | |
| | ARTICLES OF AMENDMENT | 01-23-2008 | | FI | | |
| | ANNUAL REPORT PAYMENT | 11-15-2007 | 11-14-2007 | SYS | | |
| | ARTICLES OF AMENDMENT | 04-30-2007 | | FI | Name | |
| | ANNUAL REPORT PAYMENT | 12-11-2006 | 12-08-2006 | SYS | | |
| | AMNDMT TO ANNUAL RPT/INFO STATEMENT | 10-09-2006 | | FI | | |
| | AMENDED ANNUAL REPORT | 12-05-2005 | | FI | | |
| | ARTICLES OF INCORPORATION | 12-17-2004 | | FI | Agent | |

About Us | Announcements | Laws & Rules | Feedback
Policy | SOS Home | Oregon Blue Book | Oregon.gov

For comments or suggestions regarding the operation of this site,
please contact : corporation.division@sos.oregon.gov

© 2025  Oregon Secretary of State.  All Rights Reserved.