1  MICHELE BECKWITH
   Acting United States Attorney
2  DAVID THIESS
   STEVEN TENNYSON
3  Assistant United States Attorneys
   Eastern District of California
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Phone: (916) 554-2700

6  Attorneys for the United States

7  IN THE UNITED STATES DISTRICT COURT

8  EASTERN DISTRICT OF CALIFORNIA

| 9  UNITED STATES OF AMERICA, | CASE NO. 2:24-cv-00287-WBS-CKD |
|---|---|
| 10             Plaintiff, | |
| 11  v. | OPPOSITION TO SYNERGY MEDICAL SYSTEM LLC'S MOTION TO SET ASIDE ENTRY OF DEFAULT (DKT. 72). |
| 12  MATTHEW H. PETERS; *et al.*, | |
| 13             Defendants. | HEARING DATE:  MAY 27, 2025 |
| 14 | TIME:  1:30 P.M. COURTROOM:  5, 14th FLOOR |

The Court should deny Synergy Medical Systems LLC's ("SMS") motion to set aside the entry of default (Dkt. 72) for a simple reason: SMS—a sophisticated healthcare company with legal representation—made an informed choice to ignore this case for nearly a year. It was properly served with the complaint and summons in April 2024, explicitly warned of the consequences of inaction in August 2024, and became aware of the default shortly after its entry in September 2024. Yet, SMS waited nearly one full year after being served with the complaint and more than 175 days after the entry of default before filing the instant motion in March 2025. Under Ninth Circuit precedent, such deliberate inaction over a prolonged period by a represented party constitutes culpable conduct warranting denial of relief. *See, e.g.*, *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 698 (9th Cir. 2001) (collecting cases).

SMS attempts to obscure this reality with vague claims of "confusion" about various Synergy entities and "lengthy discussions" with the government. These excuses fail both factually—because SMS knew about the default—and legally. The Ninth Circuit has consistently rejected similar excuses,

including reliance on settlement discussions, as a basis for failing to respond. *See, e.g.*, *Franchise Holding II, LLC v. Huntington Rests. Grp., Inc.*, 375 F.3d 922, 926 (9th Cir. 2004).

Finally, granting the motion would inject unnecessary delay into this complex, multi-defendant case. SMS's defenses—such as reliance on a settlement agreement that expressly excludes the claims asserted in this matter—are meritless on their face. Setting aside the default would therefore be an exercise in futility, causing needless delay and expense. The default should stand.

## I. FACTUAL BACKGROUND

The facts necessary to resolve this motion are straightforward and cannot be genuinely disputed:

1. On April 5, 2024, SMS was properly served with a summons and the complaint. (Dkt. 14 at 9) (proof of service); (Dkt. 72 at 8) (SMS admits "Plaintiff serve[d] Defendant SMS").

2. Throughout this litigation, SMS was represented by counsel and regularly conferred with its attorneys. (*Id.*) (listing events that involved interactions with counsel from May 2024 through October 2024).

3. On August 1, 2024, SMS's counsel told the United States it recognized that it needed to respond to avoid a default judgment. (Tennyson Decl., Exhibit A).

4. On August 23, 2024, the United States notified SMS that the United States would soon seek default judgment and SMS needed to respond. (Tennyson Decl., Exhibit B). SMS counsel committed to do so. (*Id.*)

5. Despite knowledge of this action and having been warned regarding default, SMS chose not to file a responsive pleading.

6. On September 24, 2024, the Clerk of Court entered a default against SMS. (Dkt. 63).

7. SMS and its counsel learned of the default shortly thereafter. (Dkt. 72 at 9) (acknowledging SMS "learned that a Default was entered" and counsel contacted the United States).

8. Despite this knowledge, SMS took no action to remedy the default for more than 175 days. (Dkt. 63) (entry of default dated September 26, 2024) (Dkt. 72) (motion to lift default dated March 21, 2025).

In short, SMS, while represented by counsel, fully aware of the litigation, and capable of responding, chose not to answer the complaint for nearly a year.

## II. STANDARD

Rule 55(c) provides that the Court has discretion to set aside an entry of default for "good cause." Fed. R. Civ. P. 55(c). In the Ninth Circuit, good cause turns on three factors: (1) whether the defaulting party engaged in culpable conduct that led to the default, (2) whether the opposing party

would be prejudiced if the default is set aside, or (3) whether the defaulting party has a meritorious defense. *United States v. Aguilar*, 782 F.3d 1101, 1105 (9th Cir. 2015).

Critically, these factors are disjunctive. The Court may properly deny the motion if any of these three factors is present. *Id.* (citing *United States v. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010)). Thus, if the Court finds SMS engaged in culpable conduct, it may deny the motion on that basis alone, regardless of the other factors. *Pena v. Seguros La Comercial, S.A.*, 770 F.2d 811, 816 (9th Cir. 1985) (affirming denial of request to lift default based solely on culpability).

The party seeking to set aside the default—here, SMS—bears the burden of showing all three factors favor vacating the default. *TCI Group Life Ins. Plan*, 244 F.3d at 696 (the "party invoking Rule 55(c) . . . bears the burden"). While courts generally prefer to decide cases on the merits, this policy preference does not overcome a represented party's deliberate failure to respond to a complaint. *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987).

### III. ARGUMENT

#### A. SMS's Conduct Was Culpable.

##### 1. SMS Was Fully Aware of this Action but Waited Far Too Long to Respond.

SMS—a represented party that ignored a summons for nearly a year—engaged in culpable conduct that led to the default. The timeline here does not reflect confusion or an innocent mistake. It indicates a deliberate choice to ignore this case.

Where, as here, a party "has received actual or constructive notice of the filing of the action and intentionally failed to answer," then it is culpable. *Mesle*, 615 F.3d at 1093 (citations and emphasis omitted). A represented party is presumed to understand the "consequences of failing to answer" and is deemed to have chosen to do "so only if they see some advantage to themselves." *See TCI Grp. Life Ins. Plan*, 244 F.3d at 699 n.6. Thus, when "considering a legally sophisticated party's culpability in a default, an understanding of the consequences of its actions may be assumed, and with it, intentionality." *Mesle*, 615 F.3d at 1093.

SMS, a sophisticated entity, was properly served in April 2024, putting it on notice of this action and its duty to respond. (Dkt. 72 at 8) (SMS admits to being served). From the outset, SMS consulted with its attorneys about the case. (*See id.*). Unlike in *Mesle*, SMS is not a "layman working without aid

of an attorney" who is not held "to the same standards to which we hold sophisticated parties acting with the benefit of legal representation." *Mesle*, 615 F.3d at 1091. SMS had multiple legal advisors. Yet, it "ignored the summons and complaint despite frequent chats with [its] lawyers during the period for answer." *TCI Grp. Life Ins. Plan*, 244 F.3d at 698 (citing *Kingvision Pay-Per-View Ltd. v. Lake Alice Bar*, 168 F.3d 347, 350 (9th Cir. 1999)). As *TCI Group* explains, that makes SMS's conduct culpable. *See id*.

Even if SMS could somehow claim initial confusion despite acknowledging service of the complaint and summons, by August 2024, any claim of misunderstanding became untenable. By then, SMS's own counsel had acknowledged to the United States that SMS needed to respond to avoid default. (Tennyson Decl., Exhibit A). Despite this clear understanding, SMS still did nothing. On August 23, 2024, the United States provided SMS with a courtesy notice that the Government would soon seek default. (*Id*., Exhibit B). SMS's counsel replied, affirmatively committing to making "sure a responsive pleading is filed." (*Id*.)

By that point, there can be no question that SMS had everything it needed to respond: proper service, ongoing legal representation, knowledge of its obligations, and a direct warning from the United States. Nevertheless, SMS failed to act. That kind of inaction, especially from a sophisticated party, is not an oversight or a misunderstanding. On that timeline, inaction shows intentionality. *See Mesle*, 615 F.3d at 1093.

When the consequences followed and the Clerk entered default on September 24, 2024 (*see* Dkt. 63), SMS did not rush to correct its "mistake." SMS admits that the company and its attorneys "learned that a Default was entered" shortly after the entry of default. (*See* Dkt. 72 at 9). Even after learning of the default, SMS did nothing for more than 175 days after the default was entered. Because it "retained counsel to check the docket," learned of the default, and still failed to act, SMS is culpable on this independent basis. *TCI Grp. Life Ins. Plan*, 244 F.3d at 698 (citing *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1390 (9th Cir. 1988); *Richmark Corp. v. Timber Falling Consultants, Inc*., 937 F.2d 1444, 1449 (9th Cir. 1991)). That extended delay—the better part of a year since service and more than five months after learning of the default—is clear evidence of willfulness. *Id*.

SMS was not unable to act. It was unwilling. Through the same counsel that also represented

4
OPPOSITION TO MOTION TO SET ASIDE DEFAULT

SMS at the time, SMS executive Brian Baumgartner resolved his personal False Claims Act liability with the United States related to payments he received to conceal pharmacy ownership, registration, and licensing. (Dkt. 72 at 81) (settlement agreement listing counsel Gregory Veralrud); (Tennyson Decl., Exhibit B) (Mr. Veralrud acknowledging SMS needed to file answer). SMS was fully "aware of the relevant federal law, fully informed of the legal consequences of failing to respond, and sufficiently sophisticated and experienced . . . to protect their interests." *Id*. (citing *Meadows*, 817 F.2d at 522). It knew it was a defendant in this case, which concerns SMS's admitted "interactions with Mr. Peters." (Dkt. 72 at 12); (Dkt. 50 at ¶¶ 12, 264 to 266). Its failure to respond here demonstrates its belief that inaction provided "some advantage to [itself]." *TCI Grp.*, 244 F.3d at 699 n.6.

The Ninth Circuit has consistently found parties in similar circumstances culpable. *See, e.g., TCI Grp. Life Ins. Plan*, 244 F.3d at 698 (collecting cases). Under these cases, SMS's conduct was culpable, which is sufficient reason to deny the motion. *See Pena*, 770 F.2d at 816.

### 2. There Is No Valid Excuse for SMS's Conduct.

SMS offers two principal excuses for its failure to respond: (1) that it was "confused" about being a "direct participant" in the case and (2) that it was engaged in "lengthy discussions" with the government. (Dkt. 72 at 11). Neither withstands minimal scrutiny.

#### a. SMS's "Confusion" Claim Is Unsupported and Legally Irrelevant.

SMS's assertion that it did not realize it was a "direct participant" in the case is untenable. (*Id*.) SMS was served with a federal summons while represented by counsel. (Dkt. 14). That summons, issued by the Court, was a formal notice that SMS had been sued, had a duty to respond within a fixed time, and risked default if it failed to appear. *See* Fed. R. Civ. P. 4(a)(1).

SMS's claim of confusion is further undermined by its own attorney's contemporaneous admissions. Initially, counsel acknowledged that SMS needed to respond to the complaint to avoid a default judgment. (Tennyson Decl., Exhibit A). Later, counsel affirmatively promised that SMS would file a response. (*Id.*, Exhibit B). This commitment refutes SMS's current claim of confusion. SMS knew the consequences of failing to respond—indeed, its counsel expressly acknowledged them—yet it remained silent for a year. That decision was intentional. *Mesle*, 615 F.3d at 1093.

SMS relies on a conclusory declaration from counsel that provides no support to its motion. (Dkt. 72-1). First, the declaration consists almost entirely of legal arguments, which "do not belong in a declaration." *Jacobson v. Schwarzenegger*, 650 F. Supp. 2d 1032, 1044 (C.D. Cal. 2009). Second, the declarant lacks personal knowledge because he was not personally involved in the events leading up to the default, including the demand letter (Dkt. 72 at 69), the settlement agreement (*id.* at 81), and the correspondence that contradicts SMS's current claims. (Tennyson Decl., Exhibits A, B). Counsel's secondhand understanding of those events in which he had no involvement is irrelevant. *Clark v. Cty. of Tulare*, 755 F. Supp. 2d 1075, 1083 (E.D. Cal. 2010) (holding that an attorney is not "competent to testify as to what another individual is expected to say under oath").

SMS's motion hinges primarily on alleged confusion, yet it offers no sworn statement from a corporate officer to support that claim. Instead of submitting direct evidence, SMS leans on vague, anonymized assertions. This choice is telling. The United States alleges that SMS allowed entities with similar names to use its name to submit improper claims to federal healthcare programs. Having allegedly profited from this confusion, SMS now seeks to exploit it—again—this time to excuse its failure to respond. But unsworn, anonymous claims are not enough. In *Meadows*, the Ninth Circuit declined to accept an "anonymous memorandum" offered to justify a similar failure to respond. *See Meadows*, 817 F.2d at 521. The Court should give SMS's vague assertions no more weight than the Ninth Circuit gave to the memorandum in *Meadows*—that is to say, none at all. *Id*.

Even assuming SMS sincerely believed it was not a proper party, the law did not permit it to ignore the case. The Federal Rules provide mechanisms to challenge improper claims. *See, e.g.*, Fed. R. Civ. P. 12(b)(6). What they do not allow is willful inaction. Thus, an unsupported belief that the United States had named the wrong entity does not excuse SMS's 350-day failure to respond. *See Meadows*, 817 F.2d at 521-22 (finding foreign sovereign defendants culpable where they had notice but failed to answer based on unsubstantiated immunity claims).

This is why SMS's reliance on the general policy favoring merits-based decisions falls flat. The Federal Rules establish an orderly framework within which parties must operate, even when they dispute the complaint's allegations. *See, e.g.*, Fed. R. Civ. P. 12. When a represented party deliberately disregards this framework, as SMS did for nearly a year, it undermines the very process that enables

6

OPPOSITION TO MOTION TO SET ASIDE DEFAULT

resolution on the merits. Therefore, the preference for merits-based dispositions does not excuse SMS's culpable conduct here. *Pena*, 770 F.2d at 816; *United States v. Brandner*, 707 F. App'x 920 (9th Cir. 2017).

### b. Discussions Do Not Excuse Missed Deadlines.

SMS argues that its "lengthy discussions" with the Government relieved it of its obligation to respond to the Complaint. (Dkt. 72 at 11). This argument fails both factually and legally.

Factually, SMS did not seek an extension based on these talks. They did not alter SMS's litigation deadlines, and SMS does not contend otherwise. Further, when these discussions proved unproductive, the United States warned SMS that it needed to respond. (Tennyson Decl., Exhibit B). SMS had clear notice that it needed to respond.

Legally, the Ninth Circuit has made clear that settlement discussions do not excuse a sophisticated party's failure to respond to a complaint. *See Franchise Holding II*, 375 F.3d at 926. As one court put it, "settlement discussions occur, or at least should occur, in every dispute." *Medline Indus. v. Medline Rx Fin., LLC*, 218 F.R.D. 170, 172 (N.D. Ill. 2003). If routine settlement discussions justified ignoring court deadlines, those deadlines would become meaningless because any party could begin negotiations to avoid its obligations. *See id.*; *Gerawan Farming v. Rehrig Pac. Co.*, 2013 U.S. Dist. LEXIS 39121, at *13 (E.D. Cal. Mar. 19, 2013) (collecting cases); *Mitchell v. Eaves*, 24 F.R.D. 434, 435 (E.D. Tenn. 1959) ("A hope of settlement does not justify a failure to obtain an extension of time to answer."); *Brand v. NCC Corp.*, 540 F. Supp. 562, 564 (E.D. Pa. 1982) (where a defendant chooses to pay counsel for settlement negotiations but not litigation, "the client also chooses the consequences").

## B. Setting Aside the Default Would Prejudice the United States.

While SMS's motion should be denied based on its culpable conduct alone, setting aside the default now would also significantly prejudice the United States. In this context, prejudice means impairing the plaintiff's ability to pursue its claim effectively. *TCI Grp. Life Ins. Plan*, 244 F.3d at 701. That impairment includes not only lost evidence but also "increased difficulties of discovery, or greater opportunity for fraud or collusion." *Id*. SMS, as the party seeking relief, bears the burden of proving that vacating the default would not prejudice the United States. *See Lieu v. Tran*, 2025 U.S. Dist. LEXIS

7

OPPOSITION TO MOTION TO SET ASIDE DEFAULT

26559, at *19 (C.D. Cal. Feb. 11, 2025). It fails to do so.

SMS's nearly year-long delay would upend this complex, multi-defendant litigation. Discovery closes on October 31, 2025. (Dkt. 57 at 3). If SMS is permitted to file a responsive pleading after its long delay, resolution of any motion to dismiss could take months. That risks a situation where the pleadings would not even be settled before discovery currently closes, forcing a wholesale extension of deadlines and delaying resolution of the United States' claims against a dozen other defendants. Allowing SMS to re-enter the case now after it strategically sat on the sidelines for nearly a year would undermine the United States' interest in the "just, speedy, and inexpensive determination" of this action, not just against SMS, but also against its co-conspirators. Fed. R. Civ. P. 1.

Moreover, SMS provides no evidence that it has preserved relevant documents or communications. Its disregard for basic litigation obligations, such as responding to the complaint, raises a risk that evidence has been lost. SMS's vague and unsupported claim that "there has been no loss of evidence" is insufficient under Local Rule 230(h), which requires factual assertions to be backed by a declaration. If SMS had taken preservation seriously, it could have submitted such a declaration. It did not. The burden should not fall onto the United States to prove destruction of evidence when SMS alone controls the ephemeral evidence and has provided no proper assurances of its integrity.

Finally, SMS's delay has materially impaired the United States' ability to prove its case. This is not a "short delay" of "less than a month." *TCI Grp. Life Ins. Plan*, 244 F.3d at 701. SMS chose not to respond for nearly a year. As time passes, it becomes harder to examine SMS personnel, co-defendants, and third-party witnesses about events that have grown more remote. *Brown v. Cty. of Buena Vista*, 95 U.S. 157, 161 (1877) ("The lapse of time carries with it the memory and life of witnesses, the muniments of evidence, and other means of proof"). This is particularly damaging where key elements of the case turn on testimonial evidence—evidence necessary to explain documents and contextualize undocumented interactions at the heart of the conspiracy alleged in the Complaint. (Dkt. 50.) By waiting until March 2025 to participate, SMS has exacerbated these challenges, making a fair resolution on the merits more difficult.

//

//

OPPOSITION TO MOTION TO SET ASIDE DEFAULT

## C. SMS Cannot Establish a Meritorious Defense.

Beyond culpability and prejudice, SMS also fails to meet its burden of presenting "specific facts that would constitute a defense" sufficient to potentially alter the outcome of the litigation. *Mesle*, 615 F.3d at 1094. Vague assertions or general denials are insufficient; SMS must demonstrate some likelihood that a trial would yield a result contrary to the default. *Franchise Holding II*, 375 F.3d at 926; *Haw. Carpenters' Tr. Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986). SMS offers three potential defenses, none of which meet this standard. Setting aside the default would therefore be an exercise in futility, causing needless delay and expense. *Id.*

### 1. The Statute of Limitations Does Not Bar the Claims Against SMS.

SMS vaguely suggests that "some or all" of the claims asserted against it by the United States might be time-barred under 31 U.S.C. § 3731(b). (Dkt. 72 at 12). SMS is mistaken.

The application of the statute of limitations has already been decided in this case. As the Court previously noted, the applicable six-year statute of limitations under Section 3731(b)(1) of the False Claims Act precludes liability for claims submitted prior to January 22, 2018. (Dkt. 49 at 12). The operative complaint unequivocally focuses only on the period within the six-year statute of limitations. (Dkt. 50 at ¶ 3). It alleges that SMS engaged in a conspiracy continuing well into the limitations period, specifically by allowing other defendants, like Synergy RX, to submit false claims to federal healthcare programs using SMS's billing privileges from at least January 22, 2018 through 2020. (Dkt. 50 at ¶¶ 10-12, 237). During this actionable period, the United States alleges these pharmacies received more than $20 million from Medicare in part due to SMS's assistance. (*Id.*) The claims pleaded against SMS fall squarely within the limitations period.

SMS offers a general denial of knowledge regarding "all interactions with Mr. Peters" after January 2018. (Dkt. 72 at 12). But that is precisely the type of "conclusory statement," lacking specific supporting facts, that fails to establish a potentially meritorious defense. *See Franchise Holding*, 375 F.3d at 926.

### 2. The Baumgartner Settlement Agreement Expressly Excluded SMS.

SMS repeatedly and incorrectly asserts that an SMS executive, Brian Baumgartner, settled "on behalf of SMS." (Dkt. 72 at 6, 11). The Baumgartner settlement agreement contradicts this claim. The

9
OPPOSITION TO MOTION TO SET ASIDE DEFAULT

agreement released only Baumgartner in his individual capacity, not SMS. (*Id*. at 73-74) (stating that "the United States releases Baumgartner from any civil or administrative monetary claim"). SMS was not mentioned in the agreement, was not a party to the agreement, and was not released from liability. (*See, e.g.*, *id*. at 72) (defining the Parties as "the United States" and "Brian Baumgartner"). Baumgartner did not sign the agreement on behalf of any entity, let alone SMS:

[signature block: DEFENDANT BRIAN BAUMGARTNER, DATED: 7/9/2024 BY: Brian Baumgartner; DATED: 7/10/2024 BY: Gregory E. Veralrud, Counsel for Brian Baumgartner]

(Dkt. 72 at 81). Indeed, SMS was expressly excluded from the agreement's scope. (*Id*. at 74) (expressly reserving and not releasing any conduct other than the Covered Conduct, which is defined at 71-72 in reference to claims against Baumgartner); (*id*. at 79) (The agreement "was intended to be for the benefit of the Parties only" and the Parties did "not release claims against any other person or entity").

SMS identifies no legal basis to ignore the unambiguous contractual language excluding it from the release. (Dkt. 72 at 12). And attempting to expand an FCA settlement to unnamed, unreleased third parties contravenes public policy. *See Cell Therapeutics, Inc. v. Lash Grp., Inc.*, 586 F.3d 1204, 1212 (9th Cir. 2010). This defense is based on a factual premise directly refuted by the evidence SMS itself submitted and lacks merit.

### 3. The Purported Scope of the United States' Pre-Complaint Investigation Is Not a Defense to Liability.

Third, SMS advances what is essentially an "investigative fairness" theory, arguing that because the Government's initial investigation purportedly focused elsewhere, SMS should be excused from liability. But SMS does not make a serious attempt to establish this argument as a defense.

OPPOSITION TO MOTION TO SET ASIDE DEFAULT

The FCA imposes liability on "any person" who knowingly submits or causes the submission of false claims. 31 U.S.C. § 3729(a)(1). It should go without saying that no legal principle makes liability contingent on whether a particular defendant was the investigation's initial target. *See id*. This alone defeats SMS's argument.

Even if this argument could provide SMS with a legal defense, SMS provides no support for its claim that the United States "consistently told Mr. Baumgartner . . . that only Synergy RX was involved in this matter (not SMS)." (Dkt. 72 at 6). No specific facts in the motion suggest the government ever represented that SMS would not face liability. A focus on one entity during settlement discussions does not amount to a binding promise of immunity for third parties. *See Cell Therapeutics, Inc*, 586 F.3d at 1212.

SMS has failed to provide "specific facts" that would constitute a defense. *See Franchise Holding II*, 375 F.3d at 926. Its generalized assertions, unsupported by factual specificity or legal analysis, fall well short of the standard required to set aside a default. Nothing in the motion indicates the outcome at trial will be contrary to the result achieved by default, and so lifting the default would cause needless delay and expense to the parties and the court system. *Haw. Carpenters' Tr. Funds*, 794 F.2d at 513.

### IV. CONCLUSION

The undisputed facts compel a straightforward conclusion: SMS, a sophisticated healthcare business with legal representation, willfully ignored this case for nearly a year. Under well-settled Ninth Circuit precedent, the Court should deny SMS's motion to set aside the default due to its culpable conduct alone.

Dated: April 4, 2025

UNITED STATES OF AMERICA

MICHELE BECKWITH
Acting United States Attorney

By: /s/ *Steven Tennyson*
DAVID E. THIESS
STEVEN S. TENNYSON
Assistant United States Attorneys

11
OPPOSITION TO MOTION TO SET ASIDE DEFAULT