CLINTON MIKEL, SBN 251319
The Health Law Partners, P.C.
32000 Northwestern HWY., Ste. 240
Farmington Hills, MI 48334
Telephone: (248) 996-8510
Facsimile: (248) 996-8525
cmikel@thehlp.com

IAN W. CRAIG, SBN 160651
Law Offices of Ian W. Craig, PC
700 University Ave., Ste. 100
Sacramento, CA 95825
Telephone: (916) 277-8580
Facsimile: (916) 914-1803
Ian@IWC-Law.com

Attorneys for Defendant Synergy Medical Systems, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW H. PETERS, BAYVIEW SPECIALTY SERVICES LLC, COASTLINE SPECIALTY SERVICES LLC, STRAND VIEW CORPORATION, INNOVATIVE SPECIALTY SERVICES LLC, PARAGON PARTNERS LLC (D/B/A PARAGON MEDICAL PARTNERS), CARDEA CONSULTING LLC, PRAXIS MARKETING SERVICES LLC, PROFESSIONAL RX PHARMACY LLC, INLAND MEDICAL CONSULTANTS LLC (D/B/A ADVANCED THERAPEUTICS), PORTLAND PROFESSIONAL PHARMACY LLC, SUNRISE PHARMACY LLC, PROFESSIONAL 205 PHARMACY LLC (D/B/A PROFESSIONAL CENTER 205 PHARMACY), SYNERGY MEDICAL SYSTEMS LLC (D/B/A SYNERGY RX), SYNERGY RX LLC (D/B/A SYNERGY RX), PRESTIGE PROFESSIONAL PHARMACY, JMSP LLC (D/B/A PROFESSIONAL CENTER 205 PHARMACY), MPKM, LLC (D/B/A PROFESSIONAL CENTER PHARMACY), ONE WAY | Case No. 2:24-cv-00287-CKD<br><br>**NOTICE OF MOTION AND RENEWED MOTION TO SET ASIDE ENTRY OF DEFAULT**<br><br>**Hearing Date: July 21, 2025**<br>**Time: 1:30 P.M.**<br>**Courtroom: 5, 14th Floor**<br>**Judge: Hon. W. B. Shubb** |

1    DRUG LLC (D/B/A PARTELL PHARMACY),
     PARTELL PHARMACY LLC, OPTIMUM CARE
2    PHARMACY INC. (D/B/A MARBELLA
     PHARMACY), GLENDALE PHARMACY LLC, and
3    LAKE FOREST PHARMACY (D/B/A LAKEFOREST
     PHARMACY),
4
                    Defendants.
5

6          TO ALL PARTIES AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD

7    HEREIN: PLEASE TAKE NOTICE that on July 21, 2025, or as soon thereafter as the matter

8    may be heard in the above-entitled court located at 501 I Street, Suite 4-200, Courtroom No. 5,

9    14th Floor, Sacramento, California, Defendant Synergy Medical Systems, LLC, will and hereby

10   does move this Court for an order setting aside the default entered against it on September 26,

11   2024.

12         This motion is made pursuant to Federal Rule of Civil Procedure 55(c) on the grounds

13   that good cause exists to vacate the entry of default due to lack of service, excusable neglect,

14   meritorious defenses, and the lack of prejudice to Plaintiff.

15         This Motion is based on this Notice of Motion, the accompanying Memorandum of Points

16   and Authorities, the Declarations of Clinton Mikel, Esq., Ian Craig, Esq., Gregory Veralud, Esq.,

17   and Brian Baumgartner, all pleadings and papers on file in this action, and upon such other

18   matters as may be presented to the Court at the time of the hearing.

19

20

21

22

23

24

25

26

27

28

                                    2

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Synergy Medical Systems, LLC ("**SMS**"), through its undersigned counsel, respectfully requests that the Court set aside the entry of default (Dkt. 63) pursuant to Federal Rule of Civil Procedure 55(c).

**A.    The Default Must be Set Aside as it is Based on the First Amended Complaint —a Superseded and Dismissed Pleading—and the Second Amended Complaint was Never Served on SMS**

Good cause exists under FRCP 55 because on September 20, 2024, the default was improperly taken as to the First Amended Complaint ("**FAC**") (Dkt. 58).



This Court dismissed the FAC in its entirety on July 10, 2024. (Dkt. 49). On July 30, 2024, Plaintiff filed its Second Amended Complaint ("**SAC**") (Dkt. 50). As the Ninth Circuit has long held, "an amended complaint supersedes the original complaint and renders it without legal effect." *Valadez–Lopez v. Chertoff*, 636 F.3d 851, 857 (9th Cir. 2011).

Here, the SAC was filed after the FAC was dismissed, but **the SAC was never served on SMS**. Accordingly, on September 20, 2024—when the default was sought –the FAC was not the operative pleading in the case as it was both legally inoperative and procedurally invalid. See

3

*Valadez-Lopez*, 636 F.3d at 857 (9th Cir. 2011). Because default may not rest on a defunct or unserved complaint, the entry of default against SMS is improper and must be vacated.[1]

The never-served SAC introduced new allegations that materially altered the claims as to the Defendant Pharmacies – which expressly includes SMS (see SAC ¶¶11, 19) – changes which underscore the procedural impropriety of seeking default based on the now-defunct FAC. For example, SAC ¶12 newly alleged that prescriptions filled by Synergy RX LLC were billed under the name of SMS – a connection not present in the FAC. SAC ¶22 added that each Defendant Pharmacy, including SMS, primarily dispensed compounded medications, such as pain creams and foot baths—again expanding the scope of conduct at issue. SAC ¶136 further expanded the alleged scheme's purpose by stating that the MSOs were used to buy physician loyalty by inducing prescriptions to the Defendant Pharmacies, which would then submit claims for reimbursement. SAC ¶294 introduced additional language tying the Defendant Pharmacies to alleged failures to report and return overpayments, a new statutory theory not previously pled. Finally, SAC ¶¶ 3, 207, 237, 264, 273, and 301 changed the relevant time period of alleged conduct, narrowing the dates from 2015–2020 to 2018–2020—substantially altering the scope and applicability of the claims. These additions materially expanded the scope, theory, and timeline of liability against the Defendant Pharmacies, such that service of the SAC was not only legally required, but essential to afford SMS fair notice and a meaningful opportunity to respond. (Dkt. 50).

**B.      Any Delay by SMS in Its Response Was Justified, as Plaintiff Named Multiple Synergy Defendants and SMS Reasonably Believed that the Settlement Agreement**

---

[1] This is SMS's second motion to set aside the default. The first motion (Dkt. 72) was denied without prejudice. In this renewed motion, SMS cures the prior deficiencies by (1) expressly raising the procedural impropriety of entering default based on the superseded First Amended Complaint, which was never served, and (2) supplying additional factual evidence—including a declaration from SMS's executive, Brian Baumgartner—clarifying the source of SMS's confusion and supporting its good-faith conduct.

In this renewed motion, SMS also includes correspondences that the government curiously omitted from its filing with this Court in Dkt. 78.

RENEWED MOTION TO SET ASIDE DEFAULT

**Reached with the Oregon AUSA Disposed of All Claims**

Good cause also exists because SMS's failure to respond was not willful, but rather the result of significant confusion—confusion caused by overlapping corporate identities, the Government's inconsistent pre-suit representations, and SMS's good-faith belief that the issues had been resolved through Mr. Baumgartner's prior cooperation and settlement. There are numerous defendants and d/b/a's in this case bearing the "Synergy" moniker, and SMS's entire purported nexus to the action arises from Mr. Baumgartner/SMS selling Synergy RX LLC (a separately named defendant) to Mr. Peters in July 2017 for $100,000. The purchase price was so low because Synergy RX LLC was no longer an operational pharmacy, had no meaningful assets, and retained only a dormant NPI. Mr. Baumgartner understood the entity to be functionally defunct at the time of sale, and the nominal price reflected that belief. (**EXHIBIT 1 –** Baumgartner Decl. ¶3).

As explained below, SMS's involvement in this matter was never clearly identified during the Government's investigation. Instead, the Department of Justice (DOJ) repeatedly referenced a separate entity, Synergy RX LLC, as the focus of its inquiry. SMS's executive, Mr. Brian Baumgartner, cooperated with DOJ for years and ultimately resolved all claims through a civil settlement agreement. That agreement, and all prior communications with the government, exclusively referenced Synergy RX LLC. At no time was SMS identified as a target. (**EXHIBIT 1 –** Baumgartner Decl. ¶5).

To further illustrate the basis for SMS's confusion and good-faith belief that it was not a party to this action, the following timeline summarizes key factual events, including communications with the Government, document exchanges, and settlement discussions. These events reflect that DOJ consistently treated Synergy RX LLC—*not SMS*—as the relevant entity, and that SMS's role was never clearly identified or actively pursued.

- July 6, 2021 -- Plaintiff sends a Civil Investigative Demand ("**CID**") to Mr. Baumgartner, regarding conduct pertaining to Synergy RX (**EXHIBIT 2**);

- August 20, 2021 – Mr. Baumgartner provides initial response to the CID (**EXHIBIT 1 –**

Baumgartner Decl. ¶6);

- October 18, 2021 – Mr. Baumgartner supplements his response to the CID (**EXHIBIT 1** – Baumgartner Decl. ¶6);

- October 18, 2021 – Plaintiff DOJ proposes a settlement agreement to Mr. Baumgartner. **In the proposed settlement agreement, Plaintiff makes it clear that Synergy RX LLC (_not_ SMS) billed CMS (EXHIBIT 1** – Baumgartner Decl. ¶5-9);

- December 13, 2021 – Mr. Baumgartner further supplements his response to the CID (**EXHIBIT 1** – Baumgartner Decl. ¶6);

- February 14, 2022 – Plaintiff sends a demand letter to Mr. Baumgartner's attorney, Gregory Veralrud (**EXHIBIT 3**). In this demand letter, Plaintiff asserts that Synergy RX LLC was used to bill CMS;

  o The Demand Letter states in part "Mr. Baumgartner sold Synergy (NPI 1306037825, RP-0002412-CS) to Mr. Peters in July, 2017, but agreed to act as the straw owner of the pharmacy in order to conceal the Synergy's true ownership." (**EXHIBIT 3**);

- March 29, 2022 – Counsel for Mr. Baumgartner meets with AUSA Bunker and discusses potential settlement agreement (**EXHIBIT 4** – Veralrud Decl. ¶2);

- ~July 2022 – Plaintiff proposes a Tolling Agreement to Mr. Baumgartner (**EXHIBIT 1** – Baumgartner Decl. ¶6);

- July 10, 2023 – Mr. Baumgartner executes Waiver of Statute of Limitations. This Waiver, drafted by Plaintiff, asserts that Synergy RX, LLC was used to bill CMS (**EXHIBIT 1** – Baumgartner Decl. ¶6);

- January 30, 2024 – Mr. Baumgartner executes a second Waiver of Statute of Limitations. This Waiver, drafted by Plaintiff, asserts that Synergy RX, LLC was used to bill CMS (**EXHIBIT 1** – Baumgartner Decl. ¶6);

- March 18, 2024 – First Amended Complaint is filed with the Court (Dkt. 5);

- April 5, 2024 – Plaintiff is still discussing the matter with Mr. Baumgartner. Plaintiff serves Defendant SMS, d/b/a "Synergy RX," with the FAC (**EXHIBIT 1**);

- May 6, 2024 – Plaintiff requests entry of default regarding the FAC against Defendant Peters

6

1    *only*, due to Peters' failure to respond to the FAC (Dkt. 20);[2]

2    • May 7, 2024 – The Court Clerk denies Plaintiff's Request for Entry of Default against

3    Defendant Peters (Dkt. 22);

4    • May 15, 2024 – Defendants (including some "Pharmacy Defendants") file a Motion to

5    Dismiss on numerous procedural deficiencies, including statute of limitations and failure to

6    plead underlying fraud with particularity under FRCP 9(b). (Dkts. 21, 32, and 33);

7    • July 9, 2024 – AUSA Thiess interviews Mr. Baumgartner on behalf of Plaintiff (**EXHIBIT 1 –**

8    **Baumgartner Decl. ¶6**);

9    • July 9, 2024 – Mr. Baumgartner executes Settlement Agreement (**EXHIBIT 5**), and Plaintiff

10    counter-executes on August 6, 2024 (**EXHIBIT 5**);

11    • July 10, 2024 – This Court grants multiple motions to dismiss the First Amended Complaint

12    (Dkt. 49), holding that it failed to allege the timing of false claims with particularity and must

13    be amended. In doing so, the Court found that all pharmacy defendants—including SMS—

14    were alleged to have played the same role in the alleged scheme, and it permitted collective

15    pleading on that basis;[3]

16    • July 30, 2024 – Plaintiff files its Second Amended Complaint (Dkt. 50), which superseded the

17    dismissed First Amended Complaint.

18        o  Plaintiff never served the SAC on SMS, never issued a new summons, and never

19           notified SMS, Mr. Baumgartner, or Mr. Veralrud of the amended pleading.[4] All

20           subsequent communications proceeded under the assumption that the FAC remained

21           operative. (**EXHIBIT 1 – Baumgartner Decl. ¶9**). Plaintiff's Request for Entry of

---

[2] At all times, the Government the Government has treated Peters as the principal target of this action. Plaintiff alleges that Peters personally owned, operated, or controlled the Defendant Pharmacies—including SMS—and was the driving force behind the alleged scheme. Yet, despite multiple defendants failing to respond to the FAC, the Government initially sought default only against Peters. It was not until after that request was denied—and only after filing but not serving the SAC—that Plaintiff moved for default against SMS. This sequence underscores the irregularity of Plaintiff's procedural posture and further supports SMS's position that it was not viewed as a central actor, nor was it afforded fair notice or opportunity to respond to the operative complaint.

[3] Although SMS did not join in the Motions to Dismiss, it was described identically to Partell Pharmacy, LLC, another "Pharmacy Defendant" whose Motion to Dismiss was granted. See Dkt. 32.

[4] See **EXHIBITS 2 and 4**.

RENEWED MOTION TO SET ASIDE DEFAULT

1   Default (Dkt. 58) confirms this, referencing only the FAC having been served and

2   strategically omitting any reference to the SAC, yet still asserting that service had been

3   effectuated under FRCP 4 (it had not);

4 • August 1, 2024 – Attorney Gregory Veralrud, representing Mr. Baumgartner only, emails

5  AUSA Thiess and states his belief that SMS had "legitimately divested its interest in the

6  pharmacy to Baumgardner [sic] before Baumgardner [sic] entered into the pharmacy sale to

7  Peters and had no interest in, never DBA'd as, Synergy RX LLC after Baumgardner [sic]

8  acquired the pharmacy." (**EXHIBIT 4** – Veralrud Decl. ¶6). Although the Second Amended

9  Complaint had been filed days earlier, it was never served or provided to Mr. Veralrud, and no

10  action on it was requested. His communications proceeded under the reasonable

11  understanding that the First Amended Complaint remained operative. (**EXHIBIT** 4 –

12  Veralrud Decl. ¶14);

13 • September 9, 2024 – Attorney Gregory Veralrud[5] emails AUSA Thiess, advising that due to a

14  conflict and the presence of other members in one of the Synergy entities, separate counsel

15  would be needed for SMS. (**EXHIBIT 6**); (**EXHIBIT 4** – Veralrud Decl. ¶7);[6]

16 • September 13, 2024 - Mr. Veralrud follows up to confirm he cannot represent SMS and that

17  attorney Ian Craig is reviewing materials to potentially appear on behalf of SMS. **Mr.**

18  **Veralrud requests a four-week extension to avoid default while representation is**

19  **formalized.** *He received no response* (**EXHIBIT 4**); (**EXHIBIT 6**);

20 • August-September 2024 – Plaintiff never served the SAC on SMS and never provided a copy

21  to Mr. Baumgartner or Mr. Veralrud. No waiver of service was requested, and no follow-up or

22  notice of any kind was provided before Plaintiff sought default. Under these circumstances, it

23  was reasonably understood that the previously served First Amended Complaint remained the

24  operative pleading. (**EXHIBITS 1 and 4**);

25

---

26 [5] Gregory Veralud served as counsel for Mr. Baumgartner in his individual capacity throughout the Government's investigation and settlement discussions. He has never represented SMS, a fact of which Plaintiff has been aware at all relevant times. (Veralud Decl. ¶3).

27

28 [6] Interestingly, Plaintiff neglected to include this complete email chain in its Opposition Brief to SMS's previously filed Motion to Set Aside. (Dkt. 83).

1    • September 20, 2024 – Despite the numerous emails between Veralrud and Plaintiff explaining

2    the confusion and lack of counsel for SMS, and a request to hold off for 4 weeks so SMS can

3    secure counsel, Plaintiff files Request for Entry of Default. Plaintiff did so without serving the

4    SAC, without responding to Mr. Veralrud's request for extension, and without notifying Mr.

5    Veralrud, or Mr. Craig, or Mr. Baumgartner. Plaintiff DOJ provided no notice to attorney

6    Veralrud or anyone at SMS (including Mr. Baumgartner) that it has applied for a default with

7    respect to SMS (**EXHIBIT 4** – Veralrud Declaration ¶10); (**EXHIBIT 6**);

8    • September 26, 2024 – Court enters Default against SMS (Dkt. 63);

9    • October 16, 2024 – Counsel is engaged for SMS and begins evaluating the case file, Mr.

10    Baumgartner's lengthy dealings with Plaintiff, and the allegations and status of defendant

11    SMS. (**EXHIBIT 7** – Mikel Decl. ¶5). Approximately 20 days after the Default being

12    technically entered against SMS, despite SMS's complete non-involvement in this case, this

13    firm emailed Plaintiff to discuss resolving the Default. (**EXHIBIT 8**);

14    • October 25, 2024 – Nine days later, having received no response, this firm followed up with

15    Plaintiff. (**EXHIBIT 8**);

16    • October 30, 2024 – This firm and Plaintiff had a call regarding the matter. During this call,

17    this firm expressed its desire to file a motion to set aside the default as to SMS, or otherwise

18    reach a resolution on SMS's behalf in this matter. Plaintiff would not commit to concurring

19    with or opposing a motion to vacate, but instead asked to have another discussion following

20    Thanksgiving. This firm expressed trepidation at waiting so long to file this Motion, but

21    deferred to Plaintiff in an attempt to resolve this matter in good-faith, without burdening the

22    Court. (**EXHIBITS 7 and 8**);

23    • December 4, 2024 – This firm re-reengaged Plaintiff on the matter at the requested time.

24    (**EXHIBIT 8**);

25    • December 12, 2024 – This firm and Plaintiff held another call regarding this matter. During

26    this call, this firm again reiterated its concerns with the Default entered against SMS, given

27    that all prior discussions, correspondence, and agreements between Plaintiff and Mr.

28    Baumgartner had portrayed Synergy RX, LLC as the sole and exclusive entity involved in this

9

matter, and at no time prior to the filing of this action was Mr. Baumgartner or SMS made aware of the fact that SMS would in fact be a named party (**EXHIBIT 7** – Mikel Decl. ¶¶2-5);

- December 2024 – March 2025 – This firm continued efforts to resolve the ongoing confusions and uncertainties with Plaintiff. Despite continuing good-faith efforts on behalf of SMS and Plaintiff, such efforts were ultimately unsuccessful. (**EXHIBIT 7 –** Mikel Decl. ¶5);

- January 14 - 23, 2025 – This firm and AUSA Thiess continue to engage in email correspondence regarding this matter, and counsel for SMS specifically requests information in SMS's draft Motion to Set Aside Default which AUSA Thiess described as "inaccurate statements"; however, AUSA never responded providing any specific claims/language which he identified as "inaccurate" (**EXHIBIT 8**);

  - January 15, 2025 – Counsel for SMS emails AUSA Thiess with a draft of SMS's Motion to Set Aside Default, inquiring whether Plaintiff will oppose the requested relief (**EXHIBIT 8**);

  - January 17, 2025 – AUSA Thiess responds, stating in relevant part: "[T]he draft Motion makes numerous inaccurate and misleading statements, including but not limited to several inaccurate and misleading statements in regards to the United States." (**EXHIBIT 8**);

  - January 23, 2025 – Counsel for SMS responds to AUSA Thiess, requesting further details regarding the "numerous inaccurate and misleading statements," as referenced in AUSA Thiess's January 17 correspondence. These requests were done in good faith in efforts to resolve any need for the instant motion to be filed. Plaintiff had no substantive response regarding the "numerous inaccurate and misleading statements". (**EXHIBIT 8**);

- March 24, 2025 – After further attempts at discussion with Plaintiff, counsel for SMS files a Motion to Set Aside Entry of Default (Dkt. 74);

- June 3, 2025 – Co-counsel for SMS, Ian Craig, sends a formal meet-and-confer letter to AUSA Thiess, raising for the first time in writing the procedural defect stemming from Plaintiff's failure to serve the operative SAC on SMS. (**EXHIBIT 9** – Craig Decl. ¶3). The

10

letter explains that the SAC—filed on July 30, 2024, following the Court's dismissal of the FAC—was the operative pleading at the time Plaintiff sought default on September 20, 2024. (**EXHIBIT 10**). It further emphasizes that the default was improperly based on the FAC, which had already been dismissed and was "of no legal effect," and that the SAC added new allegations regarding the "Pharmacy Defendants." (**EXHIBIT 10**). Counsel also noted that the FAC had been dismissed as to other similarly situated defendants and requested that Plaintiff stipulate to withdrawal of the default in light of these procedural defects (**EXHIBIT 10**);

- June 4, 2025 – AUSA Thiess responds, declining the request to stipulate to the withdrawal of the default. (**EXHIBIT 11**);

- June 4, 2025 – In a follow-up to his prior letter, Mr. Craig reiterates that Plaintiff's default request was based on a dismissed complaint and highlights that the operative SAC had not been served on SMS. (**EXHIBIT 11**). He again notes that the Government had been informed that Mr. Veralrud did not represent SMS and had been provided Mr. Craig's contact information prior to the default. Mr. Craig renewed his request that the Government agree to set aside the default voluntarily. (**EXHIBIT 11**). As of the date of this filing, AUSA Thiess has not responded. (**EXHIBIT 11**).

These facts demonstrate that SMS's failure to respond was not intentional or in bad faith, but the result of ongoing confusion and good-faith efforts to cooperate with the Government and resolve the matter informally. Under the applicable legal standard, this provides ample basis for setting aside the default.

## ARGUMENT

Federal Rule of Civil Procedure 55(c) permits courts to set aside an entry of default for good cause. See *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010). The standard for setting aside an entry of default is less rigorous than the

11

standard for setting aside a default judgment. *See Hawaii Carpenters' Tr. Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986). This standard is to be "liberally interpreted when used on a motion for relief from an entry of default." *Id.* Where timely relief is sought from the entry of default and the movant has a meritorious defense, doubt, if any, should be resolved in favor of the motion to set aside. *Schwab v. Bullock's Inc.*, 508 F.2d 353, 355 (9th Cir. 1974).

In evaluating such motions to set aside default, Courts consider three factors: (1) whether defendant's culpable conduct led to the default; (2) whether the defendant has a meritorious defense; and (3) whether the plaintiff would be prejudiced if the default is set aside. *See O'Connor v. Nevada*, 27 F.3d 357, 364 (9th Cir. 1994), *as amended* (Jul. 1, 1994), *as amended* (Jul. 12, 1994); *Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988); *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987). Under this standard, SMS easily satisfies the requirements for setting aside the default.

## I. Procedural Defects – No Service of the Operative Second Amended Complaint

### A. Service of the SAC Was Required under Fed. R. Civ. P. 5(a)(1)

Federal Rule of Civil Procedure 5(a)(1)(B) provides that any "pleading filed after the original complaint must be served on every party." **There is no dispute that Plaintiff never served the SAC (or any pleading filed after the FAC) on SMS. No certificate of service was filed with the SAC, and Plaintiff has never submitted any evidence of service to this Court.**

Because the SAC became the operative complaint when it was filed on July 30, 2024, following the Court's dismissal of the FAC, service of that operative pleading on SMS was required. See Fed. R. Civ. P. 5(a)(1). An amended complaint supersedes the original and renders it a legal nullity. See *Valadez–Lopez v. Chertoff*, 636 F.3d 851, 857 (9th Cir. 2011) ("[A]n

RENEWED MOTION TO SET ASIDE DEFAULT

amended complaint supersedes the original complaint and renders it without legal effect."); *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 919 (E.D. Cal. 2017) ("Once an amended complaint is filed, the original complaint is treated as non-existent.").

Following the Court's Order on the motions to dismiss the FAC, Plaintiff filed the SAC on July 30, 2024. (Dkt. 50). However, Plaintiff never issued a new summons, and never served the SAC on SMS. Instead, Plaintiff continued communicating with Mr. Veralrud throughout August and September 2024, without ever serving SMS with the SAC, or otherwise indicating that a new, operative pleading had been filed. At that time, Mr. Veralrud—who had never been served with the SAC—reasonably understood the FAC to remain the operative complaint.

Nevertheless, on September 20, 2024, Plaintiff requested entry of default based on SMS's failure to answer the FAC—despite knowing it had filed a superseding pleading weeks earlier and never served it. That request was granted on September 26, 2024. (Dkt. 63). Plaintiff's failure to serve the operative SAC, coupled with its affirmative use of the FAC as the basis for default, is not only procedurally defective—it reflects an intentional effort to exploit procedural technicalities against an unrepresented party. The entry of default under these circumstances—based on a dismissed and legally inoperative pleading—is procedurally defective and must be set aside.

### B. Even if Rule 5(a)(2) Applies, the SAC Required Service Under Rule 4

Even if the Court were to analyze this under Rule 5(a)(2), service of the SAC was still required. Rule 5(a)(2) states: "[n]o service is required on a party who is in default for failing to appear. ***But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.***" (Emphasis added).

At the time the SAC was filed, the clerk had not entered default against SMS. Therefore,

the service exception under Rule 5(a)(2) is not triggered, and service under Rule 5 was plainly

required.

Moreover, even if SMS had been in default at the time the SAC was filed, the SAC

materially expanded the factual allegations against SMS in a way that clearly qualifies as asserting

a "new claim for relief" under Rule 5(a)(2), triggering the heightened service requirements of

Rule 4.

Specifically, the SAC introduced, for the first time, allegations that:

- New allegations that claims for medications dispensed by Synergy RX LLC were submitted using SMS's NPI (SAC ¶12);

- A description of each "Pharmacy Defendant," including SMS, as primarily a "compounding pharmacy" (SAC ¶20);

- A new allegation that MSOs were created to "buy physician loyalty… in prescribing medications to the Defendant Pharmacies" (SAC ¶136);

- Revisions to Count IV alleging that Defendant Peters *and the Defendant Pharmacies* failed to report or return overpayments (SAC ¶294); and

- A narrowed time frame of alleged wrongdoing against SMS—revised from 2015–2020 to 2018–2020 (SAC ¶301).

These additions materially altered the scope, theory, and time frame of liability asserted

against SMS. Even under Rule 5(a)(2), these constitute "new claims for relief" requiring service

under Rule 4.

Because the SAC was never served and the FAC had been dismissed, there was no

operative, valid pleading on which default could be entered. Accordingly, the entry of default

against SMS is legally improper and must be vacated.

## II. <u>Defendant Did Not Engage in Culpable Conduct</u>

A party's conduct is culpable only "if he has received actual or constructive notice of the

filing of the action and ***intentionally*** failed to answer." *Francois & Co., LLC v. Nadeau*, 334

F.R.D. 588, 596 (C.D. Cal. 2020) (citations and internal quotations omitted) (emphasis in

original). "Intentionally" means that a movant "cannot be treated as culpable simply for having

made a conscious choice not to answer; rather, to treat a failure to answer as *culpable*, the movant

must have acted with bad faith, such as an intention to take advantage of the opposing party,

interfere with judicial decision-making, or otherwise manipulate the legal process." *Id.* Simple

carelessness is not sufficient to treat a negligent failure to reply as inexcusable, at least without a

demonstration that other equitable factors, such as prejudice, weigh heavily in favor of denial of

the motion to set aside default. *Ibid.* (citing to *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691,

696-97 (9th Cir. 2001); see also *Mesle,* 615 F.3d at 1091 (quoting *Falk*). Ultimately, a neglectful

failure to respond is not culpable unless "there is no explanation of the default inconsistent with a

devious, willful, or bad faith failure to respond." *TCI*, 244 F.3d at 698.

Here, SMS's failure to respond was not the result of any bad-faith or willful or strategic

conduct. Rather, it arose from the Government's contradictory representations and omissions,

which led SMS's executive, Brian Baumgartner, to believe in good faith that SMS was not a target

of this litigation. Further, as the timeline above demonstrates, SMS expressed interest in filing to

set aside the default from the inception of its discussions with the Plaintiff, and it was Plaintiff

who delayed the same. Plaintiff can in no way allege or prove bad faith by SMS.

SMS's failure to respond was the product of reasonable confusion—not bad faith—and is

wholly inconsistent with the kind of intentional, strategic disregard required to establish culpable

conduct.

### A. SMS Acted in Good Faith Based On the Government's Representations Regarding Synergy RX

Beginning in 2021, Mr. Baumgartner, acting as an executive of SMS, engaged extensively with the Department of Justice in connection with its False Claims Act investigation. In every communication—from the Civil Investigative Demand (CID) to the ultimate settlement agreement—the Government consistently identified "Synergy RX LLC" as the relevant entity associated with the NPI and the alleged billing conduct. At no point did DOJ assert that SMS was implicated in the scheme or responsible for submitting claims under its own NPI.

In July 2024, the Government executed a written settlement agreement with Mr. Baumgartner. (**EXHIBIT 5**). The agreement, drafted by DOJ, explicitly referenced only Synergy RX and described the billing activity at issue as having been conducted by that entity. It made no mention of SMS. Based on this, Mr. Baumgartner reasonably believed that any governmental exposure had been resolved and that SMS was not part of the litigation. (**EXHIBIT 1** – Baumgartner Decl. ¶4).

In or around July 2017, Mr. Baumgartner/SMS sold Synergy RX LLC to Matthew Peters for $100,000—a figure that reflected the parties' shared belief that Synergy RX LLC, SMS's pharmacy line of business, was effectively defunct, had no meaningful operational assets, and retained only minimal residual value through its existing NPI. (**EXHIBIT 1** – Baumgartner Decl. ¶3). The nominal sale price underscores SMS's good-faith understanding that SMS itself would no longer be operational or relevant in future billing activity. *Id*. This context further explains why SMS was not perceived as an entity likely to be implicated in any subsequent government investigation or complaint.

Given the duration and substance of these communications—and the DOJ's consistent focus on Synergy RX LLC rather than SMS—Mr. Baumgartner's understanding that SMS was not a party to the action was both reasonable and in good faith.

### B. SMS's Delay Was the Product of Ongoing Confusion and Good-Faith Efforts – Not Culpable Conduct

Although Plaintiff identifies Defendant as "Synergy Medical Systems LLC, d/b/a Synergy RX" (Dkt. 50 ¶ 12), the Application for Entry of Default omits the d/b/a and is based on a complaint that had already been superseded and never re-served. (Dkt. 63).

More importantly, SMS was unrepresented at the time of default and had no reason to believe it needed to respond. After being retained in October 2024, SMS promptly began efforts to clarify its status with the Government. These efforts were not evasive or dilatory—they reflected SMS's consistent belief that it had no meaningful role in the alleged fraud and sought to resolve the confusion without burdening the Court. (**EXHIBIT 7 –** Mikel Decl. ¶3-5 ).

Prior to default, SMS's then-contact, Gregory Veralrud, informed DOJ in writing that he did not represent SMS, was not licensed in California, and had a conflict. (**EXHIBIT 4 –** Veralrud Decl. ¶7). He further advised that separate counsel would be needed for SMS and requested a short extension to allow time for counsel to appear. DOJ ignored this request (not responding on the extension request at all), and instead moved for default (notifying no one) less than a week later—despite knowing SMS was unrepresented and that potential SMS counsel had been identified. Although the Second Amended Complaint had been filed during this time, it was never served on SMS, nor was it provided to Mr. Veralrud or Mr. Baumgartner. The Government did not request that it be reviewed, acknowledged, or acted upon in any way.

After default was entered, SMS quickly retained counsel, who contacted DOJ within approximately 20 days to discuss resolution. (**EXHIBIT 7 –** Mikel Decl. ¶5). Although settlement negotiations do not excuse nonappearance, they reinforce that SMS was actively seeking to resolve the matter in good faith. Plaintiff even requested that SMS delay filing its motion until after the holidays—a request SMS honored. Only after it became clear that DOJ would not

17

voluntarily revisit the default and had no evidence linking SMS to the Peters' billing conduct did SMS file this motion.

SMS's delay in appearing was the product of confusion, miscommunication, and reasonable reliance—not bad faith. This is precisely the type of situation the Ninth Circuit has found not to be culpable. See *Mesle*, 615 F.3d at 1092; *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1225 (9th Cir. 2000). Accordingly, this factor weighs in favor of setting aside the default.

Finally, it bears emphasis that SMS was never served with the operative Second Amended Complaint, and thus cannot be faulted for failing to respond to it. The Government's application for default rests entirely on a superseded pleading—one this Court has already found procedurally deficient and dismissed in its entirety. See Dkt. 49. Against that backdrop, there is no basis to characterize SMS's conduct as culpable.

### III.    Defendant has a Meritorious Defense

To satisfy the "meritorious defense" factor, a defendant need only allege facts that, if proven true, would constitute a defense to the claims asserted. The Ninth Circuit has emphasized that this is a low threshold: "The question whether the factual allegation is true is not to be determined by the court when it decides the motion to set aside the default." *United States v. Aguilar*, 782 F.3d 1101, 1107 (9th Cir. 2015). "All that is necessary to satisfy the 'meritorious defense' requirement is to allege sufficient facts that, if true, would constitute a defense." *Id*. The burden is not "extraordinarily heavy." *Id*.

Defendant SMS readily satisfies this low bar. It has multiple meritorious defenses – both factual and legal – that warrant setting aside the default.

#### A.  Statute of Limitations – False Claims Act

The claims asserted against SMS are likely barred, in whole or in part, by the applicable

18

statute of limitations under the False Claims Act. See 31 U.S.C. § 3731(b). SMS's only

interactions with Matthew Peters—specifically, the sale of Synergy RX LLC—occurred before

January 1, 2018. To the best of SMS's knowledge, no conduct involving SMS took place after that

date. Accordingly, Plaintiff's claims, even if accepted as true, fall outside the FCA's relevant

limitations period.

### B. Settlement Agreement Undermines Claims Against SMS

The Government's claims are also undermined by a written settlement agreement

executed in July 2024 between Plaintiff and Mr. Baumgartner, SMS's executive. Although SMS

was not formally a party to that agreement, the discussions that led to it centered around Synergy

RX and Mr. Baumgartner's alleged role. (**EXHIBIT 1** – Baumgartner Decl. ¶¶5-8). At no point

during the investigation—or the ultimate resolution—did the Government identify SMS as a

culpable party or suggest that it had any involvement in the alleged fraud. Indeed, all written

correspondence from the government identified Synergy RX LLC as being the billing entity sold

to Mr. Peters. Mr. Baumgartner's settlement agreements language, scope, and surrounding

communications reflect a mutual understanding that the matter had been resolved as to the parties

involved. (**EXHIBIT 1** – Baumgartner Decl. ¶¶5-8; **EXHIBIT 5**). As such, the existence and

terms of the settlement agreement further support SMS's position that it had no actionable

involvement in the alleged misconduct.

### C. No Particularized Allegations Against SMS

SMS was never identified as a relevant actor in the underlying conduct. Plaintiff's own

investigative communications and the Government's case theory consistently pointed to Matthew

Peters and Synergy RX LLC—not SMS—as the central figure. The never-served Second

Amended Complaint asserts that Peters, not SMS, submitted the claims and operated the

RENEWED MOTION TO SET ASIDE DEFAULT

business. SMS, which sold Synergy RX in 2017 for nominal consideration, did not profit from or knowingly facilitate the alleged scheme. Plaintiff has not produced any evidence in settlement discussions to suggest otherwise—and more importantly, has failed to plead any specific conduct by SMS that satisfies Rule 9(b)'s particularity requirement. SMS adamantly maintains that it neither knowingly submitted false claims nor had knowledge that its billing credentials were being used improperly.

Even if the Government's theory were that SMS's NPI was used, it has failed to allege with particularity any knowing conduct or willful participation by SMS. This complete lack of scienter defeats liability under the FCA and provides a complete defense to the claims. See *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

### IV.    Plaintiff will not be Prejudiced if the Default is Set Aside

The final factor is whether setting aside the default will prejudice the plaintiff. The Ninth Circuit has made clear that to be prejudicial, setting aside a default must result in greater harm than simply delaying resolution of the case. See *TCI Group*, 244 F.3d at 701. "It must result in tangible harm such as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or collusion." *Id.* Mere delay, standing alone, is not sufficient. *Mesle*, 615 F.3d at 1095.

No such harm is present here. This case remains in its early stages. Discovery is ongoing, trial is not set until April 2026, and there is no indication that any evidence has been lost, that discovery has been impeded, or that any witness availability has been compromised. Plaintiff remains fully able to pursue its claims on the merits. **Plaintiff obtained discovery concerning SMS through Civil Investigative Demand subpoenas for more than three years before filing this action—and still lacks any specific evidence to support its theories.**

Additionally, Plaintiff has been on notice since October 2024, less than three weeks after

20

entry of default, that SMS intended to contest it. Counsel for SMS promptly contacted the Government, expressed intent to appear, and sought to resolve the matter without court intervention. (**EXHIBIT 7 –** Mikel Decl. ¶5). However, in the months that followed, the Government repeatedly postponed meaningful engagement, asking to delay calls or discussions, often citing scheduling constraints or requesting to revisit the issue after the holidays. (**EXHIBIT 7 –** Mikel Decl. ¶5).  Even after receiving a full draft of SMS's proposed motion on January 15, 2025, Plaintiff declined to state whether it would oppose the relief requested and offered no substantive feedback. (**EXHIBIT 8**). These actions reflect a broader pattern: failing to serve the operative SAC, then seeking default on an inoperative pleading while SMS remained unrepresented. This pattern of delay stands in stark contrast to SMS's demonstrated efforts to address the default efficiently and transparently. Plaintiff thus had ample opportunity to assess its position and prepare for this filing. Any claim of surprise or prejudice is meritless.

Setting aside the default would not undo any substantive progress in the case. It would merely allow SMS to assert its defenses and litigate this matter on the merits—precisely what the Federal Rules favor. *See Mesle*, 615 F.3d at 1091. Because Plaintiff cannot demonstrate any meaningful prejudice, this factor also weighs in favor of granting relief.

More importantly, allowing the default to stand would sanction a procedural result obtained through a defective and dismissed pleading. The Court already concluded that the First Amended Complaint—which formed the basis for Plaintiff's request for default—was deficient under Rule 9(b) and dismissed it in full. (Dkt. 49). **Plaintiff's decision to pursue and obtain default against SMS based on a legally invalid complaint—while failing to serve the operative Second Amended Complaint—strikes at the heart of due process and fundamental fairness.** SMS is identically situated to the "Pharmacy Defendants" for whom dismissal of the

FAC was granted. To preserve default under these circumstances would create an inequitable and anomalous result, rewarding procedural gamesmanship over substance. Vacating the default would merely allow SMS to respond to the current, operative pleading on equal footing with all other similarly situated defendants. There is no prejudice in restoring parity.

## CONCLUSION

Good cause exists to grant Defendant SMS's Motion to Set Aside the Default. SMS was never served with the operative complaint, rendering the default procedurally defective and void. In any event, SMS's conduct was not culpable, as it was not the result of bad faith but, at most, inadvertence—largely stemming from Plaintiff's own procedural missteps. SMS also has multiple meritorious defenses to Plaintiff's claims, including lack of involvement or knowledge of Mr. Peters' conduct, the bar of applicable statutes of limitations, and a prior settlement agreement releasing SMS from liability. Finally, Plaintiff will suffer no prejudice from having to litigate this matter on the merits. In light of these facts, and consistent with the liberal standard under Fed. R. Civ. P. 55(c), relief from default is plainly warranted.

For all the foregoing reasons, Defendant respectfully requests this Honorable Court:

A. Grant Defendant Synergy Medical Systems, LLC's Renewed Motion to Set Aside Default entered against SMS;

B. Permit SMS to file its Answer and Affirmative Defenses, attached hereto as **EXHIBIT 12**, within five (5) days of the Court's order setting aside the default.

**Respectfully submitted**,

**Dated**: June 16, 2025                    **THE HEALTH LAW PARTNERS, P.C.**
By:/s/Clinton Mikel
_____
Clinton Mikel, Attorney for Defendant
Synergy Medical Systems, LLC

22